UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x

CLEMENT BOWEN, et. al.

                Plaintiffs,

  - against -

JACOB RUBIN d/b/a LEBEN HOME FOR
ADULTS, LEBEN HOME FOR ADULTS,
AMERICARE, INC., MARTIN KLEINMAN,
DIANE AHERN, PARKWAY HOSPITAL, INC.,
JAMILLE PERESS and HARRY JOSIFIDIS,

                Defendants.

---------------------------------------------------------------- x

Index No.:  01 Civ. 0070 (J. Gershon)

## MEMORANDUM OF LAW IN SUPPORT OF THE
## AMERICARE DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

**WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER LLP
3 Gannett Drive
White Plains, New York 10604**

**Of Counsel:**  **Glen Feinberg
Joseph D'Avanzo
Alyssa DeSimone
John Webber**

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ................................................................................................ iv

INTRODUCTION ............................................................................................................... 1

PROCEDURAL HISTORY................................................................................................. 3

STATEMENT OF FACTS .................................................................................................. 4

     THE PARTIES................................................................................................................ 4

          The Plaintiffs:........................................................................................................ 4

          Jacob Rubin d/b/a The Leben Home for Adults: ................................................. 4

          The Doctors:.......................................................................................................... 5

          The Americare Defendants: ................................................................................... 5

          Martin Kleinman:.................................................................................................. 6

          Diane Ahern:......................................................................................................... 6

          The Surgeries: ....................................................................................................... 8

ARGUMENT ...................................................................................................................... 9

     POINT I

     SUMMARY JUDGMENT STANDARD......................................................................... 9

     POINT II

     THE CONSPIRACY CLAIMS AGAINST THE
     AMERICARE DEFENDANTS ARE NOT SUPPORTED
     BY THE LAW OR THE EVIDENCE .......................................................................... 10

          A.     The Americare Defendants Cannot Be Held Vicariously
                     Liable for Ahern's Actions ................................................................ 10

          B.     There is No Evidence that The Americare Defendants Were
                     Knowing Participants in the Alleged Conspiracy................................. 12

POINT III

THERE IS NO EVIDENCE TO SUPPORT THE CLAIM
THAT THE AMERICARE DEFENDANTS VIOLATED
THE PLAINTIFFS' CIVIL RIGHTS UNDER § 1986 ................................................... 19

POINT IV

PLAINTIFFS' § 1986 CLAIM IS TIME-BARRED ........................................................ 20

POINT V

THE NEGLIGENT SUPERVISION CLAIM MUST BE
DISMISSED BECAUSE  IT WAS NOT FORESEEABLE
THAT AHERN WOULD ENGAGE IN A CONSPIRACY
TO ASSAULT PATIENTS BY PERFORMING
UNNECESSARY SURGERY ........................................................................................... 21

POINT VI

THE AMERICARE DEFENDANTS CANNOT BE HELD
LIABLE UNDER SECTION 504 OF THE
REHABILITATION ACT ............................................................................................... 23

POINT VII

THE AMERICARE DEFENDANTS DID NOT OWE
PLAINTIFFS A FIDUCIARY DUTY ............................................................................. 26

POINT VIII

PLAINTIFFS' CLAIM FOR INJUNCTIVE RELIEF
MUST BE DISMISSED BECAUSE PLAINTIFFS ARE
NOT AT RISK OF SUSTAINING IRREPARABLE
HARM ............................................................................................................................. 29

POINT IX

PLAINTIFFS' ADA CLAIMS MUST ALSO BE
DISMISSED BECAUSE THEY HAVE NOT
DEMONSTRATED THAT AMERICARE OR ITS
EMPLOYEES ENGAGED IN ANY ACTS OF
DISCRIMINATION ........................................................................................................ 31

POINT X

THE AMERICARE DEFENDANTS DID NOT VIOLATE
THE NEW YORK  HUMAN RIGHTS LAW .................................................................. 32

POINT XI

THERE IS NO EVIDENCE OF FRAUD ........................................................................ 34

POINT XII

IF THIS COURT DISMISSES THE PLAINTIFFS' FEDERAL CLAIMS, IT SHOULD DECLINE JURISDICTION OVER THE PLAINTIFFS' REMAINING STATE LAW CLAIMS ........................................................................ 36

CONCLUSION ..................................................................................................................... 38

# TABLE OF AUTHORITIES

## FEDERAL CASES

**PAGE**

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) .......................................................... 9, 10

Bryant v. Maffucci, 923 F.2d 979 (2d Cir. 1991) ...................................................................... 10

Buck v. Board of Elections of the City of New York, 536 F.2d 522 (2d Cir. 1976)................19

Burlington v. Ellerth, 524 U.S. 742 (1998) ................................................................................ 25

Byrd v. International Brotherhood of Electrical Workers,
    375 F. Supp. 545 (D. Md. 1974) ...................................................................................... 18

Carey v. Crescenzi, 923 F.2d 18 (2d Cir. 1991) ......................................................................... 10

Carnegie-Mellon University v. Cohill, 484 U.S. 343 (1988)....................................................... 36

Carnegie v. Miller, 811 F. Supp. 907 (S.D.N.Y. 1993) ............................................................... 12

Civic Association of the Deaf v. Giuliani, 915 F. Supp. 622 (S.D.N.Y. 1996)............................ 31

Computerized Radiological Services v. Syntex Corp., 786 F.2d 72 (2d Cir. 1986)..................... 34

Cramer v. Devon Group, Inc.,
    774 F. Supp. 176 (S.D.N.Y. 1991)………………………………………………………..26

Crump v. Patterson, No. 92 Civ. 4772, 1995 U.S. Dist. LEXIS 10282
    (S.D.N.Y. July 24, 1995) ................................................................................................ 29

Cushing v. Moore, 970 F.2d 1103 (2d Cir. 1992)........................................................................ 36

Deshawn E. by Charlotte E. v. Safir, 156 F.3d 340 (2d Cir. 1998) ........................................... 30

Doe v. Pfrommer, 148 F.3d 73 (2d Cir. 1998).............................................................................. 31

Ehrens v. The Lutheran Church-Missouri Synod,
    269 F.Supp.2d 328 (S.D.N.Y. 2003)............................................................................... 22

Forum Ins. Co. v. Zeitman, 91 Civ. 7980, U.S. Dist. LEXIS 13229
    (S.D.N.Y. September 12, 1995) ...................................................................................... 26

Golden v. Zwickler, 394 U.S. 103 (1969)..................................................................... 30

Great American Federal Savings & Loan Association v. Novotny, 442 U.S. 366 (1979) ........... 13

Griffin v. Breckenridge, 403 U.S. 88 (1971) ............................................................... 12

Gruen v. Rodriguez, 176 F.3d 27 (2d Cir. 1999) ......................................................... 24

Harvey v. Harvey, 949 F.2d 1127 (11th Cir. 1992) ...................................................... 11

Hayes v. New York City Department of Corrections, 84 F.3d 614 (2d Cir. 1996) ..................... 10

Hoepfl v. Barlow, 906 F. Supp. 317 (E. D. Va. 1995) .................................................. 29

International Distribution Centers, Inc. v. Walsh Trucking, Co., Inc.,
    812 F.2d 786 (2d Cir. 1987)......................................................................... 17

Iskander v. Village of Forest Park, 690 F.2d 126 (7th Cir. 1982) ................................... 11

Lang v. Retirement Living  Public Co., 949 F.2d 576 (2d Cir. 1991) ................................... 9

Lohr v. Association of Catholic Teachers, 416 F. Supp. 619 (E.D. Pa. 1976) ........................ 18

Los Angeles v. Lyons, 461 U.S. 95 (1983)................................................................ 29

Lux v. Hansen, 886 F.2d 1064 (8th Cir. 1989) .......................................................... 11

Matsushita Electrical Indust. Co. v. Zenith Radio Corp.,
    475 U.S. 574 (1986)................................................................................. 10

McPartland v. American Broadcasting Companies, Inc.,
    623 F. Supp. 334 (S.D.N.Y. 1985).................................................................. 18

Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57 (1986) ............................................. 24,25

Mian v. Donaldson, Lufkin & Jenrette Securities Corp., 7 F.3d 1085 (2d Cir. 1993) ................ 19

Monell v. Department of Social Services of the City of New York,
    436 U.S. 658 (1978)................................................................................. 11

Morse v. University of Vermont, 973 F.2d 122 (2d Cir. 1992) ........................................ 37

Naguib v. Illinois Dep't of Prof'l Reg., 986 F. Supp. 1082 N. D. Ill 1997) ......................... 11

New York v. Ocean Club,  Inc., 602 F. Supp. 489 (E.D.N.Y. 1984) .................................... 32

O'Shea v. Littleton, 414 U.S. 488 (1974) ............................................................. 29, 30

Omaha Employees Betterment Ass'n v. City of Omaha, 883 F.2d 650
    8th Cir. 1989) ............................................................................................. 17

Owens v. Hass, 601 F.2d 1242 (2d Cir. 1979) .................................................... 12

Padover v. Gimbel Brothers, Inc., 412 F. Supp. 920 (E.D. Pa 1976) ............. 11

Pallozzi v. Allstate Life Insurance Company, 198 F.3d 28 (2d Cir. 2000) ................ 31

Peck v. United States, 470 F. Supp. 1003 (S.D.N.Y. 1979) ............................... 18

Powell v. National Board of Medical Exam'rs, 364 F.3d 79 (2d Cir. 2004) ............... 24

Roe v. City of N.Y., 151 F. Supp. 2d 495 (S.D.N.Y. 2001) ............................... 30

Schmidt v. Bishop, 779 F. Supp. 321 (S.D.N.Y. 1991) ..................................... 35

Simmons v. Poe, 47 F.3d 1370 (4th Cir. 1995) ................................................. 29

Spencer v. Casavilla, 903 F.2d 171 (2d Cir. 1990)....................................................13

Spychalsky v. Sullivan, No. CV01-0958, 2003 U.S. Dist. LEXIS 15704
    (E.D.N.Y. August 29, 2003) ...................................................................... 24

Temple v. Albert, 719 F. Supp. 265 (S.D.N.Y. 1989) .................................... 11

Thomas v. Roach, 165 F.3d 137 (2d. Cir. 1999) .......................................... 18,19

United States v. Wardy, 777 F.2d 101 (2d Cir. 1985) ................................. 13,17

Valencia v. Lee, 316 F.3d 299 (2d Cir. 2003) ............................................. 36

Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708 (2d Cir. 1996) .................. 17, 20

Venture Technology, Inc. v. National Fuel Gas Company, 685 F.2d 41 (2d Cir. 1982) ............. 13

Webb v. Goord, 340 F.3d 105 (2d Cir. 2003) ............................................... 13

Weixel v. Bd of Education of N.Y., 287 F.3d 138 (2d Cir. 2002) ...................... 24

Wilson v. Diocese of the Episcopal Church, 96 Civ. 2400 (JGK),
    1998 Dist. LEXIS 2051 (S.D.N.Y. 1998).................................................. 21

## STATE CASES

Cahill v. Rosa, 89 N.Y.2d 14, 674 N.E.2d 274, 651 N.Y.S.2d 344 (1996) ................................. 33

Cirella v. Central General Hospital, 217 A.D.2d 680, 630 N.Y.S.2d 93 (2d Dep't 1995) ........... 33

Cummings v. Watertown Lodge No. 496 Benevolent and Protective Order of Elks, Inc.,
    262 A.D.2d 1007 (4th Dept. 1999) ...................................................................................... 32

D'Amico v. Commodities Exchange Inc., 235 A.D.2d 313, 652 N.Y.S.2d 294
    (1st Dept. 1997) ................................................................................................................... 33

Detone v. Bullit Courier Service, Inc., 140 A.D.2d 278, 528 N.Y.S.2d 575
    (1st Dep't 1998)................................................................................................................... 22

Diaz v. N.Y. Downtown Hospital, 287 A.D.2d 357, 731 N.Y.S2d 694
    (1st Dep't 2001)................................................................................................................... 22

Dodd v. Middletown Lodge (Elks Club) No. 1097, 264 A.D.2d 706,
    695 N.Y.S.2d 115 (2nd Dept. 1999) ................................................................................... 32

Doe v. Westfall Health Center, Inc., 303 A.D.2d 102, 755 N.Y.S.2d 769
    (4th Dep't 2002) .................................................................................................................. 22

Eastern Paralyzed Veterans Associate v. Metropolitan Transport Auth.,
    79 A.D.2d 516, 693 N.Y.S.2d 294 (1st Dept. 1980)........................................................... 33

Gallo v. Dugan, 228 A.D.2d 376, 645 N.Y.S.2d 7 (1st Dep't 1996) ........................................... 22

Garcia v. Montefiore Medical Center, 293 A.D.2d 264, 740 N.Y.S.2d 307
    (1st Dep't 2002)................................................................................................................... 22

Gomez v. City of New York, 304 A.D.2d 374, 758 N.Y.S.2d 298
    (1st Dep't 2003)................................................................................................................... 22

Hector v. Commissioner of Social Services of the City of New York, 102 Misc. 2d 676, 425
    N.Y.S.2d 199 (Fam. Ct. N.Y. January 22, 1980) ............................................................... 27

Hill v. Seward, 122 Misc. 2d 375, 470 N.Y.S.2d 971 (N.Y. Sup. Ct 1983) ............................... 29

Judith M v. Sisters of Charity Hospital, 93 N.Y.2d 932, 693 N.Y.S.2d 67 (1999) .................... 35

Mandelblatt v. Devon Stores, Inc., 132 A.D.2d 162, 521 N.Y.S.2d 672 (1st Dep't 1987) .......... 28

<u>Mary "KK" v. Jack "LL"</u>, 203 A.D.2d 840, 611 N.Y.S.2d 347  (3d Dep't 1994) ........................ 22

<u>Murray v. Research Foundation</u>, 203 A.D.2d 995, 723 N.Y.S.2d 805 (4th Dep't 2001) ............. 23

<u>N.X. v. Cabrini Medical Center</u>, 97 N.Y.2d 247, 739 N.Y.S.2d 348 (2002) ............................... 35

<u>Oates v. New York Hospital</u>, 131 A.D.2d 368, 517 N.Y.S.2d 6 (1st Dep't 1987) ....................... 21

<u>Paul J.H. v. Lum</u>, 291 A.D.2d 894, 736 N.Y.S.2d 561 (4th Dep't 2002)  .................................... 22

<u>Penato v. George</u>, 52  A.D.2d 939, 383 N.Y.S.2d 900 (2d Dep't 1976)  ...................................... 26

<u>Rodriguez v. United Transport Co.</u>, 246 A.D.2d 178, 677 N.Y.S.2d 130 (1st Dep't 1998)...21, 22

<u>Schloendorff v. Society of N.Y. Hospital</u>, 211 N.Y. 125, 105 N.E. 92 (1914)  ........................... 21

<u>Schulman v. State Division of Human Rights</u>, 89 N.Y.2d 934,
    226 A.D.2d 645 (1997) ....................................................................................................... 33

<u>Simcuski v. Saeli</u>, 44 N.Y.2d 442, 406 N.Y.2d 259 (1978)  ....................................................... 35

<u>Spinosa v. Weinstein</u>, 168 A.D.2d 32, 571 N.Y.S.2d 747 (2d Dep't 1991).................................. 35

## FEDERAL STATUTES

42 U.S.C. § 1985 ............................................................................................... 3, 10, 11, 13

42 U.S.C. § 1986 ........................................................................................................ 3, 19, 20

42 U.S.C. § 2000a-3(a) ....................................................................................................... 29

42 U.S.C. § 12101…………………………………………………………………………3

29 U.S.C. § 794 ............................................................................................................. 3, 23

28 U.S.C. § 1367(a) ............................................................................................................ 36

Fed. R. Civ. P., Rule 56…………………………………………………………………9, 10

Fed. R. Civ. P., Rule 12(b)(6)…………………………………………………………..3

**STATE STATUTES**

N.Y. Penal Law § 120.00 *et seq.* ................................................................................................. 21

N.Y. Public Health Law § 2805-d(1)………………………………………………………33

**OTHER**

F. Mechem, <u>Outlines of the Law of Agency</u>, § 394, P. 266 (P. Mechem, 4th ed., 1952)………...25

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------- x
CLEMENT BOWEN, et. al.                           :
                              Plaintiffs,        :        Index No.:  01 Civ. 0070 (J. Gershon)
                                                 :
        - against -                              :
                                                 :
JACOB RUBIN d/b/a LEBEN HOME FOR                 :
ADULTS, LEBEN HOME FOR ADULTS,                   :
AMERICARE, INC., MARTIN KLEINMAN,                :
DIANE AHERN, PARKWAY HOSPITAL, INC.,             :
JAMILLE PERESS and HARRY JOSIFIDIS,              :
                                                 :
                              Defendants.        :
                                                 :
-------------------------------------------------------------- x

## MEMORANDUM OF LAW IN SUPPORT OF THE
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

Defendants, Americare, Inc. ("Americare") and Americare Certified Special Services, Inc. ("ACSS")(collectively the "Americare Defendants"), respectfully submit this Memorandum of Law in support of their motion, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment dismissing each and every claim against them.

In this action, the plaintiffs, seventeen mentally disabled men who resided at Leben Home for Adults ("Leben Home") during late 1997 and early 1998, seek to recover for injuries they allegedly sustained as a result of prostate surgeries that were performed on them at Parkway Hospital by Dr. Harry Josifidis in January 1998.  The plaintiffs allege that co-defendants, Dr. Jamille Peress, Dr. Harry Josifidis, Parkway Hospital and Jacob Rubin d/b/a the Leben Home for Adults (collectively referred to as the "Settling Defendants"), conspired with the Americare Defendants and co-defendant Diane Ahern to perform unnecessary surgery upon them in

1

violation of the Americans with Disabilities Act (ADA), the Rehabilitation Act, and the Civil Rights Act. The plaintiffs also allege various state law claims, including fraud, negligent hiring and supervision, breach of fiduciary duty and the New York State Human Rights Law (NYSHRL).

The evidence establishes that the Americare Defendants did not have knowledge of the allegedly unnecessary surgery before it occurred. Thus, the sole basis for the claims against the Americare Defendants is the assertion that they are vicariously responsible for the alleged conspiratorial conduct of Ahern because they employed her.

In this Memorandum of Law, we shall demonstrate that the Americare Defendants may not be held vicariously liable, under any legal theory offered by plaintiffs, for the alleged criminal, intentionally tortious acts of Ahern. In this regard, the evidence establishes that *if* Ahern did conspire with some of the Settling Defendants to perform unnecessary surgery on the plaintiffs, she did not do so within the scope of her employment for the Americare Defendants. Moreover, there is no evidence that Ahern displayed conduct or characteristics that would lead the Americare Defendants to suspect that she might conspire to assault mentally ill patients by arranging to perform unnecessary surgery on them without their informed consent. Such evidence is the *sine qua non* of every claim asserted against the Americare Defendants. We will also demonstrate that the Americare Defendants did not owe or breach any fiduciary duty to plaintiffs and that there is no evidence of any fraud against them.

Finally, we will demonstrate that there is no basis for the injunctive relief demanded in the complaint because the Americare Defendants did not participate in a conspiracy to violate the plaintiffs' rights, and because any alleged conspiracy by the co-defendants ended years ago, as

plaintiffs admit.   Thus, there is absolutely no basis to conclude that any of the Americare Defendants present a current risk of harm to the plaintiffs, or anyone else.

Alternatively, if this court dismisses the plaintiffs' federal claims, but does not dismiss the plaintiffs' state law claims, this court should decline to exercise supplemental jurisdiction over the remaining state law claims.

## PROCEDURAL HISTORY

Plaintiffs commenced this lawsuit by filing a Complaint on or about January 8, 2001. Plaintiffs thereafter filed an Amended Complaint dated March 6, 2001, and subsequently, a Second Amended Complaint ("Complaint") dated April 16, 2001. See, Declaration of Glen Feinberg, dated October 14, 2004, Ex. A.[1]

The Complaint alleges violations of Title III of the Americans with Disabilities Act of 1990 (42 U.S.C. § 12101 et seq); Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794); conspiracy provisions of the Civil Rights Law (42 U.S.C. §§ 1985(3) & 1986); the New York State Human Rights Law (N.Y.S. Exec. Law § 290 et seq); and asserts common law claims for Breach of Fiduciary Duty, Fraud, Negligence, Breach of Contract, Medical Malpractice, and Failure to Obtain Informed Consent.   The claims for breach of contract, medical malpractice and failure to obtain informed consent were not asserted against the Americare Defendants.

Prior to discovery, all defendants served motions to dismiss the Complaint pursuant to FRCP Rule 12(b)(6).   In an Order dated May 17, 2002, this Court denied the motions, finding that all of the allegations in the Second Amended Complaint were sufficient to state a claim. Following the denial of the motions to dismiss, all defendants served answers denying the

---

[1] All further references to Exhibits are to those pleadings, sworn affidavits and deposition testimony, discovery responses and documents identified and submitted with the Feinberg Declaration.

essential allegations of the Complaint.  Over the last two years, the parties have engaged in extensive discovery, conducting over 70 depositions of party and non-party witnesses, as well as exchanging thousands of documents.

On or about July 16, 2004, plaintiffs entered into a settlement with the Settling Defendants whereby plaintiffs agreed to dismiss their claims against the Settling Defendants in consideration for payments totaling $8,349,999.96, including attorneys' fees.  The Settlement Agreement does not contain any provision for equitable relief against the Settling Defendants. Following the settlement, discovery among the remaining parties was completed.

## STATEMENT OF FACTS

### THE PARTIES

#### The Plaintiffs:

Plaintiffs are mentally disabled men who at all relevant times resided in the Leben Home for Adults ("Leben Home"), an adult care facility that was located in Queens, New York. All of the plaintiffs exhibited some symptoms of incontinence, or other urological problems, prior to the surgeries that are the subject of this lawsuit. See, Ex. E, # 9, 10; Ex. H, pp. 178, 198-199, 201-202, 204-205, 209-210, 212-213, 215, 217-227, 230-232, 234-236; Ex. I, pp. 53-57; Ex. J, pp. 52-54, 60-67, 74-81, 86-89, 93-99; Ex. K, pp. 40-43, 53, 55-57, 59-60; Ex. L, pp. 86-87; Ex. M, pp. 125-128, 130-135, 138-139, 141-148; Ex. N, pp. 28, 67, 78-82; Ex. O, pp. 95-96; Ex. P, pp. 22-23, 40-41, 43.

#### Jacob Rubin d/b/a The Leben Home for Adults:

Settling Defendant Jacob Rubin owned and operated the Leben Home, the largest adult home in New York State, which had more than 350 residents.  See, Ex. Q, pp. 9-13.  Because Leben Home was an adult facility, and not a nursing home, it was not required by law to provide

4

any kind of nursing care to its residents.  <u>See</u>, 18 NYCRR § 487.3.  Leben Home therefore arranged for various home health care agencies to provide nursing and home health care to residents of the Home whose doctors ordered such services.  <u>See</u>, Ex. Q, pp. 51-53.  Jacob Rubin no longer owns or operates the facility formerly known as the Leben Home.  <u>See</u>, Ex. Q, pp. 8-10.  An adult home is now operated at that same location by new operators under the name of "Queens Adult Care Center."  <u>See</u>, Ex. D, # 1.

### The Doctors:

Settling Defendants, Jamille Peress, M.D. ("Peress") and Harry Josifidis, M.D. ("Josifidis"), are physicians who were licensed to practice medicine in the State of New York. <u>See</u>, Ex. R, p. 252; Ex. S, pp. 8-9.  They were both board certified in urology and limited their practice to that specialized field.  <u>See</u>, Ex. R, pp. 15-19; Ex. S, pp. 22-27.  Dr. Peress and Dr. Josifidis both had privileges to admit patients and perform surgery at the facilities of the settling defendant, Parkway Hospital.  <u>See</u>, Ex. R, p. 14; Ex. S, p. 34.  In addition, Dr. Peress was the Chief of Urology at Parkway Hospital and one of its principal shareholders.  <u>See</u>, Ex. R, p. 113.

### The Americare Defendants:

The Americare Defendants are in the business of providing home health care services. <u>See</u>, Ex. G, ¶ 11; Ex. T, p. 28.  Americare Certified Special Services, Inc. is a certified home health care agency. <u>See</u>, Ex. G, ¶ 3.  Americare, Inc. is a licensed home care services agency. <u>See</u>, Ex. G, ¶ 3.  These entities do <u>not</u> provide any medical services and do <u>not</u> employ any doctors. <u>See</u>, Ex. G, ¶ 11.  The services provided by the Americare Defendants at the Leben Home included both nursing and personal care. <u>See</u>, Ex. T, p. 28.  The nursing care, which generally involved services such as changing dressings and administering medication under a doctor's order, was carried out by registered nurses employed by ACSS.  <u>See</u> Ex. T, p. 87; Ex. U,

pp. 37-38; Ex. V, p. 21.  The personal care, which involved assisting patients for a few hours a day with activities of daily living such as grooming, toileting, and laundry, was carried out by home health aides who were unskilled workers.  See, Ex. U, pp. 43, 49-50; Ex. W, pp. 33-35. These home health aides were employed by Americare, Inc. but were under the supervision of the ACSS nurses.  See, Ex. W, p. 27; Ex. X, pp. 40-42.

All care provided to patients at the Leben Home by the Americare Defendants was performed pursuant to a "Plan of Care" ordered by the physicians who were treating the patients. See, Ex. U, p. 40; Ex. AA, pp. 38-39; Ex. EE, p. 59.  The employees of the Americare Defendants are not qualified to determine whether a patient needs medical or surgical care, or to provide such care.  See, Ex. G, ¶ 11.  All medical and surgical care was directed and provided by physicians.  See, Ex. G, ¶ 11; Ex. CC, p. 60.

**Martin Kleinman:**

Martin Kleinman is the President and CEO of Americare and ACSS, and is the sole shareholder of each of these separately incorporated entities.  See, Ex. T, pp. 7, 13-17, 21-22.

As set forth in the Martin Kleinman Affidavit, sworn to on October 11, 2004 and submitted in connection with his motion for summary judgment, Kleinman had no involvement in patient care or the day-to-day activities of the Americare Defendants at the Leben Home.  See, Ex. G, ¶ 8.  Kleinman did not learn of the plaintiffs' prostate surgeries until he received a copy of the complaint in this lawsuit. See, Ex. G, ¶ 2, Ex. T, p. 132.

**Diane Ahern:**

Diane Ahern first started working at the Leben Home in 1992.  See, Ex. H, p. 14.  When ACSS began to provide services to the residents of the Leben Home in 1996, it hired Ahern to work at the Leben Home in the capacity of "Home Health Aide Coordinator."  See, Ex. H, pp.

6

17, 20-21; Ex. Y.  She was hired at an annual salary of $31,200.  See, Ex. Y.  Her annual salary

in 1998 was $32,000.  See, Ex. Z.  She was not part of Americare's management structure and

had no managerial or supervisory responsibilities.  See, Ex. U, p. 78.  Ahern was a low-level

employee. See, Ex. L, p.  41; Ex. U, p. 78; Ex. AA, pp. 26-27.

Ahern gave the following testimony with respect to her duties as "Home Health Aide

Coordinator" for Americare:

> Q.      What were those[duties you would be assuming as Home Health
>         Aide Coordinator]?
>                                  *   *   *
> A.      I would be . . . [a]n in-house coordinator.  Instead of 25 aides
>         scattered in 25 different directions, they would come to me.  If they
>         needed extra towels or sheets or whatever their complaints were, or
>         problems were, they would come to me and I would go, and be the
>         liaison between Leben Home and the aides.  I made up schedules
>         for, the dining room for days off for vacations for lunch for the
>         laundry room, so that things just ran a lot smoother. I was a liaison
>         for the nurses and the doctors.  Make sure the papers were done,
>         you know, they have orders for this and orders for that. I was a
>         liaison with the front offices, with the nurses, if they were having
>         problem with an aid or with the nurses, or if there was a question
>         that wasn't answered, whose job it was to do, what I was a general
>         liaison around Leben Home for Americare.

See, Ex. H, pp. 20-21.

Although Americare did not know it, Ahern was also performing services directly for

various physicians who treated patients at the Leben Home, including Settling Defendant Dr.

Peress.  See, Ex. H, pp. 79-81, 271-272; Ex. T, p. 125; Ex. U, p. 124; Ex. AA, p. 75-77.  Dr.

Peress and other physicians directly paid Ahern for the services she performed for them.  See,

Ex. H, pp. 81-84.

Ahern's duties as Americare's Home Health Aide Coordinator did *not* include making

arrangements for patients to see doctors, assisting doctors in the coordination of their treatment

of patients or participating in the informed consent process.  See, Ex. H, pp. 20-21, 30, 35-36,

271; Ex. T, pp. 107-109; Ex. U, pp. 78, 95-96.  Ahern performed these tasks at the behest of Dr.

Peress and other doctors and was paid by them for such services.  See, Ex. H, pp. 34-35, 80-81;

Ex. R, pp. 79-80, 257-259.  Dr. Peress acknowledged that he paid Ahern to arrange for patients

to see him and that she witnessed the informed consents at his direction. See, Ex. H, p. 272; Ex.

R, pp. 79-80, 257-259.  He did not seek permission from the Americare Defendants to employ

Ahern in this capacity and did not notify the Americare Defendants of his employment of Ahern.

See, Ex. R, pp. 258-259.   Similarly, Ahern never informed the Americare Defendants that she

was performing these services for Dr. Peress and the other doctors.  See, Ex. H, pp. 31, 271-272.

### The Surgeries:

In late 1997, Dr. Peress went to the Leben Home in order to provide urological care for

some of the residents at the Home who needed such care.  See, Ex. H, pp. 34-35; Ex. R, pp. 123-

126.   Around that same time period, Dr. Peress spoke with Ahern and asked her to make

arrangements for patients to see him at the Home.  See, Ex. H, p. 35.  In exchange for a fee of

$300 a month, Ahern agreed to assist Dr. Peress in setting up the patient medical visits.  See, Ex.

R, pp. 79-82; Ex. H, p. 80.  In late 1997 and early 1998, Dr. Peress saw approximately 125

Leben residents in a medical office at the Leben Home.  See, Ex. H, p. 94.  After examining the

patients, Dr. Peress identified approximately 50 – 60 patients with symptoms of urinary

incontinence who, in his opinion, needed follow-up evaluations. See, Ex. H, p. 94, Ex. R, pp.

137-138.  Those patients were then asked to sign a surgical consent form in Dr. Peress' presence.

See, Ex. H, pp. 116, 119.  At Dr. Peress' direction, Ahern witnessed the patients' signatures.

See, Ex. H, p. 116-117, 124.  Dr. Peress thereafter requested that Ahern arrange for these patients

to be sent to his office for such follow-up evaluations, and that each patient bring the signed surgical consent form with them to his office. See, Ex. H, pp. 95, 114-119, 130.

Plaintiffs were among the group of 50 – 60 patients examined by Dr. Peress at the Leben Home and were sent to his offices for further examination and testing. See, Ex. H, p. 94. Neither Ahern, the home health aides, nor any other Americare employees were present during Dr. Peress' examination of the plaintiffs, and they were not involved in the determination of who would need a transurethral prostate resection ("TURP"). See, Ex. R, pp. 255-256. That was solely Dr. Peress's decision. See, Ex. R, p. 256. After recommending that plaintiffs undergo TURPs, Dr. Peress arranged for their admission to Settling Defendant Parkway Hospital. Settling Defendant Dr. Josifidis performed the surgery on plaintiffs at Parkway Hospital.

From the time the alleged conspiracy ended in February 1998 to the present, neither the plaintiffs, the Department of Health, nor the new operators of the Home, have made any allegation of wrongdoing against the Americare Defendants with regard to their care of patients at the former Leben Home. See, Ex. G, ¶ 19.

## ARGUMENT

### POINT I

### SUMMARY JUDGMENT STANDARD

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a motion for summary judgment must be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P., Rule 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986); Lang v. Retirement Living

Pub. Co., 949 F.2d 576, 580 (2d Cir. 1991); Hayes v. New York City Dep't of Corrections, 84

F.3d 614, 619 (2d Cir. 1996); Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).

Once a moving party has met the initial burden of showing the absence of a genuine issue

as to material facts, the non-moving party must "set forth specific facts showing that there is a

genuine issue for trial." Fed. R. Civ. P., Rule 56;  Matsushita Elec. Indust. Co. v. Zenith Radio

Corp., 475 U.S. 574 (1986).  To withstand a summary judgment motion, the non-moving party

must produce "significant probative supporting evidence" upon which a reasonable jury could

return a verdict for the non-movant.   Anderson, 477 U.S. at 248-49.   Bald assertions of

conjecture or speculation are insufficient to overcome a motion for summary judgment.  Carey v.

Crescenzi, 923 F.2d 18, 21 (2d Cir. 1991). As demonstrated below, there are no genuine issues of

material fact and the Americare Defendants are entitled to judgment as a matter of law on all

claims asserted against them in the Second Amended Complaint.

**POINT II**

**THE CONSPIRACY CLAIMS AGAINST THE AMERICARE
DEFENDANTS ARE NOT SUPPORTED
BY THE LAW OR THE EVIDENCE**

**A.**     **The Americare Defendants Cannot Be Held
Vicariously Liable for Ahern's Actions**

The gravamen of the plaintiffs' complaint is that the Americare Defendants conspired

with the Settling Defendants to carry out a plan to subject the plaintiffs to unnecessary surgery

without first obtaining an informed consent, in violation of the plaintiffs' civil rights.  According

to their Supplemented Responses to Americare's First Set of Contention Interrogatories,

plaintiffs predicate the Americare Defendants' liability under 42 U.S.C. § 1985(3) solely on the

theory of *respondeat superior*.  See generally, Ex. D.  Plaintiffs cannot point to any evidence that

Americare's management had actual knowledge of the alleged conspiracy, or of Ahern's alleged

10

role in said conspiracy.  Rather, they seek to hold the Americare Defendants vicariously liable for Ahern's role in the alleged conspiracy.

Plaintiffs' claims against the Americare Defendants run afoul of the well-settled principle that a defendant in a civil rights action must have personal involvement in the alleged wrongs. Liability cannot be solely predicated on the operation of *respondeat superior*. Monell v. Department of Social Services of the City of New York, 436 U.S. 658 (1978). In Monell, the Supreme Court held that a "municipality cannot be held liable *solely* because it employs a tortfeasor – or, in other words, a municipality cannot be held liable under [42 U.S.C.] § 1983 on a *respondeat superior* theory." Id., 436 U.S. at 691.

Monell's prohibition against liability based solely on *respondeat superior* applies to private employers. See e.g., Temple v. Albert, 719 F. Supp. 265 (S.D.N.Y. 1989)(private employer may not be held vicariously liable for civil rights violations of its employees); Harvey v. Harvey, 949 F.2d 1127 (11th Cir. 1992)(private mental hospital could not be held vicariously liable under § 1983 for the conduct of its employees); Lux v. Hansen, 886 F.2d 1064 (8th Cir. 1989)(private mental health facility could not be held vicariously liable under § 1983 based on social worker's conduct); Iskander v. Village of Forest Park, 690 F.2d 126 (7th Cir. 1982) (private corporation cannot be vicariously liable under § 1983 for its employee's deprivation of another's civil rights).

Similarly, Monell's prohibition against vicarious liability also applies to claims brought under 42 U.S. C. § 1985.  See e.g., Naguib v. Illinois Dep't of Prof'l Reg., 986 F. Supp. 1082 (N. D. Ill 1997)(privately-owned hospital could not be held vicariously liable under § 1985 for alleged misconduct of agent); Padover v. Gimbel Bros., Inc., 412 F. Supp. 920 (E.D. Pa 1976)(in an action brought under § 1985, private department store could not be held vicariously liable

11

under doctrine of *respondeat superior* for the acts of its employees); Carnegie v. Miller, 811 F.

Supp. 907 (S.D.N.Y. 1993)(municipality not liable for actions of employees under a theory of

*respondeat superior* in claims arising under § 1985); Owens v. Hass, 601 F.2d 1242 (2d Cir.

1979)(County of Nassau could not be held liable under § 1985 on a *respondeat superior* theory).

Accordingly, the Americare Defendants cannot be held vicariously liable for Ahern's

alleged involvement in a civil rights conspiracy.

> **B.      There is No Evidence that The Americare
>           Defendants Were Knowing Participants in the
>           Alleged Conspiracy**

Because liability cannot be predicated on the doctrine of *respondeat superior*, plaintiffs

must provide evidence that the Americare Defendants were knowing participants in a conspiracy

to perform unnecessary surgery.  The complete absence of such evidence is fatal to plaintiffs'

conspiracy claim.

Section 1985(3) of Title 42 of the United States Code prohibits "two or more persons"

from conspiring to deprive any person or class of persons of the equal protection of the laws, or

of equal privileges and immunities under the laws.  In order to survive a motion for summary

judgment, plaintiffs have the burden of presenting "significantly probative supporting evidence"

that there are material factual issues that the alleged conspirators: (1) engaged in a conspiracy;

(2) acted for the purpose of denying plaintiffs equal enjoyment of rights secured by the law to

all; (3) committed an overt act in furtherance of the object of the conspiracy; and (4) deprived the

plaintiffs of federally protected rights.  Griffin v. Breckenridge, 403 U.S. 88, 101-105 (1971).  In

addition, plaintiffs must present the same level of evidence that there was "some racial, or

perhaps otherwise class-based invidiously discriminatory animus behind [the defendants']
action." Id. at 102. [2]

The principle element of a conspiracy is an unlawful agreement. See United States v.
Wardy, 777 F.2d 101, 107 (2d Cir. 1985). A plaintiff "must provide some factual basis
supporting a meeting of the minds, such that defendants entered into an agreement, express or
tacit, to achieve the unlawful end." Webb v. Goord, 340 F.3d 105, 110 (2d Cir. 2003). Even
though a plaintiff may prove a conspiracy through circumstantial evidence, "however slight or
circumstantial, the evidence must tend to prove that the [defendants] did enter into some form of
agreement." Wardy, 777 F.2d at 107. A mere showing of close relations or frequent meetings
will not be sufficient to satisfy a plaintiff's burden. See Venture Technology, Inc. v. National
Fuel Gas Company, 685 F.2d 41, 45 (2d Cir. 1982).

In this case, the plaintiffs can present only speculation and conjecture that there was a
meeting of the minds between the Americare Defendants and the Settling Defendants. An
examination of plaintiffs' responses to Americare's contention interrogatories reveals that the
only factual support for the claim that the Americare Defendants entered into an agreement with
co-defendants is their contention that "ACSS and/or Americare excluded nurses from being
present when physicians evaluated Leben Home residents, including Plaintiffs," see, Ex. D, #11,
and the contention that two Americare employees, Guylene Charles and Maxine Welsh, knew of
the unnecessary surgery. See, Ex. D, # 13. These claims do not withstand scrutiny.

_____

2 Furthermore, as the Second Circuit has stated, "this section [1985(3)] provides no substantive rights itself
but merely 'provides a remedy for violation of the rights it designates.'" Spencer v. Casavilla, 903 F.2d 171, 174
(2d Cir. 1990), quoting Great American Federal Savings & Loan Association v. Novotny, 442 U.S. 366, 372 (1979).
Thus, as a prerequisite for maintaining a claim under 42 U.S.C. § 1985(3), the plaintiffs must prove that the
Americare Defendants violated a right designated by § 1985(3), which they have failed to do.

With regard to the alleged exclusion of nurses from examinations, there is no evidence that the Americare Defendants "excluded" nurses from being present at examinations. Moreover, there is no evidence that a home health care agency has any obligation to have its nurses or home health aides present when a physician examines a patient.[3]  In addition, even if Americare did exclude its employees from observing medical exams in violation of some unidentified duty, this allegation would not tend to prove that the Americare Defendants entered into an agreement to violate the plaintiffs' rights.  No reasonable jury could infer from this evidence that there was a "meeting of the minds" between the Americare Defendants and the Settling Defendants.

Plaintiffs also claim that testimony by Maxine Welsh and Guylene Charles supports their contention that the Americare Defendants had actual knowledge of the Settling Defendants' agreement to perform unnecessary surgery on the plaintiffs, and that this knowledge somehow renders them a party to the conspiracy.

In fact, the testimony of these witnesses does not evidence knowledge by the Americare Defendants of the conspiracy.  In a vain effort to bolster their conspiracy claims, plaintiffs cite to out-of-context snippets of testimony by Maxine Welsh and Guylene Charles.  In their Responses to Defendant Americare's Contention Interrogatories, plaintiffs allege the following:

> Guylene Charles, a former nurse for ACSS, was aware that unnecessary surgeries were being performed on Plaintiffs, and that Diane Ahern arranged for the surgeries to take place. Ms. Charles and other nurses at Leben Home talked about the unnecessary surgeries as something that was "fishy."
>
> Maxine Welsh knew, prior to when male residents of Leben Home were sent to Parkway Hospital for prostate-related

---

[3] Certainly the Americare Defendants had no obligation toward the plaintiffs who were not receiving services from ACSS.

14

> procedures, that the men would be sent to Parkway for such
> procedures, and she discussed with other nurses that some
> of these men may not need the surgery.  Ms. Welsh knew
> that Ahern arranged for the surgeries to take place.

See, Ex. D, # 13.

Contrary to the plaintiffs' assertions, Guylene Charles' testimony does not support the

contention that the Americare Defendants knew of the surgery before it was performed.  Ms.

Charles testified that she only learned of the surgeries, with the exception of one patient, *after* the

surgeries had been performed.  See, Ex. BB, pp. 21-22. Moreover, she *never* expressed any

concerns about the surgeries to any of her supervisors at ACSS, Americare, or anyone else.  See,

Ex. BB, pp. 26, 63, 66-67.

Moreover, contrary to plaintiffs' contentions, Ms. Charles did not testify that Ahern

"arranged" the plaintiffs' surgeries.   Rather, she testified that Ahern merely scheduled the

patients' appointment with the doctors.  See, Ex. BB, pp. 25, 27.  Indeed, Ms. Charles did not

have any impression as to who was coordinating these surgeries.  See, Ex. BB, p. 25.  Finally,

Ms. Charles testified that she did not know if Ahern knew whether or not the surgeries were

necessary.  See, Ex. BB, pp. 62-63.

Maxine Welsh also *could not* have known about the surgeries until *after* they took place

(despite her initial testimony that she knew about some of the procedures before they were

performed).  See, Ex. CC, p. 58.  Welsh commenced work with ACSS on January 12, 1998.  See,

Ex. FF.  According to her own uncontradicted testimony, she did not visit the Leben Home until

ten days to two weeks later, and did not begin to treat patients at the Home for at least another

week thereafter.  See, Ex. CC, pp. 90-91.  Thus, she was not treating patients at Leben Home

until *after* each plaintiff had already been admitted to Parkway Hospital for surgery.  See, Ex.

CC, pp. 90-91; Exs. GG – WW.

15

In addition, Ms. Welsh stated that her supposed foreknowledge would have come from receiving lists of patients who had been absent from the Home and from reviewing the patients' charts. <u>See</u>, Ex. CC, p. 92. However, she admitted that she did not receive any lists from Ahern in her first month of employment, and she estimated that she began receiving the lists around six months after she began working for Americare. <u>See</u>, Ex. CC, p. 92-94, 125. Thus, her knowledge of the surgeries could only have been gained long after they were performed. <u>See</u>, Exs. GG – WW.

Although Ms. Welsh testified in a conclusory fashion that she had a conversation with nurses Irene Brown and Eileen Hendrickson about the procedures before they were performed, her own recollections placed these conversations in August or September, *more than six months after the procedures were performed.* <u>See</u>, Ex. CC, p. 125. This is confirmed by Nurse Hendrickson, who testified that she did not find out about the procedures until "late 98 or early 99," <u>see</u>, Ex. L, pp. 94-95, and by Nurse Brown. <u>See</u>, Ex. DD, p. 74.

The evidence clearly establishes that Maxine Welsh could not have learned about the surgeries until *after* they had already been performed. Therefore, if she did entertain questions about the necessity for the surgery, such questions could have arisen only *after* the surgeries had been completed. <u>See</u>, Ex. CC, p. 59, 125. Even then, she never discussed her concerns with any of her superiors or with the doctors performing the surgeries. <u>See</u>, Ex. CC, p. 95. When questioned why she did not discuss this with anyone, she testified:

> Because we weren't involved in that. *They never involved us with patient assessment in determination whether a patient needed to go to hospital* or something needed to be done, we were just there to provide the home care services.

<u>See</u>, Ex. CC, p. 60 (emphasis supplied).

Even if Welsh had advance knowledge of the surgeries, however, her knowledge may not be imputed to the Americare Defendants because she was only a low-level supervisor. Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708 (2d Cir. 1996)("[f]or the knowledge of a supervisor to be imputed to the company, that supervisor must be 'at a sufficiently high level in the hierarchy' of the company").

The abject failure of plaintiffs' proof is demonstrated by their reliance on the testimony of these two witnesses, neither of whom knew about the surgeries until after they were conducted, and who did not notify management about their concerns.  The Second Circuit has dismissed conspiracy claims where plaintiffs have provided only a weak basis for an inference of a conspiracy.  See International Distribution Centers, Inc. v. Walsh Trucking, Co., Inc. 812 F.2d 786 (2d Cir. 1987)(insufficient evidence of conspiracy despite testimony from defendant that he wanted to crush the plaintiff's company and evidence that defendant hired a number of plaintiff's employees); United States v. Wardy, 777 F. 2d 101, 107 (2d Cir. 1985)(insufficient evidence of conspiracy even though Wardy passed along message to Foulks to "take care" of a witness and Foulks subsequently assaulted the witness). In each of these cited cases, the circumstantial evidence was much greater than in the present case and even then was insufficient to establish a claim for conspiracy.

Even if the testimony in the record supported the assertion that the Americare Defendants knew of the conspiracy, such knowledge would be insufficient to support a claim under § 1985. The law is well-settled that the mere knowledge of another's wrongdoing is insufficient to hold a party liable as a co-conspirator under § 1985.  See e.g., Omaha Employees Betterment Ass'n v. City of Omaha, 883 F.2d 650 (8th Cir. 1989)(court held that "[e]ven if the Union knew that the City discriminated against women and failed to take appropriate measures, that alone certainly

17

does not establish the existence of an agreement to deny [plaintiff] a promotion on account of her sex"); Peck v. United States, 470 F. Supp. 1003 (S.D.N.Y. 1979)(mere knowledge of alleged agreement held insufficient to sustain claim of conspiracy under § 1985); Lohr v. Ass'n of Catholic Teachers, 416 F. Supp. 619 (E.D. Pa. 1976)(court held that employer's knowledge of illegal activity is insufficient to tie employer to alleged conspiracy); Byrd v. Int'l Brotherhood of Electrical Workers, 375 F. Supp. 545 (D. Md. 1974)(mere knowledge that unions were unlawfully discriminating against blacks did not make the trustees of the union members of the conspiracies).

Finally, the Second Circuit has repeatedly held that a plaintiff alleging a conspiracy under § 1985 must identify, with at least some degree of particularity, the overt acts in which the defendants engaged that were reasonably related to the promotion of the claimed conspiracy. Thomas v. Roach, 165 F.3d 137, 147 (2d. Cir. 1999).  Absent facts as to the participation of a particular defendant in the conspiracy, a § 1985 claim cannot survive a motion for summary judgment. McPartland v. American Broadcasting Companies, Inc., 623 F. Supp. 1334, 1341 (S.D.N.Y. 1985). Plaintiffs, have not identified *any* overt acts committed by the Americare Defendants in the furtherance of the alleged conspiracy.  Thus, plaintiffs' claim cannot withstand this motion.

Since the plaintiffs cannot present any facts from which a reasonable jury could infer a "meeting of the minds" between the Americare Defendants and the Settling Defendants and the plaintiffs can present nothing more than mere conclusory assertions, their conspiracy claim must be dismissed.

## POINT III

### THERE IS NO EVIDENCE TO SUPPORT THE CLAIM THAT THE AMERICARE DEFENDANTS VIOLATED THE PLAINTIFFS' CIVIL RIGHTS UNDER § 1986

Plaintiffs allege that the Americare Defendants had the ability to prevent the plaintiffs from undergoing unnecessary prostate surgery, and failed to do so in violation of 42 U.S.C. § 1986. In pertinent part, 42 U.S.C. § 1986 provides that:

> Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses to do so, if such wrongful act be committed, shall be liable to the party injured, or his legal representative, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented.

"Thus, a § 1986 claim must be predicated upon a valid § 1985 claim." Thomas v. Roach, 165 F.3d 137, 147 (2d Cir. 1999). Since the plaintiff cannot maintain a claim under § 1985(3), see, Point II, *supra*, their § 1986 claim must also fail. See Thomas v. Roach, *supra*; Mian v. Donaldson, Lufkin & Jenrette Securities Corp., 7 F.3d 1085, 1088 (2d Cir. 1993).

The law is clear that "[k]nowledge of the [wrongful] acts is a statutory prerequisite to suit under 42 U.S.C. § 1986." Buck v. Board of Elections of the City of New York, 536 F.2d 522, 524 (2d Cir. 1976), *citing* Hampton v. City of Chicago, 484 F.2d 602, 610 (7th Cir. 1973) (allegations that as a result of their positions of authority, mayor and superintendent of police knew of the conspiracy by the police and prosecutors to falsely arrest, imprison, and prosecute plaintiffs, was insufficient to show 'actual knowledge' by defendants of the conspiracy required under § 1986). Plaintiffs' § 1986 claims must fail because there is no evidence that the Americare Defendants had actual knowledge of the wrongful conduct.

19

Plaintiffs' reliance on the testimony of Guylene Charles and Maxine Welsh to show that the Americare Defendants had actual knowledge of the conspiracy is misplaced. See, Point II, *supra*. As discussed above, these employees did not know about the surgeries until *after* the fact, and neither of them voiced any concerns about the surgeries to their supervisors, or anyone else at ACSS. Id. Moreover, even if these employees had knowledge, given their low-level positions, such knowledge cannot be imputed to Americare. See Van Zant v. KLM Royal Dutch Airlines, supra. Under these circumstances, it cannot be said that the Americare Defendants had 'actual knowledge' of the § 1985 conspiracy and that they could have prevented the wrongful conduct.

## POINT IV

## PLAINTIFFS' § 1986 CLAIM IS TIME-BARRED

Even if the plaintiffs could establish liability under § 1986, their claim is time-barred. All claims made under § 1986 must be "commenced within one year after the cause of action accrued." 42 U.S.C. § 1986. Here, plaintiffs' cause of action for conspiracy accrued in or about February 1998, when the prostate surgeries took place. See, Ex. A, ¶¶ 175, 195, 205, 215, 225, 236, 246, 257, 268, 279, 290, 301, 312, 323, 334, 345, 356, 367, 378. The plaintiffs also admit that the "defendants ceased their [alleged] conspiracy to perform unnecessary surgery" and that the "New York State Department of Health, Bureau of Professional Medical Conduct learned about the unnecessary surgeries performed upon plaintiffs," in or about February 1998. See, Ex. A, ¶¶ 76-77. This lawsuit was not instituted until January 8, 2001, well outside the one-year statute of limitations. Under these circumstances, plaintiffs' § 1986 claim is time-barred.

POINT V

**THE NEGLIGENT SUPERVISION CLAIM MUST BE DISMISSED BECAUSE  IT WAS NOT FORESEEABLE THAT AHERN WOULD ENGAGE IN A CONSPIRACY TO ASSAULT PATIENTS BY PERFORMING UNNECESSARY SURGERY**

In their eighth cause of action, plaintiffs seek to hold the Americare Defendants liable for Diane Ahern's alleged intentional, criminal, and tortious conduct under a theory of negligent supervision. See, Ex. A, ¶¶ 543-554.  As set forth below, Americare may not be held liable for Ahern's acts, because Americare did not have notice of any facts establishing a propensity by Ahern to commit such acts.

In essence, plaintiffs have accused Ahern of participating in 17 separate assaults, i.e., non-exigent surgery without informed consent. See, Schloendorff v. Society of N.Y. Hosp., 211 N.Y. 125, 105 N.E. 92 (1914); Oates v. New York Hospital, 131 A.D.2d 368, 517 N.Y.S.2d 6 (1st Dep't 1987). See Generally, N.Y. Penal Law § 120.00 et seq.  New York does not impose a general duty upon employers to prevent their employees from committing intentional torts that, like the assaults here, are beyond the scope of employment. An employer may, however, be held responsible for intentional torts committed by an employee "because of the employer's negligence in selecting or retaining an employee *with a history of or propensity for violence.*" Rodriguez v. United Transp. Co., 246 A.D.2d 178 677 N.Y.S.2d 130, 132 (1st Dep't 1998)(emphasis supplied).  Thus, what plaintiffs have referred to as "negligent supervision" is more properly called negligent hiring/retention.

In order to state a claim for negligent hiring/retention, the plaintiff must show that the "employer knew or should have known of the employee's propensity for the conduct which caused the injury."  Wilson v. Diocese of the Episcopal Church, 96 Civ. 2400 (JGK), 1998 Dist.

21

Lexis 2051 (S.D.N.Y. 1998).   A plaintiff alleging negligent hiring and retention must demonstrate that the employer was in possession of facts showing that the employee had a propensity to commit the *specific* type of wrongdoing alleged by plaintiff. Gomez v. City of New York, 304 A.D.2d 374, 758 N.Y.S.2d 298 (1st Dep't 2003).   In Gomez, the court awarded summary judgment to the defendant employer, holding that:

> *"[R]ecovery on a negligent hiring and retention theory requires a showing that the employer was on notice of the relevant tortious propensities of the wrongdoing employee* (see Detone v Bullit Courier Serv., 140 A.D.2d 278, 528 N.Y.S.2d 575, lv denied, 73 N.Y.2d 702, 534 N.E.2d 328, 537 N.Y.S.2d 490(1988)), and the moving defendants, in support of their motion, submitted sufficient proof of their lack of such notice to demonstrate their prima facie entitlement to judgment as a matter of law."

Id. at 299 (emphasis supplied).

A plaintiff's failure to establish that the alleged tortious propensities and the wrongdoing committed by the employee were foreseeable to the employer is frequently the basis for dismissal of claims for negligent hiring/retention.   Doe v. Westfall Health Ctr., Inc., 303 A.D.2d 102, 755 N.Y.S.2d 769, 775 (4th Dep't 2002) ("suits against hospitals or nursing homes to recover damages arising from sexual assaults on patients usually founder because of the absence of the requisite element of foreseeability, i.e., the facility's lack of prior knowledge of the perpetrator's criminal tendencies"). See also, Garcia v. Montefiore Med. Ctr., 293 A.D.2d 264, 740 N.Y.S.2d 307 (1st Dep't 2002); Diaz v. N.Y. Downtown Hosp., 287 A.D.2d 357, 731 N.Y.S.2d 694 (1st Dep't 2001); Gallo v. Dugan, 228 A.D.2d 376, 645 N.Y.S.2d 7 (1st Dep't 1996); Mary "KK" v. Jack "LL", 203 A.D.2d 840, 611 N.Y.S.2d 347 (3d Dep't 1994); Ehrens v. The Lutheran Church-Missouri Synod, 269 F.Supp.2d 328 (S.D.N.Y. 2003); Paul J.H. v. Lum, 291 A.D.2d 894, 736 N.Y.S.2d 561 (4th Dep't 2002); Rodriguez v. United Transp. Co., 246 A.D.2d 178, 677 N.Y.S.2d 130, 132 (1st Dep't 1998); Detone v. Bullit Courier Serv., Inc., 140

22

A.D.2d 278, 528 N.Y.S.2d 575, 577 (1st Dep't 1998);  Murray v. Research Found., 203 A.D.2d

995, 723 N.Y.S.2d 805 (4th Dep't 2001).

In order for plaintiffs to defeat this motion for summary judgment, they must demonstrate

that the Americare Defendants had knowledge of facts demonstrating that Ahern had a

propensity to commit assaults on residents.  There is, of course, no evidence in the record that

suggests that Ahern would engage in that type of conduct, or that she had the history or

propensity for such behavior. Accordingly, plaintiffs' claim for "negligent supervision" should

be dismissed.

**POINT VI**

**THE AMERICARE DEFENDANTS CANNOT BE HELD LIABLE
UNDER SECTION 504 OF THE REHABILITATION ACT**

Plaintiffs allege that the Americare Defendants violated  Section 504 of the Rehabilitation

Act by facilitating unnecessary surgery, procuring invalid consent forms and failing to obtain

proper pre-operative medical care for the plaintiffs, "solely by reason of plaintiffs' disability."  In

pertinent part, Section 504 of the Rehabilitation Act provides that:

> No otherwise qualified handicapped individual with handicaps in
> the United States. . . shall, solely by reason of his handicap, be
> excluded from the participation in, be denied the benefits of, or be
> subjected to discrimination under any program or activity receiving
> financial assistance. . .

See 29 U.S.C. § 794.

In order to establish a violation of Section 504 of the Rehabilitation Act, a plaintiff must

demonstrate (1) that she is an "qualified individual" with a disability; (2) that the defendants are

subject to the Act and had notice of the disability; and (3) that she was denied the opportunity to

participate in or benefit from defendants' services, programs, or activities, or was otherwise

discriminated against by defendants, "solely" because of her disability.  Powell v. Nat'l Bd. of

23

Med. Exam'rs, 364 F.3d 79 (2d Cir. 2004); Spychalsky v. Sullivan, No. CV01-0958, 2003 U.S. Dist. Lexis 15704 (E.D.N.Y. August 29, 2003).

Plaintiffs' Responses to the Americare Defendants' Contention Interrogatories make it clear that plaintiffs seek to hold the Americare Defendants vicariously liable under § 504 for the actions of its employee.  In other words, Plaintiffs claim that the doctrine of *respondeat superior* should apply to this claim.  Plaintiffs' effort to hold the Americare Defendants vicariously liable for Ahern's conduct fails under well-established principles of agency law that apply to this claim.

Although the Second Circuit has yet to address whether the doctrine of *respondeat superior* has any application in claims brought under § 504 of the Rehabilitation Act, see generally, Gruen v. Rodriguez, 176 F.3d 27 (2d Cir. 1999), there are strong reasons to hold that the Rehabilitation Act does not impose vicarious liability.  This Court need not reach that question, however, because courts have held that there are clear limitations to the scope of *respondeat superior.*  Application of those limits to this case yields the unmistakable conclusion that the Americare Defendants may not be held vicariously liable for the acts allegedly committed by Ahern, even if the Rehabilitation Act were found to impose vicarious liability.

The courts treat claims brought under the Rehabilitation Act and its sister statutes, Title VII and the ADA, similarly.  Weixel v. Bd of Education of N.Y., 287 F.3d 138 (2d Cir. 2002). Thus, cases discussing the scope of *respondeat superior* liability in actions brought under Title VII and the ADA are instructive here.

In Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57 (1986), the Supreme Court examined the scope of *respondeat superior* liability under Title VII and concluded that Congress intended to "place some limits on the acts of employee for which employers under Title VII are

to be held responsible." Meritor, 477 U.S. at 72.  Thus, the Supreme Court held that agency principles should be consulted for guidance in this area.

In Burlington v. Ellerth, 524 U.S. 742 (1998), the court held that a uniform and predictable standard must be applied in determining an employer's vicarious liability under Title VII. Id. at 754.  The Court decided that the general common law of agency, rather than the law of any particular state, should apply, and pointed to the Restatement  (Second) of Agency, as a useful beginning point for a discussion of general agency principles. Id. at 755.  With respect to an employer's liability for intentional torts, the Court noted that "it is less likely that a willful tort will properly be held to be in the course of employment and that the liability of the master for such torts will naturally be more limited."  Id. at 756 quoting F. Mechem, Outlines of the Law of Agency § 394, p. 266 (P. Mechem, 4th ed., 1952).  The Court recognized that "while early decisions absolved employers of liability for the intentional torts of their employees, the law now imposes liability [only] where the employee's 'purpose, however misguided, is wholly or in part to further the master's business.'" Id. at 756.

Applying these agency principles here, it is clear that Ahern was not acting within the scope of her employment with ACSS when she allegedly conspired with the Settling Defendants to assault plaintiffs by performing unnecessary surgery upon them.  The Americare Defendants are in the business of providing home health care to patients.  In this regard, they were only responsible for providing nursing and personal care to the plaintiffs. See, Ex. G, ¶ 12, Ex. T, pp. 28, 87; Ex. U, pp. 37-38, 43, 49-50; Ex. V, p. 21; Ex. W, pp. 40-42.  It is inconceivable that Ahern's participation in a scheme to perform unnecessary surgery could be considered to be in furtherance of Americare's interests.  The mere fact that Ahern performed these actions while she was supposed to be working for Americare simply does not provide a basis for the

conclusion that she was acting in furtherance of Americare's interests when she secretly undertook these actions at the behest of Dr. Peress.

Rather than committing these acts in the scope of her employment for Americare, the record establishes that Ahern was acting within the scope of her employment by Dr. Peress, who secretly paid her and gave her instructions regarding patient visits and informed consents. See, Ex. H, pp. 34-35, 80-81; Ex. R, pp. 79-80, 257-259. Under these circumstances, general agency principles bar the imposition of vicarious liability against the Americare Defendants for Ahern's alleged violations of the plaintiffs' rights under § 504 of the Rehabilitation Act.

## POINT VII

### THE AMERICARE DEFENDANTS DID NOT OWE
### PLAINTIFFS A FIDUCIARY DUTY

In the Second Amended Complaint, plaintiffs allege that the Americare Defendants owed a "fiduciary duty" to the plaintiffs "to act in good faith, trust, and candor towards them," see, Ex. A, ¶ 527, and that they breached said duty by "facilitating the execution of invalid consent forms," and by "facilitating the unnecessary surgery performed on plaintiffs." See, Ex. A, ¶¶ 528, 529.

In order to prove a claim for breach of fiduciary duty, the plaintiffs must establish that a fiduciary relationship existed, and that the duties imposed by that relationship were breached. Forum Ins. Co. v. Zeitman, 91 Civ. 7980, U.S. Dist. Lexis 13229 (S.D.N.Y. September 12, 1995), citing Cramer v. Devon Group, Inc., 774 F. Supp. 176, 184 (S.D.N.Y. 1991). In this case, plaintiffs cannot establish any of these elements.

In New York, a "fiduciary relationship" is broadly defined as "one founded upon trust or confidence reposed by one person in the integrity and fidelity of another." Penato v. George, 52 A.D.2d 939, 942, 383 N.Y.S.2d 900, 902 (2d Dep't 1976). The definition embraces both

technical fiduciary relations, i.e., attorney, guardian, trustee, *cestui que trust*, and those informal relations which exist whenever one person trusts in, and relies upon, another. Hector v. Commissioner of Social Services of the City of New York, 102 Misc.2d 676, 682, 425 N.Y.S.2d 199 (Fam. Ct. N.Y. January 22, 1980).  However, "[t]he very nature of the trust reposed in [such persons] is *sui juris:* The distinguishing hallmark lies in the *authority and responsibility to act in the place and stead of the client.*" Id., (emphasis added).  Here, no fiduciary relationship existed between the Americare Defendants and the plaintiffs.  The Americare Defendants were merely responsible for providing assistance to the some of the plaintiffs with activities of daily living such as grooming, toileting, transportation, laundry, and for providing general nurse care.  See, Ex. G, ¶  12; Ex. U, p. 43, 49-50; Ex. W, pp. 33-35.  There is no evidence that the Americare Defendants assumed complete control over or responsibility for the plaintiffs, or that they acted in *place or stead* of them.  In fact, the plaintiffs have argued consistently throughout this case that plaintiffs' relatives or family physicians should have been consulted before any medical procedures were performed.  Accordingly, this Court should not include the relationship between a home health care agency and the patients to whom it renders home health care, as one in which a fiduciary relationship is created.

Even if this Court determines that there is a question of fact as to whether a fiduciary relationship existed between plaintiffs and the Americare Defendants, the Americare Defendants did not breach any alleged duty.  Plaintiffs specifically allege that the Americare Defendants breached a duty to obtain and/or provide proper pre-operative and postoperative medical care for the plaintiffs and that "ACSS and/or Americare and/or Ahern and/or Kleinman had an obligation to obtain proper informed consent for medical treatment by defendants Peress and Josifidis." See, Ex. D, # 8.

Since the Americare Defendants were not under a duty to provide *medical care* to the plaintiffs, see, Ex. G, ¶ 11, any claim that they breached a fiduciary duty regarding *medical care* must fail.  "A fiduciary relationship exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another *upon matters within the scope of the relation.*"  Mandelblatt v. Devon Stores, Inc., 132 A.D. 2d 162, 168, 521 N.Y.S.2d 672, 677 (1st Dep't 1987).  Thus a breach of a fiduciary duty occurs when the defendant fails to act or give advice to the plaintiff on matters within the scope of the relation.

As the uncontradicted record establishes, the Americare Defendants were not qualified to provide medical services to plaintiffs and did not undertake to provide such services.  As previously stated, they were only under an obligation to provide nursing and personal care to those plaintiffs to whom they were providing such services at the time**.**  Certainly, there is absolutely no basis to even assert that the Americare Defendants had a fiduciary duty to plaintiffs Clement Bowen, Joseph Costa, William Ford, Theodore Leabough, William Walter, Howard Ziegberman, who were not receiving services from ACSS at the time of the procedures. [4] See, Ex. ZZ.

The Americare Defendants were also not under a duty, or even in a position, to obtain informed consents from the plaintiffs for surgery, as the plaintiffs contend.  That duty, by law, rests solely with "the person providing the professional treatment or diagnosis," see, New York Public Health Law § 2805-d(1)(McKinney 1993) -- in this case, Dr. Peress and Dr. Josifidis.  New York courts have repeatedly refused to impose liability for lack of informed consent on those individuals who neither ordered nor performed the actual surgical procedure. See Crump v.

_____

[4] This claim would only make sense if Ahern was acting in the scope of her employment for Dr. Peress.  Thus, the claim is not properly directed against the Americare Defendants.

Patterson, No. 92 Civ. 4772, 1995 U.S. Dist. Lexis 10282 (S.D.N.Y. July 24, 1995)(a hospital

employee's failure to obtain proper informed consent for a surgical procedure may impose

liability on the performing surgeon, but imposes no liability on either the resident or the

hospital); Hill v. Seward, 122 Misc.2d 375, 470 N.Y.S.2d 971 (N.Y. Sup. Ct 1983)(resident's

failure to obtain proper informed consent may impose liability on performing surgeon but not on

hospital or resident).  Thus, even if there was a fiduciary relationship between the Americare

Defendants and the plaintiffs, the scope of that duty did not include obtaining informed consents

for the surgery and did not include making medical decisions for the plaintiffs.  The plaintiffs'

claim for breach of a fiduciary relationship, therefore, should be dismissed.

### POINT VIII

### PLAINTIFFS' CLAIM FOR INJUNCTIVE RELIEF MUST BE DISMISSED BECAUSE PLAINTIFFS ARE NOT AT RISK OF SUSTAINING IRREPARABLE HARM

A plaintiff alleging violation of Title III of the Americans with Disabilities Act may

obtain injunctive relief if all of the conditions required for issuance of an injunction are present.

42 U.S.C. § 2000a-3(a); See also,  Hoepfl v. Barlow, 906 F. Supp. 317, 319 (E. D. Va. 1995).

Because "federal injunctive relief is an extreme remedy," Simmons v. Poe, 47 F.3d 1370, 1382

(4th Cir. 1995), courts have erected a number of barriers plaintiffs must overcome before they

are entitled to an injunction.  As a threshold matter, an injunction will not issue unless the right

to relief is clear.

In order to obtain injunctive relief, plaintiffs must establish a "real and immediate threat

of repeated injury."  Los Angeles v. Lyons, 461 U.S. 95, 102 (1983) *quoting* O'Shea v. Littleton,

414 U.S. 488, 495-96 (1974). The Supreme Court has emphasized that "past exposure to illegal

conduct does not in itself show a present case or controversy regarding injunctive relief . . . if

unaccompanied by any continuing, present adverse effects." <u>Lyons</u>, 461 U.S. at 102, *quoting* <u>O'Shea</u>, 414 U.S. at 495-496. Plaintiffs must allege the probability of a future encounter with the defendant which is likely to lead to a similar violation of some protected right. See <u>Lyons</u>, 461 U.S. at 105-06; <u>Roe v. City of N.Y.</u>, 151 F.Supp.2d 495, 502 (S.D.N.Y. 2001).

In order to show sufficient grounds for injunctive relief, plaintiffs cannot simply "rely on past injury to satisfy the injury requirement *but must show a likelihood that they . . . will be injured in the future*." <u>Deshawn E. by Charlotte E. v. Safir</u>, 156 F.3d 340, 344 (2d Cir. 1998)(emphasis added). Abstract injury is not enough. Rather, the plaintiffs must demonstrate that "the injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" <u>O'Shea</u>, 414 U.S. at 494; <u>Golden v. Zwickler</u>, 394 U.S. 103, 110 (1969).

In this case, there is no evidence of any threat of continued or future injury to the plaintiffs who continue to reside at the Queens Adult Care Center (formerly known as the Leben Home). Indeed, Plaintiffs concede in their Complaint that the conspiracy ended upon the discovery of the surgeries in February 1998. <u>See</u>, Ex. A, ¶¶ 75-76. Plaintiffs also admit that they "are unaware of any specific, current conspiracy" by the Americare Defendants and Ahern to harm them or any other person. <u>See</u>, Ex. D, #14. Moreover, there is no evidence in the record to support any claim of threat of injury.

The record clearly establishes that the Americare Defendants do not pose a current risk to these plaintiffs or anyone else. First, the alleged wrongdoer, Ahern, is no longer working at the Home and is no longer employed by the Americare Defendants. <u>See</u>, Ex. H, pp. 9-10. Moreover, neither the plaintiffs, the Department of Health, nor the new operators of the Home have made any allegations of wrongdoing against the Americare Defendants in the more than four years since the lawsuit was filed. The absence of any complaints during the last four years,

and the fact that the Department of Health, which took action against the Settling Defendants, has taken no action vis-à-vis the Americare Defendants, compels the conclusion that there is no "real and immediate threat of repeated injury," and mandates dismissal of plaintiffs' claim for injunctive relief.

**POINT IX**

**PLAINTIFFS' ADA CLAIMS MUST ALSO BE
DISMISSED BECAUSE THEY HAVE NOT
DEMONSTRATED THAT AMERICARE OR ITS EMPLOYEES
ENGAGED IN ANY ACTS OF DISCRIMINATION**

To establish a violation of the ADA, plaintiffs must demonstrate that (1) they are "qualified individual[s] with a disability"; (2) that the defendants are subject to the ADA; and (3) that plaintiffs were denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were otherwise discriminated against by defendants, by reason of plaintiffs' disabilities. See Doe v. Pfrommer, 148 F.3d 73, 82 (2d Cir. 1998); Civic Ass'n of the Deaf v. Giuliani, 915 F. Supp. 622, 634 (S.D.N.Y. 1996).

The plaintiffs have not demonstrated any instances where Americare has denied the plaintiffs the appropriate care or treatment, which Americare was contracted to provide - - nursing and home health aide services.[5]

There is no evidence in the record that would allow a jury to infer that any Americare employees knew that the plaintiffs' urologic procedures were unnecessary. Furthermore, the

---

[5] Additionally, according to the Second Circuit, the ADA bars a "'place of public accommodation' from 'discriminat[ing] against [an individual] on the basis of disability in the full and equal enjoyment of [its] *goods* [and] *services*.'" Pallozzi v. Allstate Life Insurance Company, 198 F.3d 28, 31 (2d Cir. 2000) (emphasis added). Thus, as the language of the statute and case law demonstrate, in order to be held liable under the ADA, the defendant must have denied the plaintiff the full benefit and enjoyment of its goods and services. The plaintiffs cannot show that they did not receive the full benefit of the services from the Americare Defendants.

plaintiffs cannot show that their disability played a part in the decision of Diane Ahern to suggest that they be examined by Dr. Peress, since all of the plaintiffs had demonstrated some type of urological problem.  See, Ex. H, pp. 178, 198-199, 201-202, 204-205, 209-210, 212-213, 215, 217-227, 230-232, 234-236; Ex. I, pp. 53-57; Ex. J, pp. 52-54, 60-70, 74-81, 86-90, 93-99; Ex. K, pp. 40-43, 53, 55-57, 59-60; Ex. L, pp. 86-87; Ex. M, pp. 125-128, 130-135, 138-139, 141-148; Ex. N, pp. 28, 67, 78-82; Ex. O, pp. 95-96; Ex. P, pp. 22-23, 40-41, 43; Ex. E, # 9, 10.

Since plaintiffs cannot point to any evidence that the Americare Defendants in any way discriminated against them in the provision of home health care services, their claims under the ADA must fail.

### POINT X

### THE AMERICARE DEFENDANTS DID NOT VIOLATE
### THE NEW YORK  HUMAN RIGHTS LAW

The plaintiffs also seek relief under New York Executive Law § 296(2)(a). Under that section, it is an unlawful discriminatory practice for any person or any place of public accommodation to refuse, withhold from, or deny, any person, directly or indirectly the accommodations, advantages, facilities or privileges thereof because of, inter alia, his or her race, color, sex or disability.  Plaintiffs' basis for their allegation that the Americare Defendants violated this provision is their contention that "Americare procured invalid consent forms".

This statute does not apply to the manner in which informed consent is obtained from patients.  Rather the statute is intended to prevent organizations open to the public from denying people with disabilities access to their goods and services.  See, e.g., New York v. Ocean Club, Inc., 602 F. Supp. 489 (E.D.N.Y. 1984)(denial of membership in a public organization); Dodd v. Middletown Lodge (Elks Club) No. 1097, 264 A.D.2d 706, 695 N.Y.S.2d 115 (2nd Dept. 1999)(same); Cummings v. Watertown Lodge No. 496 Benevolent and Protective Order of Elks,

Inc., 262 A.D.2d 1007 (4th Dept. 1999)(same); Eastern Paralyzed Veterans Assoc. v. Metropolitan Transp. Auth., 79 A.D.2d 516, 693 N.Y.S.2d 294 (1st Dept. 1980)(denial of access to the trading floor of a commodities exchange); D'Amico v. Commodities Exchange Inc., 235 A.D.2d 313, 652 N.Y.S.2d 294 (1st Dept. 1997)(same); Cahill v. Rosa, 89 N.Y.2d 14, 651 N.Y.S.2d 344 (1996)(denial of treatment at a dentist's office); Schulman v. State Div. of Human Rights, 89 N.Y.2d 934, 226 A.D.2d 645 (1997)(same).

Plaintiffs contend that the Americare Defendants knew that the consent forms that were signed were invalid. See, Ex. A, ¶¶ 518-524. Since there is no evidence to support that claim, plaintiffs must establish that Ahern's mere witnessing of the signing of the consent form establishes that the Americare Defendants violated the Executive Law. However, as the Court noted in Cirella v. Central Gen. Hosp., 217 A.D.2d 680, 681, 630 N.Y.S.2d 93 (2d Dep't 1995), "the fact that an employee of the defendant undertook the ministerial task of recording the plaintiff's consent neither relieved the plaintiff's private physicians from their obligation to obtain an informed consent nor placed that obligation upon the defendant" (citations omitted).

The doctor who is to perform the surgery or procedure has the legal duty to obtain the patient's informed consent and this duty may not be delegated. A company that provides nursing and home health aide services has neither the qualifications nor the legal duty to insure that a patient understands the risks, benefits and alternatives of a medical/surgical procedure. See New York Public Health Law § 2805-d(1).

## POINT XI

## THERE IS NO EVIDENCE OF FRAUD

In the Second Amended Complaint, plaintiffs assert a claim for fraud.  Plaintiffs allege that the defendants "wantonly, deliberately and intentionally deceived plaintiffs by failing to disclose the material fact that their medical condition did not require prostate surgery."  In addition, plaintiffs allege that the defendants' "false and fraudulent statements and representations were made with the intent to have plaintiffs execute invalid consent forms" and "the intent to have plaintiffs undergo unnecessary invasive surgery for defendants' financial gain, without proper pre-operative and post-operative medical care."

To prevail on a claim for fraud in New York, a plaintiff must prove by clear and convincing evidence: (1) that the defendant made a misrepresentation, (2) as to a material fact, (3) which was false, (4) and known to be false by the defendant, (5) that the representation was made for the purpose of inducing the other party to rely upon it, (6) that the other party rightfully did so rely, (7) in ignorance of its falsity, (8) to his injury.   Computerized Radiological Services v. Syntex Corp., 786 F.2d 72, 76 (2d Cir. 1986).

Plaintiffs have failed to present evidence to support their fraud claim. Here, plaintiffs have not established any facts with regard to the details of the alleged non-disclosure and false statements.  Accordingly, this claim should be dismissed.

Even assuming, however, that the plaintiffs have pleaded fraud with the requisite particularity, their claim still fails.  First, there is no evidence in the record that the Americare Defendants, or any employees, intentionally failed to disclose to the plaintiffs that their medical condition did not require surgery.  In fact, none of the Americare Defendants even knew about the surgeries until *after* they were performed.  See, Ex. T, p. 132; Ex. U, p. 129; Ex. V, p. 81; Ex. W, p. 91; Ex. AA, p. 69.  Moreover, the Americare Defendants did not possess the skills or

34

qualifications to know whether the plaintiffs' medical condition did or did not require surgery. See, Ex. R, pp. 255-256; Ex. CC, p. 92.  Indeed, Diane Ahern specifically testified that she had no knowledge of whether the surgeries were or were not required in each instance.  See, Ex. H, pp. 272-273.

Moreover, a claim for fraud most often contemplates both a commercial relationship and a pecuniary loss flowing from a misrepresentation made in the course of that relationship. Schmidt v. Bishop, 779 F. Supp. 321 (S.D.N.Y. 1991).  Here, plaintiffs' relationship with the Americare Defendants was not commercial, and the losses sustained by the plaintiffs were not pecuniary.  Plaintiffs' fraud claim also fails for this reason.

In addition, the Americare Defendants cannot be held vicariously liable for any of Ahern's fraudulent acts because Ahern was not acting within the scope of her employment with ACSS when she engaged in any such conduct, and the Americare Defendants did not benefit by her alleged conduct. See, e.g., Judith M v. Sisters of Charity Hospital, 93 N.Y.2d 932, 933, 693 N.Y.S.2d 67, 68 (1999);  N.X. v. Cabrini Medical Center, 97 N.Y.2d 247, 251, 739 N.Y.S.2d 348, 351 (2002).

Finally, in addition to the above requirements, when the fraud exists in connection with a claim for malpractice, the plaintiff must allege that the fraud occurred separately from and subsequent to the malpractice and the defendant's knowledge of the injury.  In addition, the damages resulting from the fraud must be distinct from those flowing from the malpractice. See Spinosa v. Weinstein, 168 A.D.2d 32, 571 N.Y.S.2d 747 (2d Dep't 1991); Simcuski v. Saeli, 44 N.Y.2d 442, 406 N.Y.2d 259 (1978).  Here, plaintiffs' fraud claims are part and parcel of their claims for medical malpractice.

Accordingly, the fraud claim fails and must be dismissed.

**POINT XII**

**IF THIS COURT DISMISSES THE PLAINTIFFS' FEDERAL
CLAIMS, IT SHOULD DECLINE JURISDICTION OVER THE
PLAINTIFFS' REMAINING STATE LAW CLAIMS**

Under 28 U.S.C. § 1367(a), "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United State Constitution." A district court, however, may "decline to exercise its supplemental jurisdiction if the 'district court has dismissed all claims over which it has original jurisdiction.'" Cushing v. Moore, 970 F.2d 1103, 1106 (2d Cir. 1992), *quoting* 28 U.S.C. § 1367(c)(3). In fact, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." Carnegie-Mellon University v. Cohill, 484 U.S. 343, 350 n. 7 (1988); Valencia v. Lee, 316 F.3d 299, 306 (2d Cir. 2003).

In this case, if the Court dismisses only the plaintiffs' federal claims, it should exercise its power to decline supplemental jurisdiction over the plaintiffs' remaining state claims. This is especially necessary where the plaintiffs' state law claims, should they survive this motion for summary judgment, may raise novel issues of state law. For example, the basis of many of the plaintiffs' state claims is that the Americare Defendants owed a duty to the plaintiffs to ensure they gave their informed consent to all medical procedures. Although statutory and case law demonstrate that the duty to obtain informed consent rests solely with the doctor, the plaintiffs seek to have that duty extended to the Americare Defendants. This is not the law. Nevertheless, any such extension presents a novel issue of state law and would best be addressed by the state

36

courts.  See Morse v. University of Vermont, 973 F.2d 122, 127-128 (2d Cir. 1992) (holding that where state law claims involved novel questions of state law, it was an abuse of discretion to exercise jurisdiction over the state claims after dismissing the federal claims).  Thus, if this Court only dismisses the plaintiffs' federal claims, then it should decline to continue to exercise supplemental jurisdiction over the plaintiffs' remaining state claims.

## CONCLUSION

Plaintiffs have obtained a substantial recovery from the Settling Defendants, who are the true wrongdoers in this case. There is no evidence to support Plaintiffs' claims against the Americare Defendants. Accordingly, for all of the foregoing reasons, this Court should dismiss all of the claims asserted against the Americare Defendants, and grant their motion for summary judgment in its entirety.

Dated:  White Plains, New York
       October 14, 2004

Respectfully submitted,

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP

By:       _____
          Glen Feinberg (GSF 4790)
          Attorneys for Defendants
          Americare Certified Special Services
          Americare, Inc.
          3 Gannett Drive
          White Plains, New York 10017-5639
          (914) 323-7000
          File No. 00873.01352

Of Counsel:   Glen Feinberg
             Joseph A. D'Avanzo
             Alyssa DeSimone
             John C. Webber

689311.3