Plaintiffs
Request
Trial by Jury

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
CLEMENT BOWEN, JOSEPH COSTA,
ROBERT FAZIO, KENNETH FRANCE, LONNIE
GRANT, TIMOTHY JOHNSON, THEODORE
LEABOUGH, THOMAS MITTENDORF (by John
Mittendorf as legal guardian and/or next friend),
HOWARD ZIEGBERMAN,

     -and-

DISABILITY ADVOCATES, INC.,

     -and-

DISABILITY ADVOCATES, INC., on behalf of
PATIENT 1, PATIENT 3, PATIENT 7, PATIENT
10, PATIENT 13, PATIENT 16, PATIENT 17,
PATIENT 19, PATIENT 20, PATIENT 21,
PATIENT 22, AND PATIENT 23,
                           Plaintiffs,
    -against-

JACOB RUBIN d/b/a LEBEN HOME FOR
ADULTS, LEBEN HOME FOR ADULTS,
AMERICARE, INC., MARTIN KLEINMAN,
DIANE AHEARN, PARKWAY HOSPITAL, INC.,
JAMILLE PERESS and HARRY JOSIFIDIS, aka
HARRY JOSFIDIS,
                       Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

01 Civ. 0070 (Weinstein, J.)

SECOND AMENDED COMPLAINT

Plaintiffs, by their undersigned attorneys, MFY Legal Services, Inc.,

Patterson, Belknap, Webb & Tyler LLP, and Disability Advocates, Inc., complaining of

the defendants, hereby allege:

1

## PRELIMINARY STATEMENT

1.     This action is brought to vindicate the rights of twenty-one
mentally disabled men who were subjected to unnecessary invasive prostate surgery at
the hands of defendants.  Defendants, each of whom had a duty to care for plaintiffs,
conspired to deprive these mentally disabled men of federal and state protections against
discrimination, and to commit these acts for financial gain.

2.     All of the plaintiffs herein are or were at all times relevant to the
complaint mentally disabled residents of an adult care facility called "Leben Home" that
is specifically designed to provide room, board and case management services, including
obtaining necessary medical services, for its residents.  Plaintiffs relied upon defendants
for every personal and medical need, from meals to medication.  Defendants willfully and
knowingly exploited their ability to control every aspect of plaintiffs' lives by devising a
scheme for their personal financial gain whereby they facilitated and performed
unnecessary, invasive prostate surgery on each plaintiff.

3.     This scheme involved the operator of the home conspiring with
health care professionals to use their respective positions of trust to induce plaintiffs to
undergo the unnecessary surgery, without conducting proper pre-operative or post-
operative medical examinations and diagnostic tests and without obtaining informed
consent.

4.     Some defendants received federal Medicaid and Medicare dollars
for facilitating and performing the surgery; upon information and belief, other defendants
received indirect payments for abetting the scheme.

2

5.      Plaintiffs were targeted solely because of their mental disabilities and used as defendants' chattel from which to reap profits. Plaintiffs, who were among the individuals in society least able to protect themselves because of their mental disabilities, were preyed upon by the very persons who were charged with their care, by the very individuals who had virtual control over every aspect of their lives.

6.      Such callous and inhumane disregard for the rights of disabled individuals violates federal and state law designed to protect the disabled from abuse and discrimination, as well as New York State common law, including:

The Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq. and implementing regulations;

Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 et seq. and implementing regulations;

42 U.S.C. § 1985(3), Conspiracy to interfere with civil rights by depriving persons of rights or privileges under the law;

42 U.S.C. § 1986, Failure to prevent interference with civil rights by depriving persons of rights or privileges under the law;

Executive Law Article 15 New York State Human Rights Law and implementing regulations;

Breach of fiduciary duty;

Fraud;

Negligence;

Breach of contract;

Medical malpractice; and

3

Lack of informed consent.

Plaintiffs seek declaratory and injunctive relief, and compensatory and punitive damages, as appropriate, for injuries and indignities they suffered for being singled out as mentally disabled individuals and for the violation of their bodily integrity as a result of the unnecessary prostate surgery.

### JURISDICTION

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 for civil actions arising under the laws of the United States, 28 U.S.C. § 1343 for actions under laws providing for the protection of civil rights, and plaintiffs request that this Court exercise its supplemental jurisdiction pursuant to 28 U.S.C. § 1367 for related state claims.

8.      Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b), as it is the judicial district in which the events or omissions giving rise to the claims occurred.

### THE PARTIES

### PLAINTIFFS

9.      Plaintiffs Clement Bowen, Robert Fazio, Kenneth France, Lonnie Grant, Timothy Johnson, Theodore Leabough and Howard Ziegberman are mentally ill residents of the Leben Home for Adults, an adult care facility providing long-term care to individuals who cannot live independently. Plaintiffs Joseph Costa and Thomas Mittendorf no longer reside at the Leben Home for Adults, but were residents of the home at all times relevant to this complaint.

4

736733_1.DOC

10.     Plaintiff Disability Advocates, Inc. ("DAI"), is a not-for-profit corporation, authorized to practice law under New York State law, that provides legal representation to individuals with disabilities.

11.     DAI is an authorized protection and advocacy agency under the Protection and Advocacy for Individuals with Mental Illness Amendments Act of 1991, 42 U.S.C. § 10801, et seq.

12.     DAI has statutory authority to pursue legal, administrative and other appropriate remedies to ensure the protection of individuals with mental illness who are receiving care and treatment in New York State.  42 U.S.C. § 10805.

13.     DAI brings this action on behalf of plaintiffs Patient 1, Patient 3, Patient 10, Patient 13, Patient 17, Patient 20, Patient 21, Patient 22, and Patient 23, nine former residents of the Leben Home whose present whereabouts are unknown.[1]

14.     DAI also brings this action on behalf of plaintiffs Patient 7, Patient 16, and Patient 19 because, upon information and belief, these plaintiffs are incapable of adequately protecting their rights.

15.     In addition to the relief requested for all plaintiffs, DAI brings this action as a plaintiff to seek injunctive relief against unnecessary medical procedures on behalf of all current and future residents of the Leben Home.

16.     DAI also brings this action as a plaintiff, seeking to protect the rights and interests of current or former residents who at the time of the filing of this complaint are unidentified, and who were subjected to unnecessary medical procedures,

---

[1]      Plaintiffs whose actions are being brought by DAI are referred throughout this Complaint using the same nomenclature used to refer to them in the Hearing Committee Determination and Order of the Department of Health, attached as Exhibit A.

5

including prostate surgery, by the defendants. These currently unidentified residents would otherwise have the right to bring all of the within claims for declaratory and injunctive relief, and for damages, against these defendants.

## DEFENDANTS

Defendants Jacob Rubin and Leben Home for Adults

17. Defendant Leben Home for Adults ("Leben Home") is an adult care facility located at 80-08 45th Avenue, Elmhurst, New York, 11373.

18. An adult home is a type of adult care facility that provides long-term residential care, including room, board, housekeeping, personal care, supervision and social services, to promote the social, physical and mental well-being of its residents, including protecting residents' health and safety.

19. Leben Home has approximately 366 residents, many of whom suffer from mental disabilities, cannot live and function independently, need assistance in daily personal care activities, and are unable to work.

20. At all times relevant to this complaint, defendant Leben Home was an adult care facility subject to New York State law and regulations.

21. Defendant Jacob Rubin ("Rubin") is the operator of the Leben Home and holds a certificate to operate the home pursuant to Social Services Law ("SSL") §§ 460-a through 460-f and 461-b.

22. Defendant Rubin is solely responsible for the operation of the Leben Home, including providing a program of services, care and supervision which assures the protection of the rights of the Leben Home residents, promotes the physical and mental well-being of the residents, and complies with SSL §§ 460 through 461-h and

6

the implementing regulations at 18 New York Code of Rules and Regulations ("NYCRR") §§ 485-487.

23.    Among these responsibilities is the requirement that the operator of the home provide each resident with an admission agreement.

24.    The Leben Home admission agreement states: "The parties to this agreement understand that this facility is an adult care facility providing lodging, board, housekeeping, personal care and supervision services to the resident in accordance with New York State Social Services Law and the Regulations of the New York State Department of Social Services."

25.    Defendant Rubin is also the administrator of the Leben Home.

26.    As such, he is responsible for maintenance of Leben Home in compliance with applicable New York State Law and regulations.

27.    Defendant Rubin has an office on the first floor of Leben Home.

28.    At all times relevant to this complaint, defendant Rubin was the operator and administrator of Leben Home for Adults and was authorized to do business as such within the State of New York.

29.    Defendants Rubin and Leben Home are solely responsible for managing and providing all services which the facility is required by law or regulation to provide.

30.    Many of the Leben Home residents depend on defendants Rubin and Leben Home for all their daily needs including meals, personal care, recreational activities, case management, medical supervision, and twenty-four hour personal supervision.

7

31.     Defendants Rubin and Leben Home are responsible, inter alia, for assisting the residents in obtaining and maintaining a primary physician or source of medical care of choice who is responsible for the overall management of the residents' individual health needs.

32.     In the event of illness, defendants Rubin and Leben Home must notify the residents' personal physicians and notify the residents' representatives or next of kin.

33.     Defendants Rubin and Leben Home are responsible, inter alia, for identifying persons in need of services, assisting external service providers in establishing a relationship with the residents, working with these providers in executing a plan for service for individual residents, and assisting in arranging for transportation, as necessary, and ensuring that residents get to appointments with these external service providers.

34.     Defendants Rubin and Leben Home are responsible for coordinating the work of other case management and service providers within the home.

35.     Defendants Rubin and Leben Home, and case management staff within the Leben Home, are responsible for utilizing and cooperating with external service providers.

36.     Defendants Rubin and Leben Home employ an activities director who is responsible for establishing an activities program for the residents. A recreation room is located in the basement of Leben Home.

37.     Defendants Rubin and Leben Home have and had at all times relevant to this complaint two large meeting rooms where the residents socialize, two

8

dining rooms where the residents eat their meals, a laundry room where Leben employees launder the residents' clothing, and several offices for various Leben employees.

38.    Upon information and belief, defendants Rubin and Leben Home lease and leased at all times relevant to this complaint office space to two primary care physicians and/or their affiliated medical group.

39.    The two doctors, Zenaida Santos and Yitzhak Twersky, provide and provided at all times relevant to this complaint medical care to Leben Home residents, including performing annual medical examinations for the purpose, inter alia, of certifying that the respective residents are continent or, if incontinent, that their incontinence is controllable.

40.    Upon information and belief, defendants Rubin and Leben Home lease and leased at all times relevant to this complaint office space at the home to Comprehensive Habilitation Services, a mental health clinic, which is affiliated with Staten Island University Hospital.

41.    Upon information and belief, defendants Rubin and Leben Home lease and leased at all times relevant to this complaint office space to a psychiatrist who is affiliated with Park Avenue Health Care.  The office is located within the Leben Home.

42.    Upon information and belief, defendants Rubin and Leben Home lease and leased at all times relevant to this complaint office space to New York Psychotherapy, whose office is adjacent to defendant Leben Home at 80-20 45th Avenue, Elmhurst, New York, 11373.

9

43. Defendant Rubin, as the operator of Leben Home, is responsible for coordinating service delivery and case management services with defendant Americare.

Defendant Americare, Inc.

44. Defendant Americare, Inc. ("Americare") is a licensed for-profit home health care services agency that provides health care services to eligible Leben Home residents.

45. Defendant Americare was incorporated in New York State on June 18, 1982, and its offices are located at 171 Kings Highway, Brooklyn, New York, 11223.

46. Upon information and belief, defendants Rubin and Leben Home contracted with defendant Americare to provide home health care services to eligible Leben Home residents.

47. At all times relevant to this complaint, defendant Americare provided home health care services to eligible Leben Home residents.

48. Americare may not duplicate or replace services that Leben Home is required to provide by law.

49. Upon information and belief, defendants Rubin and Leben Home lease and leased at all times relevant to this complaint office space to defendant Americare on one of the residential floors of Leben Home.

50. Upon information and belief, at all times relevant to this complaint, defendant Americare conducted business pursuant to its contract with defendants Rubin and Leben Home.

10

Defendant Martin Kleinman

51.    Defendant Martin Kleinman ("Kleinman") is President and Chief Executive Officer ("CEO") of defendant Americare.

52.    Upon information and belief, defendant Kleinman owns 100% of the capital stock of Americare, Inc.

53.    Upon information and belief, at all times relevant to this complaint, defendant Kleinman was President and CEO of defendant Americare, and owned 100% of the capital stock of Americare, Inc.

54.    As such, defendant Kleinman is responsible for all operations of defendant Americare.

Defendant Diane Ahearn

55.    Defendant Diane Ahearn ("Ahearn") is an Americare employee who works in the Leben Home.

56.    Defendant Ahearn's duties include supervising Americare home health aides who provide care to eligible Leben Home residents.

57.    Defendant Ahearn began working at Leben Home in or about 1992 for a medical group that served Leben Home residents.

58.    Defendant Ahearn's employment with defendant Americare began in or about 1996.

59.    At all times relevant to this complaint, defendant Ahearn was an employee of defendant Americare.

60.    Upon information and belief, at all times relevant to this complaint, defendant Ahearn was an agent and/or employee of defendants Rubin and Leben Home

11

because she performed or assisted in the performance of duties that were the sole responsibility of defendants Rubin and Leben Home.

<u>Defendant Parkway Hospital, Inc.</u>

61.     Defendant Parkway Hospital, Inc. ("Parkway Hospital"), located at 70-35 113th Street, Forest Hills, New York 11375, is a for-profit general medical hospital incorporated in New York State on October 30, 1987.

62.     Upon information and belief, defendant Parkway Hospital has 940 full-time employees, including officers, and 100 part-time employees.

63.     Upon information and belief, there are 15 house physicians and over 200 attending physicians on staff at defendant Parkway Hospital.

64.     At all times relevant to this complaint, defendant Parkway Hospital operated as a general medical hospital.

<u>Defendant Dr. Jamille Peress</u>

65.     Defendant Jamille Peress ("Peress"), a urologist, was authorized to practice medicine in New York State on or about July 1, 1971, by issuance of license number 10863 by the New York State Education Department.

66.     At all times relevant to this complaint, defendant Peress was a part owner of defendant Parkway Hospital; Chairperson of the Parkway Hospital Department of Urology at Parkway Hospital; a member of the board of directors of Parkway Hospital and/or an officer of Parkway Hospital; an agent and/or employee of Parkway Hospital; and an operator of a private medical practice.

67.     Defendant Peress retired from the active practice of medicine on December 30, 1999.

12

Defendant Dr. Harry Josifidis

68.     Defendant Harry Josifidis, aka Harry Josfidis ("Josifidis"), a urologist, was authorized to practice medicine in New York State, by issuance of license number 166922 by the New York State Education Department.

69.     At all times relevant to this complaint defendant Josifidis held privileges as a surgeon at defendant Parkway Hospital.

70.     Upon information and belief, at all times relevant to this complaint, defendant Josifidis was an employee and/or agent of Parkway Hospital.

71.     Defendant Peress' and defendant Josifidis' professional relationship began in 1994 when defendant Josifidis agreed to accept surgical referrals from defendant Peress and to cover for defendant Peress at defendant Parkway Hospital when defendant Peress was unavailable.

72.     At all times relevant to this complaint, defendants Peress and Josifidis were not legal partners and they did not hold membership in the same medical practice.

73.     Upon information and belief, defendant Josifidis bought defendant Peress' medical practice in or about 1998.

13

## STATEMENT OF FACTS

Investigation by New York State Department of Health

74.    Upon information and belief, in or about early February 1998, an employee of Parkway Hospital placed an anonymous telephone call to the New York State Commission on Quality of Care for the Mentally Disabled ("the Commission") to inform the Commission of his/her suspicions and concerns regarding the weekly arrival of groups of disabled Leben Home residents for prostate surgery.

75.    Subsequently, upon information and belief, an anonymous third party informed some or all of the defendants that the Commission was investigating the weekly arrival of groups of disabled Leben Home residents for prostate surgery at defendant Parkway Hospital.

76.    Upon information and belief, immediately thereafter, defendants ceased their conspiracy to perform unnecessary surgery on mentally disabled Leben Home residents because their plan to facilitate and perform said surgery was exposed.

77.    In or about February 1998, the New York State Department of Health ("DOH"), Bureau of Professional Medical Conduct learned about the unnecessary surgeries performed upon plaintiffs.

78.    DOH subsequently investigated the matter.  As a result of the DOH investigation, in or about February 2000, Dr. Peress and Dr. Josifidis were charged by DOH with professional misconduct based on the acts that form the basis of plaintiffs' complaint.

79.    A hearing was subsequently held and determination rendered.  By Determination and Order (BPMC #00-258), dated September 22, 2000 (a copy of which

is annexed hereto as Exhibit A and available on the DOH website at www.health.state.ny.us), the New York State Department of Health, Board for Professional Medical Conduct, Hearing Committee ("The Hearing Committee") concluded, inter alia, that defendant Peress engaged in professional misconduct by reason of engaging in conduct in the practice of medicine that evidences moral unfitness to practice medicine; practiced medicine with gross negligence; practiced medicine with incompetence on more than one occasion; practiced medicine fraudulently; willfully made or filed a false report or failed to file a report required by law or by DOH; ordered treatment not warranted by the conditions of the patients; and failed to maintain records for any patient which accurately reflected the care and treatment of said patient. (Exhibit A, pp. 21 to 23.)

80. The Hearing Committee Determination and Order suspended defendant Peress' license for five years. (Exhibit A, p. 23.)

81. The Hearing Committee Determination and Order concluded that defendant Josifidis engaged in the same professional misconduct as defendant Peress with the exception of failing to maintain records for any patient which accurately reflects the care and treatment of said patient. (Exhibit A, pp. 13 - 15.)

82. The Hearing Committee Determination and Order further concluded that defendant Peress failed to adequately obtain informed consents from plaintiffs. (Exhibit A, pp. 13-15.)

83. The Hearing Committee Determination and Order further concluded that defendant Josifidis also failed to adequately obtain informed consents from plaintiffs. (Exhibit A, pp. 13-15.)

15

84.     The Hearing Committee Determination and Order further concluded that defendant Peress inappropriately recommended surgeries on more than one occasion.  (Exhibit A, p. 19.)

85.     The Hearing Committee Determination and Order further concluded that defendant Josifidis inappropriately recommended surgeries on more than one occasion.  (Exhibit A, p. 19.)

86.     The Hearing Committee Determination and Order further concluded that defendant Josifidis performed unnecessary surgeries on more than one occasion.  (Exhibit A, p. 19.)

87.     The Hearing Committee Determination and Order restricted defendant Josifidis' license to practice medicine.  (Exhibit A, p. 23.).

88.     Plaintiffs herein were not notified of the DOH hearing or Determination and Order dated September 22, 2000 by DOH, the Commission on Quality of Care, or any of the defendants.

89.     Plaintiffs Bowen, Costa, Fazio, France, Grant, Johnson, Leabough, Mittendorf, Ziegberman, Patient 7, Patient 16 and Patient 19 did not know that they had been subjected to unnecessary prostate surgery by defendants, that defendants Josifidis, Peress, and Parkway Hospital did not obtain informed consents from plaintiffs to have prostate surgery, that the DOH had found that the surgery performed on them was unnecessary, and that the DOH had found that the consent plaintiffs gave did not constitute informed consent, until they were interviewed by MFY attorneys as part of an investigation in November and/or December 2000.

16

90.     Upon information and belief, plaintiffs Patient 1, Patient 3, Patient 10, Patient 13, Patient 17, Patient 20, Patient 21, Patient 22, and Patient 23 do not know or have reason to know that they were subjected to unnecessary prostate surgery by defendants, that defendants Josifidis, Peress, and Parkway Hospital did not obtain informed consents from them to have prostate surgery, that the DOH had found that the surgery performed on them was unnecessary, and that the DOH had found that the consent they gave did not constitute informed consent.

91.     The Department of Health's Bureau of Professional Medical Conduct appealed the Determination and Order regarding defendants Peress and Josifidis.

92.     Defendant Josifidis also appealed the Determination and Order.

93.     The Administrative Review Board ("ARB") Determination and Order (BPMC #00-258B), regarding defendant Peress (a copy of which is annexed hereto as Exhibit B and available on the DOH website at www.health.state.ny.us), overturned defendant Peress' five year medical suspension and revoked his medical license. (Exhibit B, p. 10).

94.     The ARB Determination and Order affirmed the Hearing Committee's findings that defendant Peress engaged in professional misconduct by reason of engaging in conduct in the practice of medicine that evidences moral unfitness to practice medicine; practiced medicine with gross negligence; practiced medicine with incompetence on more than one occasion; ordered treatment not warranted by the conditions of the patients; and failed to maintain records for any patient which accurately reflects the care and treatment of said patient. (Exhibit B, pages 8-9 and 10.)

17

95.     The ARB Determination and Order overturned and dismissed the fraud and false reporting charges against defendant Peress on procedural grounds. It found that DOH's Office of Professional Conduct's statement of charges failed to include a fraud charge for specific acts by defendant. It further found that the Hearing Committee failed to make a finding on the record that defendant Peress knowingly and falsely misrepresented information in the plaintiffs' records. The ARB stated that the Hearing Committee had authority to draw the inference that erroneous or careless reports can constitute intent to knowingly misrepresent information, but that the inference must be articulated on the record. It thereby concluded that there was no basis articulated in the record on which the Committee could have sustained the fraud and false reporting charges. (Exhibit B, pages 6-7.)

96.     The Administrative Review Board ("ARB") Determination and Order (BPMC #00-258A) regarding defendant Josifidis (a copy of which is annexed hereto as Exhibit C and available on the DOH website at www.health.state.ny.us), overturned the penalty imposed on defendant Josifidis and suspended his medical license for three years, stayed the suspension for all but six months and placed defendant Josifidis on probation for two and one-half years. (Exhibit C, p. 11.)

97.     The ARB Determination and Order affirmed the Hearing Committee's findings that defendant Josifidis engaged in professional misconduct by reason of engaging in conduct in the practice of medicine that evidences moral unfitness to practice medicine; practiced medicine with gross negligence; practiced medicine with incompetence on more than one occasion; and ordered treatment not warranted by the conditions of the patients. (Exhibit C, p. 11.)

736733_1.DOC

98.     The ARB Determination and Order overturned and dismissed the fraud and false reporting charges against defendant Josifidis on procedural grounds. It found that the Hearing Committee failed to make a finding on the record that defendant Josifidis knowingly and falsely misrepresented information in the plaintiffs' records. The ARB stated that the Hearing Committee had authority to draw the inference that erroneous or careless reports can constitute intent to knowingly misrepresent information, but that the inference must be articulated on the record. It thereby concluded that there was no basis articulated in the record on which the Committee could have sustained the fraud and false reporting charges. (Exhibit C, p. 11.)

Plaintiffs are Solicited by Defendants for Surgery

99.     All of the named defendants in this complaint stand in a special relationship to the disabled plaintiffs and are charged in some way with the care of plaintiffs or with facilitating the care of plaintiffs.

100.     Plaintiffs trusted the defendants, and relied on each of the defendants to act in their best interests.

101.     Notwithstanding this obligation, defendants Rubin, Leben Home, Americare, Kleinman and Ahearn sent disabled residents of Leben Home by ambulette to defendant Peress' office and then to defendant Parkway Hospital where defendant Josifidis performed unnecessary prostate surgery as set forth below.

102.     Defendant Parkway Hospital sent an agent or employee to defendant Leben Home to solicit business for itself in or around 1997.

103.     Upon information and belief, defendants Rubin and Leben Home agreed to send Leben residents to defendant Parkway Hospital for medical treatment.

19

104. Dr. Mark Erenpreiss ("Dr. Erenpreiss") was an employee and/or agent of defendants Peress and Parkway Hospital all times relevant to this complaint.

105. Dr. Yitzhak Twersky and/or Dr. Zenaida Santos, the primary physicians located at Leben Home, referred plaintiffs Bowen, France, Mittendorf and Patient 23 to Dr. Erenpreiss for urological consultations in or about October 1997.

106. Dr. Erenpreiss evaluated these four plaintiffs and concluded that they did not have a voiding problem and prostate surgery was not necessary.

107. In or about December 1997, Dr. Erenpreiss had a "falling out" with defendant Peress.

108. After the "falling out," Dr. Erenpreiss no longer saw Leben Home residents.

109. After Dr. Erenpreiss and defendant Peress had a "falling out", defendant Peress came to defendant Leben to implement the scheme of facilitating unnecessary surgery.

110. Defendant Peress came to the Leben Home to examine the first group of plaintiffs for their alleged urological problems in or about early January 1998.

111. Defendant Peress returned to the Leben Home to examine the remaining plaintiffs for their alleged urological problems in mid- to late January 1998.

112. Neither of the two Leben Home primary care physicians referred plaintiffs to defendant Peress for their alleged incontinence.

113. Defendants Rubin, Leben Home, Ahearn, Americare, Kleinman, Parkway Hospital, Peress and Josifidis intentionally bypassed the Leben Home primary physicians.

20

114. Defendant Peress' initial encounter with each of the plaintiffs was an approximately five-minute long, superficial urological screening performed at Leben Home.

115. After this superficial screening, defendant Peress informed plaintiffs they needed prostate surgery.

116. Upon information and belief, defendant Peress already intended to refer the plaintiffs to defendant Josifidis for prostate surgery, even before he performed medical examinations and diagnostic tests on them.

117. Upon information and belief, defendants Rubin, Leben Home Ahearn, Kleinman, Parkway Hospital, Americare and Josifidis knew that defendant Peress already intended to refer the mentally disabled plaintiffs to defendant Josifidis for prostate surgery even before he performed any medical examinations and diagnostic tests on them, and facilitated his so doing.

118. Upon information and belief, defendants Rubin, Leben Home Ahearn, Kleinman, Parkway Hospital, Americare, and Josifidis knew of defendant Peress' plan to have the plaintiffs undergo unnecessary surgery and facilitated its execution.

119. Based solely on the five-minute long, superficial screening performed by defendant Peress at defendant Leben Home, defendant Ahearn encouraged the plaintiffs to have the unnecessary surgery.

120. Each plaintiff signed a consent form at the Leben Home for prostate surgery.

121. Upon information and belief, plaintiffs signed these consent forms as a result of defendants Rubin, Leben Home, Peress, Ahearn, Americare, Kleinman, and

21

Parkway Hospital's fraudulent misrepresentations to plaintiffs that they needed prostate surgery.

122. Defendant Ahearn witnessed each consent form signed by plaintiffs.

123. None of the consent forms signed by plaintiffs and witnessed by defendant Ahearn was informed.

124. Defendant Ahearn exercised great influence over plaintiffs, who trusted her and looked to her as a source of health care.

125. Defendant Rubin exercised great influence over plaintiffs, who trusted him and relied upon him for their every personal need.

126. In or about January 1998, defendant Ahearn received telephone calls from defendant Peress' employee requesting that plaintiffs be sent in groups to his office each Thursday in or about January 1998 for medical examinations and diagnostic tests.

Plaintiffs are Transported to Peress' Office and Parkway Hospital for Surgery

127. Based on this request, defendant Ahearn then arranged for ambulette service to transport the plaintiffs to defendant Peress' office, which is located close to defendant Parkway Hospital.

128. Upon information and belief, defendant Rubin knew of this request for ambulette service.

129. Defendant Ahearn executed patient transfer forms for each plaintiff.

22

130.    Upon information and belief, defendants Rubin and Leben Home directed defendant Ahearn to execute the patient transfer forms for each plaintiff.

131.    Defendants Rubin and Leben Home are required to execute a patient transfer form for any resident of the Leben Home who requires hospitalization.

132.    Upon information and belief, the patient transfer form has a box to be checked if the patient is incontinent, but the box marked "incontinent" was not checked on any of the plaintiffs' transfer forms.

133.    Defendants Rubin, Leben Home, Americare, Kleinman, Parkway Hospital, Josifidis and Ahearn knew that plaintiffs would go directly from Peress' office to Parkway Hospital for the unnecessary surgery.

134.    Upon information and belief, defendants intentionally misrepresented to plaintiffs that they needed prostate surgery.

135.    Defendant Peress failed to perform adequate medical examinations and diagnostic tests on the residents when they went to these appointments.

136.    After performing the inadequate medical examinations and diagnostic tests on plaintiffs, defendant Peress told them they needed prostate surgery.

137.    Upon information and belief, defendant Peress's statements to plaintiffs that they needed prostate surgery after performing inadequate medical examinations and diagnostic tests on them was an intentional misrepresentation.

138.    Immediately after completing the inadequate medical examinations and diagnostic tests, defendant Peress sent plaintiffs nearby to defendant Parkway Hospital with the invalid consent forms executed at Leben Home and witnessed by defendant Ahearn, and the patient transfer forms executed by defendant Ahearn.

23

139.   Defendant Peress referred each plaintiff to defendants Parkway Hospital and Josifidis for unnecessary prostate surgery.

140.   Defendant Parkway Hospital was advised by hospital employees that the plaintiffs were arriving at the emergency room with pre-signed consent forms, and that many of the plaintiffs did not know why they were at the hospital.

141.   Defendant Josifidis performed prostate surgery on each plaintiff.

142.   Defendants Peress, Josifidis and Parkway Hospital knew that the prostate surgery was unnecessary.

143.   In no instance were the plaintiff's next of kin, other family members, or interested parties such as guardians contacted when defendants Rubin, Leben Home, Americare, Kleinman, Ahearn, Parkway Hospital, Peress and Josifidis arranged for the unnecessary prostate surgery on plaintiffs.

144.   None of the plaintiffs was told of alternative medical treatment or procedures or informed of the risks and potential harmful side effects of prostate surgery by defendants Peress, Josifidis or Parkway Hospital.

145.   Defendants Peress, Josifidis and Parkway Hospital failed to obtain informed consent from any of the plaintiffs.

146.   None of the plaintiffs received an adequate pre-operative medical work-up before surgery by defendants Peress, Josifidis or Parkway Hospital.

147.   Each plaintiff underwent general anesthesia before having prostate surgery.

148.   Each plaintiff underwent unnecessary prostate surgery.

24

736733_1.DOC

149. Each plaintiff underwent the unnecessary surgery as a result of defendants' fraudulent procurement of plaintiffs' signatures on consent forms.

150. Each plaintiff underwent the unnecessary surgery as a result of defendants' fraudulent misrepresentation that plaintiffs needed such surgery.

151. Each plaintiff sustained an injury because of the unnecessary, invasive surgery.

152. None of the plaintiffs received adequate post-operative care.

153. Plaintiffs suffered injury due to this lack of adequate post-operative care.

154. Plaintiffs Bowen, Costa, Fazio, France, Grant, Johnson, Leabough, Mittendorf, Ziegberman, Patient 7, Patient 16, and Patient 17 had no knowledge or reason to know that the consent forms they executed were not informed, or that the surgery they underwent was not necessary from in or around January 1998 until in or around November 2000-December 2000.

155. The unnecessary prostate surgery performed on each plaintiff was paid for by Medicaid and/or Medicare dollars.

156. Each of the plaintiffs was a victim of defendants' scheme to obtain consent that was not informed and to subject plaintiffs to unnecessary invasive prostate surgery without adequate pre-operative and/or post-operative medical care.

157. Upon information and belief, defendants Rubin, Leben Home, Ahearn, Americare and Kleinman continue to refer Leben Home residents to defendant Parkway Hospital.

25

158.    Upon information and belief, all plaintiffs who continue to reside at the Leben Home continue to be threatened with unnecessary and dangerous medical procedures by defendants Rubin, Leben Home, Ahearn, Americare, Parkway Hospital and Kleinman.

Plaintiff Bowen

159.    Plaintiff Clement Bowen ("Bowen") resides at the Leben Home for Adults ("Leben Home"), 80-08 45th Avenue, Elmhurst, New York, 11373. He has resided at the Leben Home at all times relevant to this complaint.

160.    Plaintiff Bowen signed or should have been required to sign an admission agreement with defendants Rubin and Leben Home upon moving to the Leben Home.

161.    Because of mental illness, plaintiff Bowen cannot live and function independently, needs assistance in caring for himself, and is unable to work.

162.    Since admission to the Leben Home, plaintiff Bowen's federal government benefits were used and continue to be used to make regular payments for room and board pursuant to his written admission agreement.

163.    Since admission to the Leben Home, plaintiff Bowen's federal Medicaid and/or Medicare benefits were used and continue to be used to pay for medical costs and home health care services.

164.    In or about January 1998, plaintiff Bowen signed a consent form, witnessed by defendant Ahearn at defendant Leben Home, to have prostate surgery.

165.    On or about January 1998, plaintiff Bowen had prostate surgery performed on him by defendant Josifidis at defendant Parkway Hospital.

26

166.   The surgery was unnecessary and plaintiff Bowen suffered injury from said surgery.

167.   Plaintiff Bowen did not receive proper pre-operative and post-operative medical care.

Plaintiff Joseph Costa

168.   Plaintiff Joseph Costa ("Costa") is a resident of Woodhaven Adult Home, 1350 Route 112, Port Jefferson, New York, 11776.  At all times relevant to this complaint, plaintiff Costa resided at the Leben Home, 80-08 45th Avenue, Elmhurst, New York, 11373.

169.   Plaintiff Costa signed or should have been required to sign an admission agreement with defendants Rubin and Leben Home upon moving to the Leben Home.

170.   Because of mental illness, plaintiff Costa could not live and function independently, needed assistance in caring for himself, and was unable to work while a resident at the Leben Home.

171.   During his residency at the Leben Home, plaintiff Costa's federal government benefits were used to make regular payments for room and board pursuant to his written admission agreement.

172.   During his residency at the home, plaintiff Costa's federal Medicaid and/or Medicare benefits were used to pay for medical costs and home health care services.

173.   In or about January 1998, plaintiff Costa signed a consent form, witnessed by defendant Ahearn at defendant Leben Home, to have prostate surgery.

27

174.    Plaintiff Costa did not give informed consent.

175.    In or about January 1998, plaintiff Costa had prostate surgery performed on him by defendant Josifidis at defendant Parkway Hospital.

176.    The surgery was unnecessary, and plaintiff Costa suffered injury from said surgery.

177.    Plaintiff Costa did not receive proper pre-operative and post-operative medical care.

Plaintiff Robert Fazio

178.    Plaintiff Robert Fazio ("Fazio") is a resident of Leben Home, 80-08 45th Avenue, Elmhurst, New York, 11373. He has resided at the Leben Home at all times relevant to this complaint.

179.    Plaintiff Fazio signed or should have been required to sign an admission agreement with defendants Rubin and Leben Home upon moving to the home.

180.    Because of mental illness, plaintiff Fazio cannot live and function independently, needs assistance in caring for himself, and is unable to work.

181.    Since admission to the Leben Home, plaintiff Fazio's federal government benefits were used and continue to be used to make regular payments for room and board pursuant to his written admission agreement.

182.    Since admission to the Leben Home, plaintiff Fazio's federal Medicaid and/or Medicare benefits were used and continue to be used to pay for medical costs and home health care services.

183.    In or about January 1998, plaintiff Fazio signed a consent form, witnessed by defendant Ahearn at defendant Leben Home, to have prostate surgery.

28

736733_1.DOC

184.   Plaintiff Fazio did not give informed consent.

185.   In or about February 1998, plaintiff Fazio had prostate surgery performed on him by defendant Josifidis at defendant Parkway Hospital.

186.   The surgery was unnecessary, and plaintiff Fazio suffered injury from said surgery.

187.   Plaintiff Fazio did not receive proper pre-operative and post-operative medical care.

Plaintiff Kenneth France

188.   Plaintiff Kenneth France ("France") is a resident of Leben Home, 80-08 45th Avenue, Elmhurst, New York, 11373. He has resided at the Leben Home at all times relevant to this complaint.

189.   Plaintiff France signed or should have been required to sign an admission agreement with defendants Rubin and Leben Home upon moving to the home.

190.   Because of mental illness, plaintiff France cannot live and function independently, needs assistance in caring for himself, and is unable to work.

191.   Since admission to the Leben Home, plaintiff France's federal government benefits were used and continue to be used to make regular payments for room and board pursuant to his written admission agreement.

192.   Since admission to the Leben Home, plaintiff France's federal Medicaid and/or Medicare benefits were used and continue to be used to pay for medical costs and home health care services.

193.   In or about January 1998, plaintiff France signed a consent form, witnessed by defendant Ahearn at defendant Leben Home, to have prostate surgery.

29

194. Plaintiff France did not give informed consent.

195. On or about January 9, 1998, plaintiff France had prostate surgery performed on him by defendant Josifidis at defendant Parkway Hospital.

196. The surgery was unnecessary, and plaintiff France suffered injury from said surgery.

197. Plaintiff France did not receive proper pre-operative and post-operative medical care.

Plaintiff Lonnie Grant

198. Plaintiff Lonnie Grant ("Grant") is a resident of Leben Home, 80-08 45th Avenue, Elmhurst, New York, 11373. He has resided at the Leben Home at all times relevant to this complaint.

199. Plaintiff Grant signed or should have been required to sign an admission agreement with defendants Rubin and Leben Home upon moving to the home.

200. Because of mental illness, plaintiff Grant cannot live and function independently, needs assistance in caring for himself, and is unable to work.

201. Since admission to the Leben Home, plaintiff Grant's federal government benefits were used and continue to be used to make regular payments for room and board pursuant to his written admission agreement.

202. Since admission to the Leben Home, plaintiff Grant's federal Medicaid and/or Medicare benefits were used and continue to be used to pay for medical costs and home health care services.

203. On or about January 21, 1998, plaintiff Grant signed a consent form, witnessed by defendant Ahearn at defendant Leben Home, to have prostate surgery.

30

204.    Plaintiff Grant did not give informed consent.

205.    On or about January 31, 1998, plaintiff Grant had prostate surgery performed on him by defendant Josifidis at defendant Parkway Hospital.

206.    The surgery was unnecessary, and plaintiff Grant suffered injury from said surgery.

207.    Plaintiff Grant did not receive proper pre-operative and post-operative medical care.

Plaintiff Timothy Johnson

208.    Plaintiff Timothy Johnson ("Johnson") is a resident of Leben Home, 80-08 45th Avenue, Elmhurst, New York, 11373. He has resided at the Leben Home at all times relevant to this complaint.

209.    Plaintiff Johnson signed or should have been required to sign an admission agreement with defendants Rubin and Leben Home upon moving to the home.

210.    Because of mental illness, plaintiff Johnson cannot live and function independently, needs assistance in caring for himself, and is unable to work.

211.    Since admission to the Leben Home, plaintiff Johnson's federal government benefits were used and continue to be used to make regular payments for room and board pursuant to his written admission agreement.

212.    Since admission to the Leben Home, plaintiff Johnson's federal Medicaid and/or Medicare benefits were used and continue to be used to pay for medical costs and home health care services.

213.    In or about January 1998, plaintiff Johnson signed a consent form, witnessed by defendant Ahearn at defendant Leben Home, to have prostate surgery.

31

214.   Plaintiff Johnson did not give informed consent.

215.   In or about January 1998, plaintiff Johnson had prostate surgery performed on him by defendant Josifidis at defendant Parkway Hospital.

216.   The surgery was unnecessary, and plaintiff Johnson suffered injury from said surgery.

217.   Plaintiff Johnson did not receive proper pre-operative and post-operative medical care.

Plaintiff Theodore Leabough

218.   Plaintiff Theodore Leabough ("Leabough") is a resident of Leben Home, 80-08 45th Avenue, Elmhurst, New York, 11373.  He has resided at the Leben Home at all times relevant to this complaint.

219.   Plaintiff Leabough signed or should have been required to sign an admission agreement with defendants Rubin and Leben Home upon moving to the home.

220.   Because of mental illness, plaintiff Leabough cannot live and function independently, needs assistance in caring for himself, and is unable to work.

221.   Since admission to the Leben Home, plaintiff Leabough's federal government benefits were used and continue to be used to make regular payments for room and board pursuant to his written admission agreement.

222.   Since admission to the Leben Home, plaintiff Leabough's federal Medicaid and/or Medicare benefits were used and continue to be used to pay for medical costs and home health care services.

223.   In or about January 1998, plaintiff Leabough signed a consent form, witnessed by defendant Ahearn at defendant Leben Home, to have prostate surgery.

32

224.    Plaintiff Leabough did not give informed consent.

225.    In or about January 1998, plaintiff Leabough had prostate surgery performed on him by defendant Josifidis at defendant Parkway Hospital.

226.    The surgery was unnecessary, and plaintiff Leabough suffered injury from said surgery.

227.    Plaintiff Leabough did not receive proper pre-operative and post-operative medical care.

Plaintiff Thomas Mittendorf

228.    Plaintiff Thomas Mittendorf ("Mittendorf") is a resident of Laconia Nursing Home, 1050 East 230 Street, Bronx, New York, 10466.  At all times relevant to this complaint, plaintiff Mittendorf was a resident of the Leben Home, 80-08 45th Avenue, Elmhurst, New York, 11373.

229.    Plaintiff Mittendorf signed or should have been required to sign an admission agreement with defendant Leben Home upon moving to the home.

230.    Because of mental illness, plaintiff Mittendorf could not live and function independently, needed assistance in caring for himself, and was unable to work while a resident at the Leben Home.

231.    During his residency at Leben Home, plaintiff Mittendorf's federal government benefits were used to make regular payments for room and board pursuant to his written admission agreement.

232.    During his residency at Leben Home, plaintiff Mittendorf's federal Medicaid and/or Medicare benefits were used to pay for medical costs and home health care costs.

33

233.    John Mittendorf is plaintiff Mittendorf's brother and legal guardian.  He is bringing this action on behalf of his brother, plaintiff Mittendorf, as legal guardian and/or next friend.

234.    In or about January 1998, plaintiff Mittendorf signed a consent form, witnessed by defendant Ahearn at defendant Leben Home, to have prostate surgery.

235.    Plaintiff Mittendorf did not give informed consent.

236.    On or about January 9, 1998, plaintiff Mittendorf had prostate surgery performed on him by defendant Josifidis at defendant Parkway Hospital.

237.    The surgery was unnecessary, and plaintiff Mittendorf suffered injury from said surgery.

238.    Plaintiff Mittendorf did not receive proper pre-operative and post-operative medical care.

Plaintiff Howard Ziegberman

239.    Plaintiff Howard Ziegberman ("Ziegberman") is a resident of Leben Home, 80-08 45th Avenue, Elmhurst, New York, 11373.  He has resided at the Leben Home at all times relevant to this complaint.

240.    Plaintiff Ziegberman signed or should have been required to sign an admission agreement with defendants Rubin and Leben Home upon moving to the home.

241.    Because of mental illness, plaintiff Ziegberman cannot live and function independently, needs assistance in caring for himself, and is unable to work.

34

242.    Since admission to the Leben Home, plaintiff Ziegberman's federal government benefits were used and continue to be used to make regular payments for room and board pursuant to his written admission agreement.

243.    Since admission to the Leben Home, plaintiff Ziegberman's federal Medicaid and/or Medicare benefits were used and continue to be used to pay for medical costs and home health care services.

244.    In or about January 1998, plaintiff Ziegberman signed a consent form, witnessed by defendant Ahearn at defendant Leben Home, to have prostate surgery.

245.    Plaintiff Ziegberman did not give informed consent.

246.    In or about January 1998, plaintiff Ziegberman had prostate surgery performed on him by defendant Josifidis at defendant Parkway Hospital.

247.    The surgery was unnecessary, and plaintiff Ziegberman suffered injury from said surgery.

248.    Plaintiff Ziegberman did not receive proper pre-operative and post-operative medical care.

Plaintiff Patient 1

249.    Plaintiff Patient 1 was a resident of Leben Home, 80-08 45th Avenue, Elmhurst, New York, 11373, at all times relevant to this complaint.

250.    His whereabouts are unknown at this time.

251.    Plaintiff Patient 1 signed or should have been required to sign an admission agreement with defendants Rubin and Leben Home upon moving to the home.

35

252.   Because of mental illness, plaintiff Patient 1 could not live and function independently, needed assistance in caring for himself, and was unable to work while a resident at the Leben Home.

253.   During his residency at Leben Home, plaintiff Patient 1's federal government benefits were used to make regular payments for room and board pursuant to his written admission agreement.

254.   During his residency at Leben Home, plaintiff Patient 1's federal Medicaid and/or Medicare benefits were used to pay for medical costs and home health care services.

255.   In or about January 1998, plaintiff Patient 1 signed a consent form, witnessed by defendant Ahearn at defendant Leben Home, to have prostate surgery.

256.   Plaintiff Patient 1 did not give informed consent.

257.   On or about January 21, 1998, plaintiff Patient 1 had prostate surgery performed on him by defendant Josifidis at defendant Parkway Hospital.

258.   The surgery was unnecessary, and plaintiff Patient 1 suffered injury from said surgery.

259.   Plaintiff Patient 1 did not receive proper pre-operative and post-operative medical care.

Plaintiff Patient 3

260.   Plaintiff Patient 3 was a resident of Leben Home, 80-08 45th Avenue, Elmhurst, New York, 11373, at all times relevant to this complaint.

261.   His whereabouts are unknown at this time.

36

262.    Plaintiff Patient 3 signed or should have been required to sign an admission agreement with defendants Rubin and Leben Home upon moving to the home.

263.    Upon information and belief, because of mental illness, plaintiff Patient 3 could not live and function independently, needed assistance in caring for himself, and was unable to work while a resident at the Leben Home.

264.    During his residency at Leben Home, plaintiff Patient 3's federal government benefits were used to make regular payments for room and board pursuant to his written admission agreement.

265.    During his residency at Leben Home, plaintiff Patient 3's federal Medicaid and/or Medicare benefits were used to pay for medical costs and home health care services.

266.    In or about January 1998, plaintiff Patient 3 signed a consent form, witnessed by defendant Ahearn at defendant Leben Home, to have prostate surgery.

267.    Plaintiff Patient 3 did not give informed consent.

268.    On or about January 9, 1998, plaintiff Patient 3 had prostate surgery performed on him by defendant Josifidis at defendant Parkway Hospital.

269.    The surgery was unnecessary, and plaintiff Patient 3 suffered injury from said surgery.

270.    Plaintiff Patient 3 did not receive proper pre-operative and post-operative medical care.

37

Plaintiff Patient 7

271.    Plaintiff Patient 7 is a resident of Leben Home, 80-08 45th Avenue, Elmhurst, New York, 11373. He has resided at the Leben Home at all times relevant to this complaint.

272.    Plaintiff Patient 7 signed or should have been required to sign an admission agreement with defendants Rubin and Leben Home upon moving to the home.

273.    Because of mental illness, plaintiff Patient 7 cannot live and function independently, needs assistance in caring for himself, and is unable to work.

274.    Since admission to the Leben Home, plaintiff Patient 7's federal government benefits were used and continue to be used to make regular payments for room and board pursuant to his written admission agreement.

275.    Since admission to the Leben Home, plaintiff Patient 7's federal Medicaid and/or Medicare benefits were used and continue to be used to pay for medical costs and home health care services.

276.    Plaintiff Patient 7 is incapable of adequately protecting his rights.

277.    In or about January 1998, plaintiff Patient 7 signed a consent form, witnessed by defendant Ahearn at defendant Leben Home, to have prostate surgery.

278.    Plaintiff Patient 7 did not give informed consent.

279.    In or about January 1998, plaintiff Patient 7 had prostate surgery performed on him by defendant Josifidis at defendant Parkway Hospital.

280.    The surgery was unnecessary, and plaintiff Patient 7 suffered injury from said surgery.

38

281.    Plaintiff Patient 7 did not receive proper pre-operative and post-operative medical care.

Plaintiff Patient 10

282.    Plaintiff Patient 10 was a resident of Leben Home, 80-08 45th Avenue, Elmhurst, New York, 11373, at all times relevant to this complaint.

283.    His whereabouts are unknown at this time.

284.    Plaintiff Patient 10 signed or should have been required to sign an admission agreement with defendants Rubin and Leben Home upon moving to the home.

285.    Because of mental illness, plaintiff Patient 10 could not live and function independently, needed assistance in caring for himself, and was unable to work while a resident at the Leben Home.

286.    During his residency at Leben Home, plaintiff Patient 10's federal government benefits were used to make regular payments for room and board pursuant to his written admission agreement.

287.    During his residency at Leben Home, plaintiff Patient 10's federal Medicaid and/or Medicare benefits were used to pay for medical costs and home health care services.

288.    In or about January 1998, plaintiff Patient 10 signed a consent form, witnessed by defendant Ahearn at defendant Leben Home, to have prostate surgery.

289.    Plaintiff Patient 10 did not give informed consent.

290.    In or about January 1998, plaintiff Patient 10 had prostate surgery performed on him by defendant Josifidis at defendant Parkway Hospital.

39

291.    The surgery was unnecessary, and plaintiff Patient 10 suffered injury from said surgery.

292.    Plaintiff Patient 10 did not receive proper pre-operative and post-operative medical care.

Plaintiff Patient 13

293.    Plaintiff Patient 13 was a resident of Leben Home, 80-08 45th Avenue, Elmhurst, New York, 11373, at all times relevant to this complaint.

294.    His whereabouts are unknown at this time.

295.    Plaintiff Patient 13 signed or should have been required to sign an admission agreement with defendants Rubin and Leben Home upon moving to the home.

296.    Because of mental illness, plaintiff Patient 13 could not live and function independently, needed assistance in caring for himself, and was unable to work while a resident at the Leben Home.

297.    During his residency at the Leben Home, plaintiff Patient 13's federal government benefits were used and continue to be used to make regular payments for room and board pursuant to his written admission agreement.

298.    During his residency at the Leben Home, plaintiff Patient 13's federal Medicaid and/or Medicare benefits were used and continue to be used to pay for medical costs and home health care services.

299.    In or about January 1998, plaintiff Patient 13 signed a consent form, witnessed by defendant Ahearn at defendant Leben Home, to have prostate surgery.

300.    Plaintiff Patient 13 did not give informed consent.

40

301.   In or about January 1998, plaintiff Patient 13 had prostate surgery performed on him by defendant Josifidis at defendant Parkway Hospital.

302.   The surgery was unnecessary, and plaintiff Patient 13 suffered injury from said surgery.

303.   Plaintiff Patient 13 did not receive proper pre-operative and post-operative medical care.

Plaintiff Patient 16

304.   Plaintiff Patient 16 is a resident of Leben Home, 80-08 45th Avenue, Elmhurst, New York, 11373.  He has resided at the Leben Home at all times relevant to this complaint.

305.   Plaintiff Patient 16 signed or should have been required to sign an admission agreement with defendants Rubin and Leben Home upon moving to the home.

306.   Upon information and belief, because of mental illness, plaintiff Patient 16 cannot live and function independently, needs assistance in caring for himself, and is unable to work.

307.   Since admission to the Leben Home, plaintiff Patient 16's federal government benefits were used and continue to be used to make regular payments for room and board pursuant to his written admission agreement.

308.   Plaintiff Patient 16 is incapable of adequately protecting his rights.

309.   Since admission to the Leben Home, plaintiff Patient 16's federal Medicaid and/or Medicare benefits were used and continue to be used to pay for medical costs and home health care services.

41

310.    In or about January 1998, plaintiff Patient 16 signed a consent form, witnessed by defendant Ahearn at defendant Leben Home, to have prostate surgery.

311.    Plaintiff Patient 16 did not give informed consent.

312.    On or about January 8, 1998, plaintiff Patient 16 had prostate surgery performed on him by defendant Josifidis at defendant Parkway Hospital.

313.    The surgery was unnecessary, and plaintiff Patient 16 suffered injury from said surgery.

314.    Plaintiff Patient 16 did not receive proper pre-operative and post-operative medical care.

Plaintiff Patient 17

315.    Plaintiff Patient 17 was a resident of Leben Home, 80-08 45th Avenue, Elmhurst, New York, 11373, at all times relevant to this complaint.

316.    His whereabouts are unknown at this time.

317.    Plaintiff Patient 17 signed or should have been required to sign an admission agreement with defendants Rubin and Leben Home upon moving to the home.

318.    Because of mental illness, plaintiff Patient 17 could not live and function independently, needed assistance in caring for himself, and was unable to work while a resident at the Leben Home.

319.    During his residency at Leben Home, plaintiff Patient 17's federal government benefits were used to make regular payments for room and board pursuant to his written admission agreement.

42

320.     During his residency at Leben Home, plaintiff Patient 17's federal Medicaid and/or Medicare benefits were used to pay for medical costs and home health care costs.

321.     On or about January 29, 1998, plaintiff Patient 17 signed a consent form, witnessed by defendant Ahearn at defendant Leben Home, to have prostate surgery.

322.     Plaintiff Patient 17 did not give informed consent.

323.     In or about February 1998, plaintiff Patient 17 had prostate surgery performed on him by defendant Josifidis at defendant Parkway Hospital.

324.     The surgery was unnecessary, and plaintiff Patient 17 suffered injury from said surgery.

325.     Plaintiff Patient 17 did not receive proper pre-operative and post-operative medical care.

Plaintiff Patient 19

326.     Plaintiff Patient 19 is a resident of Leben Home, 80-08 45th Avenue, Elmhurst, New York, 11373.  He has resided at the Leben Home at all times relevant to this complaint.

327.     Plaintiff Patient 19 signed or should have been required to sign an admission agreement with defendants Rubin and Leben Home upon moving to the home.

328.     Because of mental illness, plaintiff Patient 19 cannot live and function independently, needs assistance in caring for himself, and is unable to work.

329.     Since admission to the Leben Home, plaintiff Patient 19's federal government benefits were used and continue to be used to make regular payments for room and board pursuant to his written admission agreement.

43

330.   Since admission to the Leben Home, plaintiff Patient 19's federal Medicaid and/or Medicare benefits were used and continue to be used to pay for medical costs and home health care services.

331.   Plaintiff Patient 19 is incapable of adequately protecting his rights.

332.   In or about January 1998, plaintiff Patient 19 signed a consent form, witnessed by defendant Ahearn at defendant Leben Home, to have prostate surgery.

333.   Plaintiff Patient 19 did not give informed consent.

334.   In or about January 1998, plaintiff Patient 19 had prostate surgery performed on him by defendant Josifidis at defendant Parkway Hospital.

335.   The surgery was unnecessary, and plaintiff Patient 19 suffered injury from said surgery.

336.   Plaintiff Patient 19 did not receive proper pre-operative and post-operative medical care.

Plaintiff Patient 20

337.   Plaintiff Patient 20 was a resident of Leben Home, 80-08 45th Avenue, Elmhurst, New York, 11373 at all times relevant to this complaint.

338.   His whereabouts are unknown at this time.

339.   Plaintiff Patient 20 signed or should have been required to sign an admission agreement with defendants Rubin and Leben Home upon moving to the home.

340.   Because of mental illness, plaintiff Patient 20 could not live and function independently, needed assistance in caring for himself, and was unable to work while a resident at the Leben Home.

44

341.    During his residency at the Leben Home, plaintiff Patient 20's federal government benefits were used to make regular payments for room and board pursuant to his written admission agreement.

342.    During his residency at Leben Home, plaintiff Patient 20's federal Medicaid and/or Medicare benefits were used to pay for medical costs and home health care services.

343.    On or about January 21, 1998, plaintiff Patient 20 signed a consent form, witnessed by defendant Ahearn at defendant Leben Home, to have prostate surgery.

344.    Plaintiff Patient 20 did not give informed consent.

345.    In or about January 1998, plaintiff Patient 20 had prostate surgery performed on him by defendant Josifidis at defendant Parkway Hospital.

346.    The surgery was unnecessary, and plaintiff Patient 20 suffered injury from said surgery.

347.    Plaintiff Patient 20 did not receive proper pre-operative and post-operative medical care.

Plaintiff Patient 21

348.    Plaintiff Patient 21 was a resident of Leben Home, 80-08 45th Avenue, Elmhurst, New York, 11373 at all times relevant to this complaint.

349.    His whereabouts are unknown at this time.

350.    Plaintiff Patient 21 signed or should have been required to sign an admission agreement with defendants Rubin and Leben Home upon moving to the home.

45

351.  Because of mental illness, plaintiff Patient 21 could not live and function independently, needed assistance in caring for himself, and was unable to work while a resident at the Leben Home.

352.  During his residency at Leben Home, plaintiff Patient 21's federal government benefits were used to make regular payments for room and board pursuant to his written admission agreement.

353.  During his residency at Leben Home, plaintiff Patient 21's federal Medicaid and/or Medicare benefits were used to pay for medical costs and home health care services.

354.  In or about January 1998, plaintiff Patient 21 signed a consent form, witnessed by defendant Ahearn at defendant Leben Home, to have prostate surgery.

355.  Plaintiff Patient 21 did not give informed consent.

356.  In or about January 1998, plaintiff Patient 21 had prostate surgery performed on him by defendant Josifidis at defendant Parkway Hospital.

357.  The surgery was unnecessary, and plaintiff Patient 21 suffered injury from said surgery.

358.  Plaintiff Patient 21 did not receive proper pre-operative and post-operative medical care.

Plaintiff Patient 22

359.  Plaintiff Patient 22 was a resident of Leben Home, 80-08 45th Avenue, Elmhurst, New York, 11373 at all times relevant to this complaint.

360.  His whereabouts are unknown at this time.

46

361.   Plaintiff Patient 22 signed or should have been required to sign an admission agreement with defendant Leben Home upon moving to the home.

362.   Because of mental illness, plaintiff Patient 22 could not live and function independently, needed assistance in caring for himself, and was unable to work while a resident at the Leben Home.

363.   During his residency at Leben Home, plaintiff Patient 22's federal government benefits were used to make regular payments for room and board pursuant to his written admission agreement.

364.   During his residency at Leben Home, plaintiff Patient 22's federal Medicaid and/or Medicare benefits were used to pay for medical costs and home health care services.

365.   In or about January 1998, plaintiff Patient 22 signed a consent form, witnessed by defendant Ahearn at defendant Leben Home, to have prostate surgery at the Leben Home.

366.   Plaintiff Patient 22 did not give informed consent.

367.   In or about January 1998, plaintiff Patient 22 had prostate surgery performed on him by defendant Josifidis at defendant Parkway Hospital.

368.   The surgery was unnecessary, and plaintiff Patient 22 suffered injury from said surgery.

369.   Plaintiff Patient 22 did not receive proper pre-operative and post-operative medical care.

47

Plaintiff Patient 23

370.    Plaintiff Patient 23 was a resident of Leben Home, 80-08 45th Avenue, Elmhurst, New York, 11373 at all times relevant to this complaint.

371.    His whereabouts are unknown at this time.

372.    Plaintiff Patient 23 signed or should have been required to sign an admission agreement with defendant Leben Home upon moving to the home.

373.    Because of mental illness, plaintiff Patient 23 could not live and function independently, needed assistance in caring for himself, and was unable to work while a resident at the Leben Home.

374.    During his residency at the Leben Home, plaintiff Patient 23's federal government benefits were used to make regular payments for room and board pursuant to his written admission agreement.

375.    During his residency at Leben Home, plaintiff Patient 23's federal Medicaid and/or Medicare benefits were used to pay for medical costs and home health care services.

376.    In or about January 1998, plaintiff Patient 23 signed a consent form, witnessed by defendant Ahearn at defendant Leben Home, to have prostate surgery.

377.    Plaintiff Patient 23 did not give informed consent.

378.    In or about January 1998, plaintiff Patient 23 had prostate surgery performed on him by defendant Josifidis at defendant Parkway Hospital.

379.    The surgery was unnecessary, and plaintiff Patient 23 suffered injury from said surgery.

48

380.    Plaintiff Patient 23 did not receive proper pre-operative and post-operative medical care.

## AS AND FOR A FIRST CAUSE OF ACTION
## BASED ON VIOLATION OF
## 42 U.S.C. § 12101 et seq., AMERICANS WITH DISABILITIES ACT OF 1990

381.    Plaintiffs repeat and reallege paragraphs 1 through 378 as if fully set forth herein.

382.    The Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 et seq., was enacted to provide legal redress to all disabled individuals who suffer discrimination by, inter alia, being relegated to lesser services, benefits, programs or other opportunities.

383.    Specifically, Title III of the ADA and its implementing regulations prohibit, inter alia, discrimination against any individual based on his/her disability by any person who owns, leases or leases to, or operates a place of public accommodation.

384.    All plaintiffs suffer, and at all times relevant to this complaint suffered, from mental disabilities that constitute or result in a substantial limitation in one or more major life activities.

385.    There is, and at all times relevant to this complaint was, a record of plaintiffs' mental disabilities that constitute or result in a substantial limitation in one or more major life activities.

386.    All defendants regard, and at all times relevant to this complaint regarded, plaintiffs as having mental disabilities that constitute or result in a substantial limitation in one or more major life activities.

49

387.   All plaintiffs receive, and at all times relevant to this complaint received, medical treatment and medication for their disabilities.

388.   This treatment and medication fails, and at all times relevant to this complaint failed, to correct the mental disabilities.

389.   As a result of plaintiffs' mental disabilities, none are able to work and, at all times relevant to this complaint, none were able to work.

390.   Work is defined as a major life activity pursuant to the ADA.

391.   As a result of plaintiffs' mental disabilities, all are substantially limited in caring for themselves and, at all times relevant to this complaint, were substantially limited in caring for themselves.

392.   Caring for one's self is defined as a major life activity pursuant to the ADA.

393.   Plaintiffs constitute qualified individuals with disabilities pursuant to Title III of the ADA and its implementing regulations and, at all times relevant to this complaint, constituted qualified individuals with disabilities pursuant to Title III of the ADA and its implementing regulations.

394.   Defendants knew or should have known that plaintiffs have mental disabilities.

395.   Defendants Leben Home, Americare, and Parkway Hospital constitute and, at all times relevant to this complaint constituted, public accommodations pursuant to Title III of the ADA and its implementing regulations.

396.   Defendants Leben Home, Americare, and Parkway Hospital affect, and at all times relevant to this complaint affected, interstate commerce.

50

397.    Defendants Leben Home, Americare, and Parkway Hospital are subject, and at all times relevant to this complaint were subject, to the nondiscrimination requirements of Title III of the ADA and its implementing regulations.

398.    Defendant Rubin constitutes and, at all times relevant to this complaint constituted, an individual entity pursuant to Title III of the ADA and its implementing regulations because he leases/leased Leben Home and an office located in Leben Home, and operates/operated Leben Home.

399.    Defendant Rubin and Rubin's office at Leben Home affect, and at all times relevant to this complaint affected, interstate commerce.

400.    Defendant Rubin is subject, and at all times relevant to this complaint was subject, to the nondiscrimination requirements of Title III of the ADA and its implementing regulations.

401.    Defendant Martin Kleinman ("Kleinman") is and, at all times relevant to this complaint was, President and Chief Executive Officer of defendant Americare.

402.    Defendant Kleinman constitutes and, at all times relevant to this complaint constituted, an individual entity pursuant to Title III of the ADA and its implementing regulations because he leases/leased and operates/operated the Americare Office.

403.    Defendant Kleinman's office affected interstate commerce at all times relevant to this Complaint.

51

404.   Defendant Kleinman is subject, and at all times relevant to this complaint was subject, to the nondiscrimination requirements of Title III of the ADA and its implementing regulations.

405.   Defendant Ahearn is, and at all times relevant to this complaint was, an agent and/or employee of defendants Rubin and Leben Home, and an employee of defendant Americare.

406.   Defendant Ahearn constitutes, and at all times relevant to this complaint constituted, an individual entity pursuant to Title III of the ADA because she was an agent and/or employee of defendants Rubin and Leben Home and assisted in the operation of the Leben Home.

407.   Defendant Ahearn constitutes, and at all times relevant to this complaint constituted, an individual entity pursuant to Title III of the ADA because she operates and did operate the Americare office at the Leben Home.

408.   Defendant Ahearn's office affected interstate commerce at all times relevant to this complaint.

409.   Defendant Ahearn is subject, and at all times relevant to this complaint was subject, to the nondiscrimination requirements of Title III of the ADA and its implementing regulations.

410.   Defendant Peress constituted an individual entity pursuant to Title III of the ADA and its implementing regulations because he leased, owned or operated office space for his private medical practice at all times relevant to this complaint.

52

411. Defendant Peress' private medical office constitutes a public accommodation pursuant to the ADA and its implementing regulations at all times relevant to this complaint.

412. Defendant Peress' medical office affected interstate commerce at all times relevant to this complaint.

413. Defendant Peress was subject to the nondiscrimination requirements of Title III of the ADA and its implementing regulations at all times relevant to this complaint.

414. Defendant Josifidis constitutes, and at all times relevant to this complaint constituted, an individual entity pursuant to Title III of the ADA and its implementing regulations because he leases/leased or operates/operated office space at defendant Parkway Hospital.

415. Defendant Josifidis' medical office affected interstate commerce at all times relevant to this complaint.

416. Defendant Josifidis is subject, and at all times relevant to this complaint was subject, to the nondiscrimination requirements of Title III of the ADA and its implementing regulations.

417. Defendants Rubin, Leben Home, and Ahearn, as agent and/or employee of Rubin and/or Leben Home, are, and at all times relevant to this complaint were, responsible, pursuant to the admission agreements which were or should have been executed with plaintiffs, for providing Leben Home residents an array of services.

418. Defendants Rubin, Leben Home, and Ahearn, as agent and/or employee of Rubin and/or Leben Home, must, inter alia, assist the resident in obtaining

53

and maintaining a primary physician or source of medical care of choice who is responsible for the overall management of the resident's individual health needs.

419.    In the event of illness, defendants Rubin, Leben Home, and Ahearn, as agent and/or employee of Rubin and/or Leben Home, must notify the resident's personal physician and notify the resident's representative or next of kin.

420.    Defendants Rubin, Leben Home, and Ahearn, as agent and/or employee of Rubin and/or Leben Home, must identify residents in need of services and assist external service providers in establishing a relationship with these residents and work with these providers in executing a plan for service to individual residents.

421.    Defendants Rubin, Leben Home, and Ahearn, as agent and/or employee of Rubin and/or Leben Home, are responsible for coordinating the work of other case management and service providers within the facility.

422.    In providing these services, defendants Rubin, Leben Home, and Ahearn, as agent and/or employee of Rubin and/or Leben Home, discriminated against plaintiffs, based on their disability, in the provision of the aforementioned services.

423.    Defendants Rubin, Leben Home, and Ahearn, as agent and/or employee of Rubin and/or Leben Home, discriminated against plaintiffs, based on their disability, by facilitating the execution of consent forms that were not informed.

424.    Defendants Rubin, Leben Home, and Ahearn, as agent and/or employee of Rubin and/or Leben Home, discriminated against plaintiffs, based on their disability, by facilitating their unnecessary surgery.

54

425.   Defendants Rubin, Leben Home, and Ahearn, as agent and/or employee of Rubin and/or Leben Home, discriminated against plaintiffs, based on their disability, by failing to obtain proper pre-operative and post-operative medical care.

426.   Defendant Rubin, as operator and administrator of the Leben Home, was individually responsible for the actions, policies and practices that caused plaintiffs to have unnecessary and invasive surgery without informed consent and without proper pre-operative and post-operative care based on their disability.

427.   Defendants Ahearn, as employee and/or agent of defendant Americare, Americare and Kleinman are, and at all times relevant to this complaint were, responsible for providing and/or overseeing the provision of proper home health care services at Leben Home.

428.   In providing these home health care services, defendants Ahearn, as employee and/or agent of defendant Americare, Americare and Kleinman discriminated against plaintiffs, based on their disability, in the provision of these services.

429.   Defendants Ahearn, as employee and/or agent of defendant Americare, Americare and Kleinman discriminated against plaintiffs, based on their disability, by facilitating the execution of consent forms that were not informed.

430.   Defendants Ahearn, as employee and/or agent of defendant Americare, Americare and Kleinman discriminated against plaintiffs, based on their disability, by facilitating their unnecessary surgery.

431.    Defendants Ahearn, as employee and/or agent of defendant Americare, Americare and Kleinman, discriminated against plaintiffs, based on their disability, by failing to obtain proper pre-operative and post-operative medical care.

432.    Defendant Kleinman is the owner and/or operator of defendant Americare and, as such, is individually responsible for the actions, policies and practices that caused plaintiffs to have unnecessary and invasive surgery without informed consent and without proper pre-operative and post-operative care based on their disability.

433.    Defendants Parkway Hospital, Peress, as agent and/or employee of Parkway Hospital, and Josifidis, as agent and/or employee of Parkway Hospital, discriminated against plaintiffs, based on their disability, by facilitating the execution of consent forms that were not informed.

434.    Defendants Parkway Hospital, Peress, as agent and/or employee of Parkway Hospital, and Josifidis, as agent and/or employee of Parkway Hospital, discriminated against plaintiffs, based on their disability, by facilitating their unnecessary surgery.

435.    Defendants Parkway Hospital, Peress, as agent and/or employee of Parkway Hospital, and Josifidis, as agent and/or employee of Parkway Hospital, discriminated against plaintiffs, based on their disability, by failing to perform proper medical examinations on them before their prostate surgery.

436.    Defendants Parkway Hospital, Peress, as agent and/or employee of Parkway Hospital, and Josifidis, as agent and/or employee of Parkway Hospital, discriminated against plaintiffs, based on their disability, by failing to provide proper pre-operative and post-operative medical care.

56

437.    Defendants Parkway Hospital, Peress, as agent and/or employee of Parkway Hospital, and Josifidis as agent and/or employee of Parkway Hospital, discriminated against plaintiffs, based on their disability, by recommending and performing unnecessary surgery on plaintiffs.

438.    Defendants' actions violated plaintiffs' rights pursuant to Title III of the ADA and its implementing regulations.

## AS AND FOR A SECOND CAUSE OF ACTION
## BASED ON VIOLATION OF
## 29 U.S.C. § 794, SECTION 504 OF THE REHABILITATION ACT

439.    Plaintiffs repeat and reallege paragraphs 1 through 378 as if fully set forth herein.

440.    Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794 et seq., was enacted to eliminate discrimination on the basis of handicap in any program or activity receiving federal financial assistance. 34 C.F.R. § 84.1.

441.    Section 504 provides that "no otherwise qualified individual with a disability" shall "solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance…." 29 U.S.C. § 794(a).

442.    Plaintiffs have mental impairments that constitute or result in substantial impediments to employment and/or mental impairments that substantially limit one or more major life activities.

443.    Plaintiffs are qualified individuals with disabilities under Section 504 of the Rehabilitation Act.

57

444.    Defendants Rubin and Leben Home received at all times relevant to this complaint and, in the case of some plaintiffs, continue to receive plaintiffs' federal benefits for room, board and services provided to plaintiffs, and are therefore recipients of federal financial assistance as defined in 34 C.F.R. § 84.3(f).

445.    Defendants Rubin and Leben Home are and were at all times relevant to this complaint a "program or activity" and/or are part of the operations of such a program or activity, within the meaning of 29 U.S.C. § 794(b)(3)(A)(i) and/or (ii), and/or § 794(b)(3)(B), and therefore subject to the nondiscrimination requirements of Section 504 of the Rehabilitation Act.

446.    Defendant Ahearn is and was at all times relevant to this complaint an agent and/or employee of defendants Rubin and Leben Home.

447.    Defendant Ahearn is and was at all times relevant to this complaint therefore a part of the operations of defendants Rubin's and Leben Home's program or activity, within the meaning of 29 U.S.C. § 794(b)(3)(A)(i) and/or (ii), and/or § 794(b)(3)(B), and therefore subject to the nondiscrimination requirements of Section 504 of the Rehabilitation Act.

448.    Defendants Rubin, Leben Home and Ahearn provided at all times relevant to this complaint and, in the case of some plaintiffs, continue to provide, housing and other aids, benefits and services to plaintiffs, including the coordination of provision of health care services.

449.    Defendants Rubin, Leben Home and Ahearn procured invalid consent forms from plaintiffs for unnecessary and invasive surgery, solely by reason of

58

plaintiffs' disability, and thus discriminated against plaintiffs in violation of Section 504 of the Rehabilitation Act.

450.    Defendants Rubin, Leben Home and Ahearn's actions, policies and practices caused plaintiffs to have unnecessary, dangerous and invasive surgery without proper pre-operative and post-operative medical care solely by reason of plaintiffs' disability.

451.    Defendant Rubin, as operator and administrator of the Leben Home, was individually responsible for the actions, policies and practices that caused plaintiffs to have unnecessary and invasive surgery without informed consent and without proper pre-operative and post-operative care, solely by reason of plaintiffs' disability, and thus discriminated against plaintiffs in violation of Section 504 of the Rehabilitation Act.

452.    Defendants Parkway Hospital, Peress and Josifidis received Medicaid and/or Medicare reimbursement for the referral for and performance of surgery on plaintiffs, and are therefore recipients of federal financial assistance as defined in 34 C.F.R. § 84.3(f).

453.    Defendants Parkway Hospital, Peress and Josifidis are and were at all times relevant to this complaint each a "program or activity" within the meaning of 29 U.S.C. § 794(b)(3)(A)(i) and/or (ii), and/or § 794(b)(3)(B) and therefore subject to the nondiscrimination requirements of Section 504 of the Rehabilitation Act.

454.    Defendants Parkway Hospital, Peress and Josifidis provided plaintiffs with health care services, which included unnecessary surgery, which were not as effective as that provided to other patients of Parkway Hospital, Peress or Josifidis,

solely by reason of plaintiffs' disability, in violation of Section 504 of the Rehabilitation Act. 34 C.F.R. § 84.4(b)(iii).

455.   Defendants Parkway Hospital, Peress and Josifidis provided plaintiffs with health care services, including unnecessary surgery, that were different or separate from health care services provided to other patients of Parkway Hospital, Peress or Josifidis, solely by reason of plaintiffs' disability, in violation of Section 504 of the Rehabilitation Act. 34 C.F.R. § 84.4(b)(iv).

456.   Defendants Parkway Hospital, Peress and Josifidis procured invalid consent forms from plaintiffs for unnecessary and invasive surgery, solely by reason of plaintiffs' disability, and thus discriminated against plaintiffs in violation of Section 504 of the Rehabilitation Act.

457.   Defendants Parkway Hospital, Peress and Josifidis failed to perform adequate pre-operative medical examinations and diagnostic tests before performing unnecessary and invasive surgery on plaintiffs, solely by reason of plaintiffs' disability, and thus discriminated against plaintiffs in violation of Section 504 of the Rehabilitation Act.

458.   Defendants Parkway Hospital, Peress and Josifidis performed unnecessary and invasive surgery on plaintiffs, solely by reason of plaintiffs' disability, and thus discriminated against plaintiffs in violation of Section 504 of the Rehabilitation Act.

459.   Defendants Parkway Hospital, Peress and Josifidis failed to provide adequate post-operative care after performing unnecessary and invasive surgery

on plaintiffs, solely by reason of plaintiffs' disability, and thus discriminated against plaintiffs in violation of Section 504 of the Rehabilitation Act.

460.     Defendant Peress was individually responsible for the actions, policies and practices that caused plaintiffs to have unnecessary and invasive surgery without informed consent and without proper pre-operative and post-operative care, solely by reason of plaintiffs' disability, and thus discriminated against plaintiffs in violation of Section 504 of the Rehabilitation Act.

461.     Defendant Josifidis was individually responsible for the actions, policies and practices that caused plaintiffs to have unnecessary and invasive surgery without informed consent and without proper pre-operative and post-operative care, solely by reason of plaintiffs' disability, and thus discriminated against plaintiffs in violation of Section 504 of the Rehabilitation Act.

462.     Defendants Americare, Ahearn and Kleinman received reimbursement under Medicaid and/or Medicare for services provided to plaintiffs, and are therefore recipients of federal financial assistance as defined in 34 C.F.R. § 84.3(f).

463.     Defendants Americare, Ahearn and Kleinman are and were at all times relevant to this complaint each a "program or activity" within the meaning of 29 U.S.C. § 794(b)(3)(A)(i) and/or (ii) and/or § 794(b)(3)(B), and therefore subject to the nondiscrimination requirements of Section 504 of the Rehabilitation Act.

464.     Defendants Americare, Ahearn and Kleinman coordinated at all times relevant to this complaint health care services for plaintiffs, including facilitating unnecessary surgery, procuring invalid consent forms for unnecessary surgery, and failing to obtain proper pre-operative and post-operative medical care for plaintiffs, solely

61

by reason of plaintiffs' disability, in violation of Section 504 of the Rehabilitation Act. 34
C.F.R. § 84.4(b)(iii).

465. Defendants Americare, Ahearn and Kleinman coordinated at all
times relevant to this complaint health care services for plaintiffs, including the
procurement of invalid consent forms for unnecessary surgery, facilitating unnecessary
surgery, and failing to obtain proper pre-operative and post-operative medical care for
plaintiffs, solely by reason of plaintiffs' disability; such services were different or
separate from health care services provided to other patients of Americare, Ahearn and
Kleinman, and were not necessary to provide plaintiffs with health care services that were
as effective as those provided to other patients, in violation of Section 504 of the
Rehabilitation Act. 34 C.F.R. § 84.4(b)(iv).

466. Defendant Kleinman was individually responsible for the actions,
policies and practices that caused plaintiffs to have unnecessary and invasive surgery
without informed consent and without proper pre-operative and post-operative care,
solely by reason of plaintiffs' disability, and thus discriminated against plaintiffs in
violation of Section 504 of the Rehabilitation Act.

467. Defendant Ahearn was individually responsible for the actions,
policies and practices that caused plaintiffs to have unnecessary and invasive surgery
without informed consent and without proper pre-operative and post-operative care,
solely by reason of plaintiffs' disability, and thus discriminated against plaintiffs in
violation of Section 504 of the Rehabilitation Act.

468. As a result of defendants' acts and omissions, plaintiffs were
injured and suffered damages.

## AS AND FOR A THIRD CAUSE OF ACTION
## BASED ON VIOLATION OF 42 U.S.C. § 1985(3), CONSPIRACY
## TO INTERFERE WITH CIVIL RIGHTS BY DEPRIVING
## PLAINTIFFS OF RIGHTS OR PRIVILEGES UNDER THE LAW

469.   Plaintiffs repeat and reallege paragraphs 1 through 378 as if fully set forth herein.

470.   Plaintiffs have disabilities, specifically mental disabilities.

471.   As such, plaintiffs are a protected class for purposes of protection from private conspiracies under 42 U.S.C. §1985(3).

472.   Defendants specifically chose these plaintiffs because their disabilities rendered them incapable of understanding the nature and consequences of the medical procedures to which they were subjected by the defendants.

473.   Defendants specifically chose these plaintiffs because their disabilities rendered them ill-equipped to complain about or thwart defendants' plan of subjecting the plaintiffs to unnecessary prostate surgery, without adequate pre-operative medical examinations and diagnostic tests, and without adequate post-operative care.

474.   Each of the defendants agreed to target plaintiffs because of their disabilities, in a scheme to obtain invalid consent forms and to cause plaintiffs to undergo unnecessary prostate surgery.

475.   Each of the defendants entered into an agreement an/or understanding to carry out a plan to obtain invalid consent forms and to carry out a plan to subject the plaintiffs to unnecessary prostate surgery without adequate pre- or post-operative care.

476.   Defendants conspired to and deprived plaintiffs of the equal protection of the laws of the United States and of New York State.

477.   Defendants conspired to and deprived plaintiffs of the equal privileges and immunities under the laws of the United States and of New York State.

478.   As a result of the defendants' acts and omissions, plaintiffs were injured and suffered damages.

## AS AND FOR A FOURTH CAUSE OF ACTION
### BASED ON A VIOLATION OF 42 U.S.C. § 1986, FAILURE TO PREVENT INTERFERENCE WITH PLAINTIFFS' CIVIL RIGHTS BY DEPRIVING PLAINTIFFS OF RIGHTS OR PRIVILEGES UNDER THE LAW

479.   Plaintiffs repeat and reallege paragraphs 1 through 378 as if fully set forth herein.

480.   Defendants knew or should have known that invalid consent forms were obtained from plaintiffs for unnecessary surgery.

481.   Defendants knew or should have known that plaintiffs did not receive adequate and proper pre-operative medical examinations and diagnostic tests before undergoing surgery.

482.   Defendants knew or should have known that plaintiffs underwent unnecessary prostate surgery.

483.   Defendants knew or should have known that plaintiffs did not receive adequate and proper post-operative medical care.

484.   Defendants had the ability to prevent or aid in preventing plaintiffs from executing invalid consent forms.

485.   Defendants had the ability to prevent or aid in preventing plaintiffs' undergoing prostate surgery for which informed consent had not been obtained.

64

486.    Defendants had the ability to prevent or aid in preventing plaintiffs from undergoing unnecessary prostate surgery.

487.    Defendants had the ability to prevent or aid in preventing plaintiffs from undergoing surgery without adequate and proper post-operative medical care.

488.    Defendants failed to prevent plaintiffs from executing invalid consent forms.

489.    Defendants failed to prevent plaintiffs from undergoing surgery without obtaining adequate and proper pre-operative medical examination and diagnostic tests for plaintiffs.

490.    Defendants failed to prevent plaintiffs from undergoing unnecessary surgery.

491.    Defendants failed to prevent plaintiffs from undergoing surgery without adequate and proper post-operative medical care.

492.    As a result of the defendants' acts and omissions, plaintiffs were injured and suffered damages.

### AS AND FOR A FIFTH CAUSE OF ACTION
### BASED ON A VIOLATION OF
### EXECUTIVE LAW ARTICLE 15
### NEW YORK STATE HUMAN RIGHTS LAW

493.    Plaintiffs repeat and reallege paragraphs 1 through 378 as if fully set forth herein.

65

494.    The New York State Human Rights Law, New York State ("NYS") Executive Law § 290 et seq., was enacted to "assure that every individual within this state is afforded an equal opportunity to enjoy a full and productive life" and to address "the failure to provide such equal opportunity, whether because of discrimination, prejudice, intolerance or inadequate education, training, housing or health care." NYS Executive Law § 290(3).

495.    The Human Rights Law provides individuals with disabilities, and other protected classes, the right to the use of places of public accommodation, and the use and occupancy of housing accommodations without discrimination. NYS Executive Law § 291(2).

496.    Plaintiffs have and had at all times relevant to this complaint a mental impairment resulting from anatomical, physiological, genetic or neurological conditions that prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques; and/or a record of such an impairment; and/or a condition regarded by others as such an impairment.

497.    Plaintiffs are and were at all times relevant to this complaint individuals with disabilities as defined in NYS Executive Law § 292(21).

498.    Defendant Leben Home is and was at all times relevant to this complaint a "housing accommodation" as defined in the Human Rights Law. NYS Executive Law § 292(10).

499.    Defendant Rubin is and was at all times relevant to this complaint the lessee and operator of Leben Home, and is subject to the non-discrimination requirements NYS Executive Law § 296(5)(a).

66

500.    The Human Rights Law prohibits unlawful discriminatory practices by "the owner, lessee, sub-lessee, assignee, or managing agent of, or other person having the right to sell, rent or lease a housing accommodation, constructed or to be constructed, or any agent or employee thereof." NYS Executive Law § 296(5)(a).

501.    The Human Rights Law provides that it shall be an unlawful discriminatory practice "to discriminate against any person because of . . . disability . . . in the terms, conditions or privileges of the sale, rental or lease of any such housing accommodation or in the furnishing of facilities or services in connection therewith." NYS Executive Law § 296(2)(a).

502.    Defendants Rubin and Leben Home provide and provided at all times relevant to this complaint housing accommodations to plaintiffs.

503.    Defendants Rubin and Leben Home's actions, policies and practices with respect to their provision of services to plaintiffs caused plaintiffs to have unnecessary and invasive surgery solely by reason of plaintiffs' disability without informed consent and without proper pre-operative and post-operative medical care.

504.    Defendants Rubin and Leben Home provided plaintiffs with inferior, dangerous and unnecessary health care services based upon plaintiffs' disability, in violation of NYS Executive Law § 296(5)(a).

505.    The Human Rights Law provides that "(i)t shall be an unlawful discriminary practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation . . . because of the . . . disability . . . of any person, directly or indirectly, to refuse, withhold from or

67

deny to such person any of the accommodations, advantages, facilities or privileges thereof . . . ." NYS Executive Law § 296(2)(a).

506. Defendant Rubin, as operator and administrator of the Leben Home, was individually responsible for the actions, policies and practices that caused plaintiffs to have unnecessary and invasive surgery without informed consent and without proper pre-operative and post-operative care, solely by reason of plaintiffs' disability.

507. Defendant Parkway Hospital is and was at all times relevant to this complaint a "public accommodation" as defined in NYS Executive Law § 292(9).

508. Defendant Parkway Hospital performed dangerous, unnecessary and invasive surgery on plaintiffs solely by reason of plaintiffs' disability.

509. In performing dangerous, unnecessary and invasive surgery on plaintiffs, without informed consent and without proper pre-operative and post-operative medical care, solely by reason of plaintiffs' disability, defendant Parkway hospital denied plaintiffs the accommodations, advantages, facilities, and privileges afforded to other patients of the hospital, in violation of NYS Executive Law § 296(2)(a).

510. Defendant Peress was in the business of providing health care services at all times relevant to this complaint, a "public accommodation" as defined in NYS Executive Law § 292(9).

511. Defendant Peress was an employee and part owner of Parkway Hospital at all times relevant to this complaint, and is subject to the non-discrimination provisions of NYS Executive Law § 296(2)(a).

68

512.   Defendant Peress performed dangerous, unnecessary and invasive surgery on plaintiffs, solely by reason of plaintiffs' disability, without informed consent and without proper pre-operative and post-operative medical care.

513.   In performing dangerous, unnecessary and invasive surgery on plaintiffs, without informed consent and without proper pre-operative and post-operative medical care, solely by reason of plaintiffs' disability, defendant Peress denied plaintiffs the accommodations, advantages, facilities, and privileges afforded to other patients of the hospital, in violation of NYS Executive Law § 296(2)(a).

514.   Defendant Josifidis is and was at all times relevant to this complaint in the business of providing health care services, a "public accommodation" as defined in NYS Executive Law § 292(9).

515.   Defendant Josifidis is and was at all times relevant to this complaint an employee of Parkway Hospital, and is subject to the non-discrimination provisions of NYS Executive Law § 296(2)(a).

516.   Defendant Josifidis performed dangerous, unnecessary and invasive surgery on plaintiffs, solely by reason of plaintiffs' disability, without informed consent and without proper pre-operative and post-operative medical care.

517.   In performing dangerous, unnecessary and invasive surgery on plaintiffs without informed consent and without proper pre-operative and post-operative medical care, solely by reason of plaintiffs' disability, defendant Josifidis denied plaintiffs the accommodations, advantages, facilities, and privileges afforded to other patients of the hospital, in violation of NYS Executive Law § 296(2)(a).

736733_1.DOC

518.    Defendant Americare is and was at all times relevant to this complaint a "public accommodation" as defined in NYS Executive Law § 292(9).

519.    Defendant Americare caused the procurement of invalid consent forms from plaintiffs for unnecessary, dangerous and invasive surgery and without proper pre-operative and post-operative medical care, solely by reason of plaintiffs' disability.

520.    By procuring the invalid consent forms from plaintiffs, facilitating unnecessary, dangerous and invasive surgery, and failing to obtain proper pre-operative and post-operative medical care, solely by reason of plaintiffs' disability, defendant Americare denied plaintiffs the accommodations, advantages, facilities, and privileges afforded to other clients of Americare, in violation of NYS Executive Law § 296(2)(a).

521.    Defendant Ahearn is and was at all times relevant to this complaint an employee of Americare, and is subject to the non-discrimination provisions of NYS Executive Law § 296(2)(a).

522.    Defendant Kleinman owns and/or operates and owned and/or operated at all times relevant to this complaint Americare, Inc., and is and was at all times relevant to this complaint subject to the non-discrimination provisions of NYS Executive Law § 296(2)(a).

523.    Defendants Ahearn and Kleinman procured invalid consent forms from plaintiffs for unnecessary, dangerous and invasive surgery, facilitated unnecessary, dangerous and invasive surgery, and failed to obtain proper pre-operative and post-operative medical care, solely by reason of plaintiffs' disability.

524.    In procuring invalid consent forms from plaintiffs for unnecessary, dangerous and invasive surgery, facilitating unnecessary, dangerous and invasive surgery,

70

and failing to obtain proper pre-operative and post-operative medical care, solely by reason of plaintiffs' disability, defendants Ahearn and Kleinman denied plaintiffs the accommodations, advantages, facilities, and privileges afforded to other clients of Americare, in violation of NYS Executive Law § 296(2)(a).

525.   As a result of defendants' acts and omissions, plaintiffs were injured and suffered damages.

## AS AND FOR A SIXTH CAUSE OF ACTION
## BASED ON BREACH OF FIDUCIARY DUTY

526.   Plaintiffs repeat and reallege paragraphs 1 through 378 as if fully set forth herein.

527.   Each defendant has a fiduciary duty to plaintiffs to act in good faith, trust and candor towards them.

528.   Defendants Rubin, Leben Home, Ahearn, Americare, Kleinman, Peress, Josifidis and Parkway Hospital breached their respective fiduciary duties to plaintiffs by facilitating the execution of invalid consent forms.

529.   Defendants Rubin, Leben Home, Ahearn, Americare, Kleinman, Peress, Josifidis and Parkway Hospital breached their respective fiduciary duties to plaintiffs by facilitating the unnecessary surgery performed on plaintiffs.

530.   Defendant Rubin, as operator and administrator of the Leben Home, is individually responsible for the actions, policies and practices that caused plaintiffs to have unnecessary and invasive surgery without informed consent and without proper pre-operative and post-operative care solely by reason of their disability.

531.   Defendant Kleinman is the owner and/or operator of defendant Americare and, as such, is individually responsible for the actions, policies and practices

71

that caused plaintiffs to have unnecessary and invasive surgery without informed consent and without proper pre-operative and post-operative care, solely by reason of plaintiffs' disability.

532. Defendants Peress, Josifidis and Parkway Hospital breached their fiduciary duty to plaintiffs by failing to perform proper medical examinations and diagnostic tests on plaintiffs before prostate surgery was performed on plaintiffs.

533. Defendant Josfidis breached his fiduciary duty to plaintiffs by performing unnecessary surgery on plaintiffs.

534. Defendants Parkway Hospital and Peress breached their fiduciary duty to plaintiffs by facilitating and allowing defendant Josifidis to perform the unnecessary surgery on plaintiffs.

535. Defendants Parkway Hospital and Peress breached their fiduciary duty to plaintiffs by failing to render adequate and proper post-operative medical services to plaintiffs.

536. As a result of defendants' acts and omissions, plaintiffs were injured and suffered damages.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### BASED ON FRAUD

537. Plaintiffs repeat and reallege paragraphs 1 through 378 as if fully set forth herein.

538. Plaintiffs relied on defendants to act in their best interest by protecting and taking care of them.

539.   Defendants wantonly, deliberately and intentionally deceived plaintiffs by failing to disclose the material fact that their medical condition did not require prostate surgery.

540.   Defendants' false and fraudulent statements and representations were made with the intent to have plaintiffs execute invalid consent forms.

541.   Defendants' false and fraudulent statements and representations were made with the intent to have plaintiffs undergo unnecessary invasive prostate surgery for defendants' financial gain, without proper pre-operative and post-operative medical care.

542.   As a result of the false and fraudulent representations of defendants, plaintiffs were injured and suffered damages.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
## BASED ON NEGLIGENCE

543.   Plaintiffs repeat and reallege paragraphs 1 through 378 as if fully set forth herein.

544.   Defendants Rubin, Leben Home, Ahearn, Americare and Kleinman had a duty to plaintiffs to ensure that plaintiffs' social, physical, and mental well-being were taken care of while plaintiffs were residents of the Leben Home.

545.   Defendants Rubin and Leben Home had a duty under plaintiffs' admission agreements, New York State Social Services Law and implementing regulations to ensure that plaintiffs and plaintiffs' rights were protected.

546.   Defendant Rubin, as operator and administrator of the Leben Home, was individually responsible for the actions, policies and practices that caused

73

plaintiffs to have unnecessary and invasive surgery without informed consent and without proper pre-operative and post-operative care, solely by reason of plaintiffs' disability.

547.   Defendant Ahearn, as an agent and/or employee of defendants Rubin and Leben Home, also had a statutory and regulatory duty to plaintiffs.

548.   Defendants Americare and Kleinman, as the employer of defendant Ahearn, had a duty to supervise their employee to ensure that their employee was responsibly performing her duties and that she was performing within the scope of her employment with Americare.

549.   Defendants Rubin, Leben Home, Ahearn, Americare and Kleinman voluntarily assumed responsibility for the health and well-being of plaintiffs by operating and/or working in the Leben Home.

550.   Plaintiffs had a reasonable expectation that defendants would provide adequate care and protection of their well-being and rights by virtue of being residents of the Leben Home and by virtue of having signed a contract with defendants Rubin and Leben Home upon admission to Leben Home.

551.   Defendants Peress, Josifidis, and Parkway Hospital, as doctors and health care providers, had a duty to plaintiffs, because of the physician-patient relationship, to provide an appropriate level of medical care and to obtain informed consent from plaintiffs before any medical procedure was performed on them.

552.   Defendants breached their respective duties to plaintiffs by concocting a scheme to deprive plaintiffs of their fundamental rights by persuading them to undergo unnecessary prostate surgery, without the benefit of informed consent, and without full pre-operative and post-operative medical care.

74

553.    As a result of defendants' acts and omissions, plaintiffs were injured and suffered damages.

554.    Plaintiffs seek compensatory damages and punitive damages in an amount to be determined by the Court.  Punitive damages are warranted in this case due to the high moral culpability in defendants' actions.  Defendants preyed upon the very people who entrusted them with their physical, social and mental health and well-being.  This scheme was intentionally and/or recklessly carried out with the intention of depriving plaintiffs of their bodily integrity in exchange for monetary gain.  Such conduct should be punished to the fullest extent allowed by law.

### AS AND FOR A NINTH CAUSE OF ACTION
### BASED ON BREACH OF CONTRACT

555.    Plaintiffs repeat and reallege paragraphs 1 through 378 as if fully set forth herein.

556.    All plaintiffs signed or should have signed an admission agreement with defendants Rubin and Leben Home which states, inter alia, that defendants Rubin and Leben Home must abide by New York State Social Services Law and implementing regulations, and must treat each resident in accordance with rights and protections afforded thereunder.

557.    Defendants Rubin, Leben Home, and Ahearn, as agent and/or employee of Rubin and/or Leben Home, physically abused plaintiffs by facilitating unnecessary surgery, in violation of the admission agreement.

558.    Defendants Rubin, Leben Home, and Ahearn, as agent and/or employee of Rubin and/or Leben Home, physically abused plaintiffs by facilitating the

75

execution of consent forms that were not informed, in violation of the admission agreement.

559.    Defendants Rubin, Leben Home, and Ahearn, as agent and/or employee of Rubin and/or Leben Home, physically abused plaintiffs by failing to obtain adequate and proper pre-operative and post-operative care, in violation of the admission agreement.

560.    Defendants Rubin, Leben Home, and Ahearn, as agent and/or employee of Rubin and/or Leben Home, violated plaintiffs' civil rights by facilitating unnecessary surgery, in violation of the admission agreement.

561.    Defendants Rubin, Leben Home, and Ahearn, as agent and/or employee of Rubin and/or Leben Home, violated plaintiffs' civil rights by facilitating the execution of consent forms that were not informed, in violation of the admission agreement.

562.    Defendants Rubin, Leben Home, and Ahearn, as agent and/or employee of Rubin and/or Leben Home, violated plaintiffs' civil rights by failing to obtain adequate and proper pre-operative and post-operative care, in violation of the admission agreement.

563.    Defendants Rubin, Leben Home, and Ahearn, as agent and/or employee of Rubin and/or Leben Home, failed to provide plaintiffs with fair and respectful care and treatment by facilitating the execution of consent forms that were not informed, in violation of the admission agreement.

564.    Defendants Rubin, Leben Home, and Ahearn, as agent and/or employee of Rubin and/or Leben Home, failed to provide plaintiffs with fair and

respectful care and treatment by facilitating unnecessary surgery, in violation of the admission agreement.

565.    Defendants Rubin, Leben Home, and Ahearn, as agent and/or employee of Rubin and/or Leben Home, failed to provide plaintiffs with fair and respectful care and treatment by failing to obtain adequate pre-operative and post-operative care, in violation of the admission agreement.

566.    Defendants Rubin, Leben Home, and Ahearn, as agent and/or employee of Rubin and/or Leben Home, failed to provide plaintiffs with supervision by failing to notify the plaintiffs' primary physician about their alleged prostate problems, in violation of the admission agreement.

567.    Defendants Rubin, Leben Home, and Ahearn, as agent and/or employee of Rubin and/or Leben Home, failed to provide plaintiffs with supervision by failing to notify plaintiffs' representatives or next of kin about their alleged prostate problems and alleged need to have surgery, in violation of the admission agreement.

568.    As a result of the acts and omissions of defendants Rubin, Leben Home, and Ahearn, plaintiffs were injured and suffered damages.

### AS AND FOR A TENTH CAUSE OF ACTION
### BASED ON MEDICAL MALPRACTICE

569.    Plaintiffs repeat and reallege paragraphs 1 through 378 as if fully set forth herein.

570.    At all times relevant to this complaint, defendant Peress was a physician licensed to practice medicine in the State of New York, represented himself to be so licensed, and engaged in the practice of his profession in the State of New York.

571.   At all times relevant to this complaint, defendant Peress represented himself to be a physician having special knowledge and skill in urology and in the diagnosis and treatment of the medical conditions with which plaintiffs were allegedly afflicted and that he possessed and exercised the standard of learning, skill, care, knowledge and diligence of such specialists.

572.   At all times relevant to this complaint, defendant Josifidis was a physician licensed to practice medicine in the State of New York, represented himself to be so licensed, and engaged in the practice of his profession in the State of New York.

573.   At all times relevant to this complaint, defendant Parkway Hospital was a general medical hospital.

574.   At all times relevant to this complaint, defendants Josifidis and Peress acted as employees and/or agents of defendant Parkway Hospital.

575.   In or about January of 1998, defendants Josifidis, Peress and Parkway Hospital undertook to care for, examine, diagnose, treat and advise plaintiffs.

576.   Defendants Josifidis and Peress, in rendering services to the plaintiffs, owed plaintiffs a duty to possess and exercise the degree of learning, knowledge, skill, care, and diligence which was ordinarily possessed and exercised by physicians in the community.

577.   Defendant Parkway Hospital, in rendering services to the plaintiffs, owed plaintiffs a duty to use the degree of learning, knowledge, skill, care, and diligence ordinarily used by hospitals in the community.

78

578.   Defendants Parkway Hospital, Josifidis and Peress owed plaintiffs a duty to exercise reasonable care to see that plaintiffs obtained proper medical and hospital care and attention in the course of rendering services to them.

579.   Defendants Josifidis, Peress and Parkway Hospital failed to use reasonable care in the exercise of their professional skills and in the application of their learning and failed to follow good, known and accepted custom and practice in the medical profession.

580.   The surgeries recommended by defendant Peress and performed on plaintiffs by defendants Josifidis and Parkway Hospital were unnecessary and should not have been performed.

581.   Defendants Josifidis, Peress and Parkway Hospital were negligent in that:

a.   they failed to properly diagnose and treat plaintiffs;

b.   they performed surgery upon plaintiffs even though surgery was not indicated and should not have been performed;

c.   they failed to perform the required and proper diagnostic tests to ascertain plaintiffs' true conditions, if any;

d.   they failed to follow accepted medical practice in examining plaintiffs and in obtaining appropriate diagnostic tests;

e.   they failed to provide proper pre-operative medical care to plaintiffs;

736733_1.DOC

f.  they failed to provide proper post-operative medical care to plaintiffs;

g.  they failed to use their best judgment and, as a result of such failure, to properly advise plaintiffs of the risks of such surgery; and

h.  they were otherwise careless and negligent in their care of plaintiffs.

582.  As a result of the acts and omissions of defendants Josifidis, Peress, and Parkway Hospital, plaintiffs were injured and suffered damages.

583.  Annexed hereto as Exhibit D is the Certificate of Merit required under New York State Civil Practice Law § 3012-a.

## AS AND FOR AN ELEVENTH CAUSE OF ACTION
## BASED ON VIOLATION OF PUBLIC HEALTH LAW § 2805-d,
## FAILURE TO OBTAIN INFORMED CONSENT

584.  Plaintiffs repeat and reallege paragraphs 1 through 378 as if fully set forth herein.

585.  None of the surgeries performed on the plaintiffs was an emergency.

586.  Prior to recommending and performing unnecessary prostate surgery on plaintiffs, defendants Josifidis, Peress and Parkway Hospital failed to inform plaintiffs of alternative treatments, and the reasonably foreseeable risks and benefits of the surgery as would have been disclosed by a reasonably prudent medical practitioner.

587.  The failure of defendants Josifidis, Peress, and Parkway Hospital to make known alternative treatments and risks of the surgery precluded plaintiffs from making knowledgeable evaluation and giving informed consents.

80

588.   As a result, plaintiffs did not give valid informed consents to the surgeries recommended to and performed upon plaintiffs by defendants Josifidis, Peress and Parkway Hospital.

589.   A reasonably prudent patient would not have undergone the surgery performed upon the plaintiffs had they been given the benefit of the disclosures about alternative treatments and risks of the surgery.

590.   Upon information and belief, defendants Josifidis, Peress, and Parkway Hospital knew or should have known that certain plaintiffs were incapable of giving informed consent.

591.   As a proximate cause of the acts and omissions of defendants Josifidis, Peress, and Parkway Hospital, plaintiffs were injured and suffered damages.

## RELIEF REQUESTED

WHEREFORE, plaintiffs respectfully request judgment:

(A)   Declaring that defendants discriminated against plaintiffs in violation of their rights under the Americans with Disabilities Act of 1990;

(B)   Declaring that defendants discriminated against plaintiffs in violation of their rights under Section 504 of the Rehabilitation Act;

(C)   Declaring that defendants conspired to interfere with plaintiffs' civil rights by depriving them of rights or privileges under the law;

(D)   Declaring that defendants failed to prevent interference with plaintiffs' civil rights;

81

(E) Declaring that defendants discriminated against plaintiffs in violation of their rights under Executive Law Article 15 New York State Human Rights Law;

(F) Enjoining defendant Rubin from operating and administering the Leben Home for Adults, or, in the alternative, decreeing that so defendant Rubin, such operation and administration shall be supervised and overseen by the Court;

(G) Enjoining defendant Rubin from operating and administering any facility that provides room, board or care to disabled individuals, or, in the alternative, decreeing that so long as any such facility is operated and/or administered by defendant Rubin, such operation and administration shall be supervised and overseen by the Court;

(H) Enjoining defendant Ahearn from acting as an employee or agent of defendants Rubin and Leben Home;

(I) Enjoining defendants Ahearn, Americare, and Kleinman from providing health care services to Leben Home residents, or, in the alternative, decreeing that so long as defendants Ahearn, Americare, and Kleinman provide health care services to Leben Home residents, such provision of services shall be supervised and overseen by the Court;

(J) Enjoining defendants Dr. Peress and Dr. Josifidis from rendering any type of medical care to any residents of the Leben Home;

82

(K)     Enjoining defendant Parkway Hospital from performing any
        medical examinations, diagnostic tests, medical procedures, or
        surgeries on any residents of the Leben Home, or, in the
        alternative, decreeing that so long as Parkway Hospital performs
        any medical examinations, diagnostic tests, medical procedures, or
        surgeries on any residents of the Leben Home, such performance
        shall be supervised and overseen by the Court;

(L)     Entering a final judgment against the defendants on causes of
        action one through eleven and awarding plaintiffs compensatory
        damages in an amount to be determined at trial;

(M)     Entering a final judgment awarding plaintiffs punitive damages in
        an amount to be determined at trial;

(N)     Awarding costs and disbursements to attorneys for plaintiffs;

(O)     Awarding attorneys' fees to attorneys for plaintiffs, Patterson,
        Belknap, Webb and Tyler LLP, and Disability Advocates, Inc.; and

83

(P)     For such other and further relief as this Court deems just and

proper.

Dated: New York, New York
       March 30, 2001

Respectfully,

MFY LEGAL SERVICES, INC.
LYNN M. KELLY (LK 1155)
299 Broadway, 4th Floor
New York, New York 10007
(212) 417-3700

By:     _____

        Jeanette Zelhof (JZ 0639)
        Julia P. Rosner (JR 7779)
        Attorneys for Plaintiffs Bowen, Costa,
        Fazio, France, Grant, Johnson, Leabough,
        Mittendorf and Ziegberman

PATTERSON, BELKNAP, WEBB & TYLER LLP
1133 Avenue of the Americas, 24th Floor
New York, New York 10036
(212) 336-2000

By:     _____

        Lisa E. Cleary (LC 2341)
        Frederick B. Warder III (FW 5348)
        Karen L. Abrams (KA 6894)
        Sneha M. Patel (SP 7588)

Attorneys for Plaintiffs Bowen, Costa, Fazio,
France, Grant, Johnson, Leabough, Mittendorf
and Ziegberman

84

DISABILITY ADVOCATES, INC.
5 Clinton Square, 3rd Floor
Albany, New York 12207-2201
(518) 432-7861

By: _____ (*by his*
Timothy A. Clune (TC 1506)      *permission*)
    Susan Kirchheimer
Attorneys for Plaintiffs Bowen, Costa, Fazio,
France, Grant, Johnson, Leabough, Mittendorf
and Ziegberman

and

Plaintiff Disability Advocates, Inc.,

and

Patient 1, Patient 3, Patient 7, Patient 10, Patient
13, Patient 16, Patient 17, Patient 19, Patient 20,
Patient 21, Patient 22 and Patient 23

85

STATE OF NEW YORK   :   DEPARTMENT OF HEALTH
STATE BOARD FOR PROFESSIONAL MEDICAL CONDUCT
————————————————————————————X

IN THE MATTER

OF

JAMILLE PERESS, M.D.

AND

HARRY JOSIFIDIS, M.D.

————————————————————————————X

COPY

:   HEARING COMMITTEE

:   DETERMINATION

:   AND OTHER

BPMC #00-258

Alan Kopman, Chairperson, Majid Eshghi, M.D., and Sheldon Putterman, M.D., duly designed members of the State Board of Professional Medical Conduct, appointed by the Commissioner of Health of the State of New York pursuant to Section 230 (1) of the Public Health Law, served as the Hearing Committee in the matter pursuant to Sections 230 (10) (e) and 230 (12) of the Public Health Law. Stephen Bermas, Esq., Administrative Law Judge, served as Administrative Officer for the Hearing Committee.

Alan Kopman was not present at the hearing session conducted on May 5, 2000 and at a portion of the hearing session conducted on May 17, 2000. Mr. Kopman has duly affirmed that he had read and considered the transcript of proceedings, and the evidence received at, such hearing sessions, prior to the deliberations in this matter. See Appendix A.

Dr. Majid Eshghi was not present at a portion of the hearing session conducted on June 20, 2000. Dr. Eshghi has duly affirmed that he had read and considered the transcript of proceedings of, and the evidence received at, such hearing session, prior to the deliberations in this matter. See Appendix B.

It should be noted that Petitioner withdrew its charges concerning Patients 4 and 6.

1

After consideration of the entire record, the Hearing Committee submits this Determination and Order

## SUMMARY OF THE PROCEEDINGS

| | |
|---|---|
| Notice of Hearing dated: | February 7, 2000 |
| Statement of Charges dated: | February 7, 2000 |
| Hearing Dates: | March 14 and 31, April 5, May 5, 12, 17, 23, and 24 and June 12, 20 and 21, 2000 |
| Deliberation Dates: | July 14 and August 8, 2000 |
| Place of Hearing: | NYS Department of Health<br>5 Penn Plaza<br>New York, New York |
| Petitioner Appeared By: | Daniel Guenzburger, Esq.<br>Associate counsel<br>Bureau of Professional Medical Conduct<br>NYS Department of Health |
| Respondent Peress Appeared By: | Wood & Scher, Esqs.<br>By Anthony Z. Scher, Esq. |
| Respondent Josifidis Appeared By: | Bartlett, McDonough, Bastone Monaghan, LLP<br>By Gerard J. Heubel, Esq. |

## EXPERT WITNESSES

Although there may have appeared to be a conflict generally between the Petitioner's expert witness and the Respondent's expert witnesses, careful analysis of their respective testimony shows that the different experts focused on different aspects of this matter. The Respondents' experts concentrated on the medical competence used in the surgical procedures. The Petitioner's expert dealt with the whole patient care process including alternative treatments, continuity of patient care and informed consents. Although the Petitioner's expert did get somewhat emotional in his testimony, his personal feelings did not obscure his analysis of the underlying facts nor lessen the value of his testimony for the Hearing Committee.

2

STATEMENT OF CHARGES

The Statements of Charges have been marked as Petitioner's Exhibits 25 and 27 and attached hereto as Appendices C and D.

FINDINGS OF FACT

Numbers in parentheses refer to transcript page numbers or exhibits. These citations represent evidence found persuasive by the Hearing Committee in arriving at a particular finding. Conflicting evidence, if any, was considered and rejected in favor of cited evidence. All Findings are unanimous except as specifically indicated.

BACKGROUND

1.   JAMILLE PERESS, M.D., Respondent, a urologist, was authorized to practice medicine in New York State on or about July 1, 1971, by the issuance of license number 10863 by the New York State Education Department. At all times relevant to the Statement of Charges Respondent Peress was a part owner of Parkway Hospital, Forest Hills New York, and Chairperson of the Parkway Hospital Department of Urology. He retired from the active practice of medicine on December 30, 1999. (Pet. Exh. 26; T. 875)

2.   HARRY JOSIFIDIS, M.D., Respondent, a urologist, was authorized to practice medicine in New York State on or about July 10, 1986, by the issuance of license number 166922 by the New York State Education Department. Respondent holds privileges at several New York City hospitals

3

including Parkway Hospital. Respondent Peress' and Respondent Josifidis' professional relationship began in 1994 when Respondent Josfidis agreed to accept surgical referrals from Respondent Peress and to cover for Respondent Peress at Parkway Hospital when he was unavailable. Respondent Peress and Josifidis are not legal partners and they do not hold membership in the same group medical practice. (Pet. Exh. 28; T. 1318-20, 1324)

3.  In January, 1998, the 24 patients identified in Appendix A of the Statement of Charges were residents of the Leben Home for Adults ("Leben Home"). The Leben Home, located at 88-08 45th Avenue, Elmhurst, New York, is an adult long term residential care facility established and operated pursuant to the New York State Social Services Law and regulations found at NYCRR Title 18 §487. The Leben Home has 361 residents, of which approximately 200 were male. (T. 767)

4.  In or about January, 1998, Respondent Peress performed outpatient urological evaluations on twenty of the patients in the statement of charges and referred all 24 patients in the Statement of Charges to Respondent Josifidis at Parkway Hospital. Respondent Josifidis either performed trans-urethral resections of the prostate ("TURP") or transurethral incisions of the prostate ("TUIP") on the patients. (Pet. Exhs. 1a-9a, 13a-15a, 17a-24a; Pet. Exhs. 1b-24b; and T. 787, 812, and 892.)

5.  Although Respondent Peress referred Patients 10, 11, 12, and 16 to Respondent Josfidis (Pet. Exhs. 10a, 11a, 12a, and 16a), he certified that he did not maintain a medical record for those patients. (Pet. Exhs. 10b, 11b, 12b, 16b). At the hearing Respondent testified that he never had seen the four patients for whom he had no record. (T. 953)

6.  A TURP is an invasive surgical procedure for the relief of lower urinary tract symptoms caused by benign prostatic hyperplasia ("BPH"), a noncancerous enlargement of the prostate gland. The procedure is performed endoscopically under general anesthesia. A TUIP is a less invasive surgical

4

procedure reserved for patients with smaller prostates. The symptoms associated with BPH are frequency of urination, nocturia, incontinence, hesitancy and weakened urinary stream. The lower urinary tract symptoms associated with BPH may be caused by other urological conditions. (T. 34-9, 1038)

7. Zenaida Santos M.D. and Yitzhak Twerskey, M.D. were the two primary care physicians who were documented as having treated 20 of the 24 patients in this case. Dr. Santos had been at the Leben Home for 5 to 6 years prior to the events in question, and Dr. Twerskey started at the Leben Home in approximately November, 1997. Both primary care physicians had privileges at Parkway Hospital. (T. 807-809). Neither Dr. Santos or Dr. Twerskey referred the subject patients to Respondents. (Pet. Exh. 1c, 2c, 3c, 4c, 5c, 7c, 8c, 9d, 11c, 12c, 13c, 14c, 15c, 16c, 18c, 19c, 21c, 22c, 23c, and 24c). In the two month period preceding the surgeries in this case Doctors Santos and Twerskey had requested urological consults for Patients 2, 8, 18, and 23 from a urologist named Dr. Ehrenpreiss. (Pet. Exh. 2c, 8c, 18c, 23c)

## SCREENING PATIENTS A THE LEBEN HOME

8. Respondent Peress' initial encounters with the Leben home patients were at two urological screenings performed at the Leben Home. Each of Respondent Peress' patient encounters was under 5 minutes in duration. The screening consisted of taking a brief oral history from the patient. Respondent Peress did not physically examine the patients nor perform any diagnostic tests at the Leben Home. (T. 812) Respondent Peress described his initial encounter with the patients as a "...triage, talking to them, not examining or anything of that sort." (T. 893)

5

9.  The credible evidence is that Respondent Peress went to the Leben Home on two occasions documented in his office record, at which time he saw approximately a total 30 to 40 patients. (Pet. Exh. 1a-9a, 13a-15a, 17a-24a)

10. After Respondent Peress concluded his brief patient screening, he had Diane Ahearn, the Leben Home Medical Coordinator assist the patients to execute written consents for TURP's. Respondent Peress was exclusively responsible for the idea that she assist patients in executing the written consents. (T. 813)

11. In light of the brief interaction that Respondent had with patients at the Leben Home, his testimony that he explained the risks, benefits and complications of a TURP prior to the Leben Home residents executing the written consent is not credible. (T. 1704)

12. Respondent testified that "It pretty quickly occurred to me that in order to facilitate this project, I needed to get somebody they trust. The only one they trust is Diane Ahearn." (T. 1703, lines 17 to 20). "I asked Diane Ahearn to obtain consent for TURP because with her they would do anything that she says." (T. 891, T. 1704, lines 14-16)

## THE FIRST GROUP: ADMISSION OF PATIENTS 12 AND 16

13. On January 7, 1998, Respondent Peress admitted Patients 12 and 16 to Parkway Hospital. Patients 12 and 16 presented to Parkway Hospital with signed consents witnessed by Diane Ahearn at the Leben Home. (Pet. Exhs. 1b-24b)

14. Respondent Peress did not evaluate Patients 12 or 16 prior to their admission to Parkway Hospital (Pet. Exhs. 12a and 16a; T. 953). At Respondent's interview with OPMC, he confirmed that he never examined or even spoke to Patient 12. (T. 553)

15. The emergency room triage nurse noted that Patient 16 reported to her that he did not know why he was in the hospital. (Pet. Exh. 16b, p.8)

16. The admitting physician noted that Patient 16 reported that he did not know why he was in the hospital. (Pet. Exh. 12b, p. 42; Pet. Exh. 16b, p.40)

17. Respondent gave instructions, via a telephone order, for the preoperative administration of certain medications, for laboratory work and to medically clear the Patients for surgery. The telephone order was noted on the physician order sheets in the hospital charts of both patients. (Pet. Exh. 12b, p. 42, Pet. Exh. 16b, p. 40)

18. On January 8, 1998, Respondent Josifidis performed TURPs on Patients 12 and 16. Respondent Josifidis failed to evaluate either patient prior to performing surgery, as evidenced by the lack of any pre-operative entry by Respondent Josifidis in the Patients' hospital charts. Respondent Josifidis did not write a pre-operative progress note or consult note and he did not sign the physician's certification on the written consent. (Pet. Exhs. 12b and 16b) Respondent Josifidis' claim that the admitting notes for both patients got lost or that he evaluated the patients but negligently failed to write a note is not credible. (T. 1390, 1392)

19. Respondent Peress signed the physicians certification on the written consents for both Patients. (Pet. Exh. 12, p. 6; Pet. Exh. 16, p. 6) Respondent Peress stated at his interview with OPMC that he signed the physicians certifications to avoid any delays in performing the surgeries. (T. 552)

20. By signing the physicians certification on the written consents without having evaluated and/or spoken to the Patients 12 or 16, Respondent knowingly and falsely represented that he had explained the "nature, purposes, benefits, risks of and alternatives" to a TURP.

## THE SECOND GROUP: PATIENTS 3, 4, 8, 13, 14, 18, AND 23

21. On January 8, 1998, Respondent Peress admitted the second group of seven Leben Home residents to Parkway Hospital, patients 3, 4, 8, 13, 14, 18 and 23. (Pet. Exhs. 3b, 4b, 8b, 13b, 14b, 18b, and 23b)

22. In response to complaints made to the Parkway Hospital administration by the emergency room physicians, Respondent Peress had been criticized by the hospital for the manner in which written consents were handled and because the Leben Home patients were disruptive in the emergency room. (T. 1182-83, 1187)

23. On January 8, 1998, and on all subsequent dates on which Respondent Peress evaluated Leben Home residents in his office, Respondent closed his office in the afternoon to other patients. (Pet. Exh. 34A; T. 835) The patients would be brought to Respondent's office in a group by ambulette. After Respondent concluded his examination, the patients would proceed by ambulette directly to the Parkway Hospital emergency room. (t. 794-795, 822)

24. Margaret Ort, R.N., Assistant Head Nurse of the Parkway Hospital emergency room, triaged the seven Leben Home residents on January 8, 1998, starting at 1:50 P.M. (Pet. Exh. 18b, p. 12) The patients presented to the emergency room with pre-signed consent forms for TURPS and patient transfer forms from the Leben Home. Ms. Ort testified that in her experience she had never encountered other situations where patients presented to an emergency room with pre-signed Parkway Hospital consent forms. (T. 518)

8

25. During the triage process Ms. Ort asked each patient if they were experiencing urinary difficulty or were experiencing any type of pain. (T. 520, 545-46) She also conducted a physical examination to determine if the patients had suprapubic distention. Ms. Ort followed the same procedure on January 15, 1998, when she triaged the third group of Leben Home residents presenting to Parkway Hospital for TURPs. (T. 520, 540-542)

26. In response to Ms. Ort's questions on triage concerning urinary difficulty, Patient 14 reported that he had no urinary complaints. (T. 535, 546; Pet. Exh. 14b, p. 18)

27. It is not credible that in the time available that Respondent could have performed all of the following components of a urological examination and discussed with the patients the issues necessary to adequately obtain informed consent, as he claimed:

   a. Taken a medical history, especially of a patient whose ability to comprehend and communicate may have been hampered by a mental disability. (Pet. Exhs. 3a, 4a, 8a, 13a, 14a, and 18a).

   b. Performed a physical examination, including a rectal examination, abdominal examination and visual examination of the genitalia. (T. 990, Pet. Exhs. 3a, 4a, 8a, 13a, 14a and 18a)

   c. Measured oxygen perfusion with a pulse oximeter. (T. 987)

   d. Urinalysis. (Pet. Exhs. 3a, 4a, 8a, 13a, 14a, and 18a.)

   e. Bilateral renal sonogram. (Pet. Exhs. 3a, 4a, 8a, 13a, 14a, and 18a.)

f.   Measured post-void residual urine, including performing a three-dimensional bladder sonogram and then draining post-void urine through either a cystocope or a catheter. (T. 933-35) According to the written statement of Sandra Bermudex, the office manager, it could take up to 3 hours for the patient to completely void. (Pet. Exh. 34a.)

g.   Examined the patient's urinary tract with cystoscopy. (Pet. Exhs. 3a, 4a, 8a, 13a, 14a, and 18a.)

h.   Discussed with the patient his condition, the proposed procedure, and reasonable alternatives to a TURP, including explaining to the patient why he was not a suitable candidate for medical management. (T. 1001, line 14)

28.   Respondent Peress deviated from medically accepted standards in failing to perform an adequate urological evaluation on Patients 1, 2, 3, 5, 7, 8, 9, 13, 14, 15, 17, 18, 19, 20, 21, 22, 23, and 24 who he examined in his office. (T. 43-67, Pet. Exhs. 1a to 9a, 13a to 15a, 17a to 24a)

29.   Respondent Josifidis deviated from medically accepted standards by inappropriately relying on the inadequate evaluation of Respondent Peress, by failing to adequately evaluate the out-patient examinations performed by Respondent Peress, and by failing to review the medical records of each of Respondent Peress' urological evaluations. (T. 87-88, 325-326)

30.   In addition, Respondent Josifidis inappropriately operated on two patients, 12 and 16, who had never been pre-operatively evaluated by either Respondent Peress or by Respondent Josifidis. (Pet. Exhs. 12a, 12b, 16a, and 16b)

31. Respondent Peress failed to take an adequate history of the patients. An adequate history would include a description of symptoms, duration of symptoms, history of prior urological evaluations and treatment, and a through general medical history including medication history. (T. 54-55) The histories taken by Respondent Peress fell below acceptable standards in the following respects:

    a.  Respondent Peress failed to elicit and note prior treatment, including the fact that Patients 3, 6, 8, 14 and 23 had previously had TURPS (Pet. Exh. 3b, p. 12; Pet. Exh. 6b, p. 15; Pet. 8b, p. 16; Pet. Exh. 14c; and Pet. Exh. 23c, progress noted dated October 21, 1996.) and that Patients 2, 7, 8, 18 were taken Ditropan, a bladder relaxant. (Pet. Exhs. 2c, 7c, 8c, 18c) Respondent Peress' failure to elicit that four patients were taken Ditropan is significant, since Respondent Peress admitted that the combination of Ditropan and other medication might have contributed to the patient's lower urinary tract symptoms. (T. 1132)

    b.  Respondent Peress failed to elicit and note prior urological evaluations, including the fact that Patients 2 and 18 had recently undergone cystometrograms. The cystometrograms had been performed at Parkway Hospital by Respondent Peress' former employee, Dr. Ehrenpreiss. (Pet. Exh. 31 and 35, T. 885-886)

    c.  Respondent Peress failed to elicit and note the duration of symptoms for all patients. (Pet. Exhs. 1a-24a)

    d.  Respondent Peress failed to elicit and note a medication history for all patients. (Pet. Exhs. 1a-24a; T.54-55)

e.   In cases where Respondent Peress specifically noted that the patient was a poor historian, he failed to contact the patient's primary physician, or seek relevant records from other sources. (t. 600-601, 680; Pet. Exhs. 18a and 22a)

32.  Respondent Peress inappropriately measured post void residual (PVR) urine because he only measured the PVR urine with one transverse ultrasound image. (T. 62, Pet. Exh. 30) The credible evidence does not support Respondent Peress' assertion that he also measured PVR urine by draining the urine through a catheter or through the cystoscope. When Respondent Peress was asked at the OPMC interview how he measured the patients' PVR urines, he stated with ultrasound and that he may have catheterized one or two patients. (T 553) Respondent Peress' notes also reflect that almost all PVR urines were measured by ultrasound. Similarly, Respondent Josifidis, who professed that he knew from past experience how Respondent Peress measured PVR urines, repeatedly recorded in his admitting notes large PVR on "sono". (T. 1346, Pet. Exhs. 1b-24b)

33.  Since Respondent Peress examined seven patients in under two hours, he could not have catheterized PVR urine within such a time frame. Draining urine through a cystoscope is time consuming because the port is small. (T. 111) Further, Respondent Peress testified that he had only one cystoscope in his office and that it would take approximately 10 minutes to sterilize the cystoscope. (T. 934)

34.  In some instances, Respondent Peress failed to perform urodynamic studies to ascertain whether a patient's symptoms were caused by bladder dysfunction or prostatic obstruction. (T58-59) Several of the patients had histories that might suggest a neurological factor as the cause of the patient's symptoms, including Patient 8's recent cerebral vascular accident (Pet. Exh. 8c), Patient 3's history of alcohol abuse (Pet. Exh. 3c), and those patients who were on chronic psychotropic medication which is known to impair bladder function. (T. 55, 253, 299)

35. Respondent Peress and Respondent Josifidis inappropriately relied on a visual assessment made through cystoscopy to diagnose prostatic obstruction. In Respondent Peress's records he repeatedly notes "obstructive prostate, bladder trabeculation and diverticula." Because urination is a dynamic event, it is well accepted that you cannot rely on a visual assessment of the prostate to make a diagnosis of prostatic obstruction. (t. 65) Steven Kaplan, M.D., Respondent Josifidis' expert, conceded that cystoscopy is not an accurate assessment of obstruction, and he testified that "...size of the prostate absolutely clearly does not have any relationship to obstruction period. I mean, that has been documented in studies and studies and studies". (T. 1630, lines 5-10, 1651)

36. Respondent Peress inappropriately relied on findings of bladder trabeculation and diverticuli to support a diagnosis of prostatic obstruction. (T. 995, 14a) Since diverticuli may also be caused by bladder dysfunction, finding of diverticuli or other bladder wall abnormalities is of limited use in diagnosing prostatic obstruction. (T. 53)

## INFORMED CONSENT

37. Both Respondents failed to adequately obtain informed consents. For a patient to have given informed consent, the patient must understand his condition, the procedure proposed, benefits and risks of the proposed procedure, and reasonable alternative forms of treatment. The obligation to explain to the patient all the necessary components of "informed consent" falls on the physician treating the patient. (T. 68) With respect to a TURP, the risks that should be explained to a patient include infection, post-operative urinary incontinence, impotence and developing scar tissue. (T. 68) If a patient has symptoms but is not experiencing complications, the reasonable alternatives that should be explained to a patient contemplating a TURP include watchful waiting with regular follow-up, medical management or procedures that are less invasive that a TURP. (T. 68)

38. Before the Leben Home patients were admitted to Parkway hospital, Respondents discussed the issue of obtaining informed consents from the patients. Respondent Josifidis testified that Respondents decided that Respondent Peress would "take care of consents essentially ...." (T. 1331) The majority of the written consents identify Respondent Peress as the physician who explained the procedure to the patient. (See for example, Pet. Exh. 1b, p. 5, paragraph 2).

39. In some instances, Respondent Peress had patients inappropriately execute written consents authorizing Respondent Josifidis to perform TURPs at Parkway Hospital. Such conduct was inappropriate because at the time the consent was executed by the patients Respondent Peress had only conducted a screening and lacked the pertinent information to adequately explain the patient's condition and would not have known if a TURP was indicated. (T. 212-214) Paul Svensson testified that Respondent Peress' conduct also violated Parkway Hospital procedure which requires that the written consent for a hospital surgical procedure be done 100 percent in the hospital by the operating surgeon and properly witnessed.

40. Respondent Peress' testimony that he explained to each Leben Home patient that the patient should not attempt a trial of medical management because the patient could not be trusted is not credible. The Leben Home patients were not necessarily adverse to taking oral medication on a daily basis, as evidenced by the office charts of the primary care physicians. (Pet. Exh. 1c, 2c, 3c, 4c, 5c, 7c, 8c, 9d, 11c, 12c, 13c, 14c, 15c, 16c, 18c, 19c, 21c, 22c, 23c and 24c)

41. Respondent Josifidis inappropriately delegated the responsibility of explaining the significant elements of informed consent to Respondent Peress. Respondent Josifidis admitted that he entirely left to Respondent Peress the issue of explaining that the patients were inappropriate candidates for medical management. (T. 1386) Since Respondent Josifidis was the treating physician, he would have been responsible for explaining reasonable alternative treatments to the patient. (T. 68)

14