**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------x
**CLEMENT BOWEN, et al.,**

                **Plaintiffs,**

    - against -

**JACOB RUBIN d/b/a LEBEN HOME FOR**
**ADULTS, LEBEN HOME FOR ADULTS,**
**AMERICARE INC., AMERICARE**
**CERTIFIED SPECIAL SERVICES INC.,**
**MARTIN KLEINMAN, DIANE AHEARN,**
**PARKWAY HOSPITAL, INC., JAMILLE**
**PERESS, and HARRY JOSIFIDIS,**
**aka HARRY JOSFIDIS,**

                **Defendants.**
-------------------------------------------------------x

**ORDER**

**01 CV 0070 (NG) (SMG)**

**GERSHON, United States District Judge:**

       Plaintiffs, a group of mentally disabled individuals and their estates, bring claims for

discrimination under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12181-

12189, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; civil rights conspiracy claims

under 42 U.S.C. § 1985(3) and § 1986; and state law claims under the New York Human Rights

Law, N.Y.S. Exec. Law §§ 290 *et seq.*, and common law.  On May 17, 2002, all of the defendants'

motions to dismiss the complaint were denied.  *See Bowen v. Rubin*, 2002 U.S. Dist. LEXIS 25283

(E.D.N.Y. 2002).  On July 29, 2004, I approved a settlement by defendants Jacob Rubin d/b/a Leben

Home for Adults, Leben Home for Adults, Parkway Hospital, Inc., Jamille Peress, and Harry

Josefidis, and third-party defendant National Union Fire Insurance Company.  The remaining,

nonsettling defendants are Americare, Inc. ("Americare") and Americare Certified Special Services,

Inc. ("ACSS") (collectively, the "Americare Defendants"), which contracted to perform home health

care and nursing services at the Leben Home; Martin Kleinman, president and sole shareholder of

Americare and ACSS; and Diane Ahern, a former employee of ACSS.  The Americare Defendants and Martin Kleinman now move for summary judgment on all of plaintiffs' claims.

## BACKGROUND

Unless otherwise indicated, the following facts are undisputed.

Plaintiffs are mentally disabled individuals who resided at the Leben Home Adult Care Center in December 1997 and January 1998.[1]  While they resided there, each plaintiff received prostate surgery, which was performed by Dr. Peress at Parkway Hospital after an initial consultation at the Leben Home.  It is undisputed that these surgeries, described by defendants at oral argument as "heinous acts," were not medically necessary and that they were performed without plaintiffs' informed consent.  Plaintiffs further contend that they were targeted to receive these unnecessary surgeries because of their mental disability.

In January 1996, the Americare Defendants entered into an agreement with Jacob Rubin, the owner and operator of the Leben Home, to provide nursing and home health care services to Leben Home residents.  Americare provided home health aide services, such as assistance with bathing, dressing, and other activities of daily life, and ACSS provided nursing care services.  Defendant Kleinman negotiated the agreement with Rubin.  The Americare Defendants were reimbursed for the cost of the services they provided to the Leben Home residents by Medicare and Medicaid directly.

Under the terms of the agreement between the Americare Defendants and the Leben Home,

_____

[1] Since the commencement of this lawsuit several plaintiffs have died.  In each case, the administrator of the deceased plaintiff's estate is continuing to prosecute the law suit.

2

as of October 1997, the Americare Defendants paid Leben Home rent of $2,237.50 per month for 895 square feet of office space inside the Leben Home out of which Americare's activities in the Home were operated. Beginning in October 1997, the Americare Defendants paid an additional management services fee of $984.41 per month for utilities, supplies, maintenance of the leased space, and administrative support, including answering phones, photocopying, faxing, and file maintenance. When asked about the management services agreement between Leben Home and Americare at his deposition, Jacob Rubin asserted his Fifth Amendment privilege against self-incrimination.

The parties characterize these payments in very different ways. Noting that several doctors also paid for space rental at the Leben Home, but actually saw patients in Americare's offices, plaintiffs contend that doctors, as well as the Americare Defendants, effectively paid for access to the Leben Home residents, whom they could provide with services that were charged to Medicare and Medicaid. Defendants cite an appraisal of the office space and argue they were paying fair market value for their leased office space inside Leben Home.

At the time plaintiffs underwent the prostate surgeries that are the subject of this litigation, Diane Ahearn was employed by ACSS in the Leben Home. Her exact job title and the nature of her duties is the subject of dispute among the parties. Ms. Ahearn testified that she was hired as an in-house coordinator to coordinate the activities of the health aides working in the Leben Home, even though ACSS was the corporation which provided nursing care services. She stated that her responsibilities included scheduling of home health aides, finding replacement workers when aides called in sick or were on vacation, acting as a liaison between the Leben Home and the home health aides, coordinating paperwork, and acting as a liaison between nurses and doctors administering care

to Leben Home residents.

Ms. Ahearn also testified that she had the title "medical director" while she worked at the Leben Home.  This title was listed on a board in the lobby of the Leben Home and was used by Ms. Ahearn when she signed Leben Home transfer forms, used when residents were transported to other facilities, including Parkway Hospital, where the unnecessary surgeries were performed.  Ms. Ahearn testified that she inherited the title from her predecessor at the Leben Home and that no responsibilities were associated with the title.

It is undisputed that Ms. Ahearn scheduled appointments with Dr. Peress for Leben Home residents, including the plaintiffs in this case.  Defendants maintain that this was not part of her job duties as in-house coordinator for ACSS.  Janice Spillane, who worked as an administrator at ACSS from December 1996 to August 1998, testified that Ms. Ahearn was responsible for supervising home health aides at the Leben Home but that it was not Ms. Ahearn's responsibility to set up appointments with doctors.

Eileen Hendrickson, a nurse at the Leben Home, testified that Ms. Ahearn coordinated the home health aides, assigning aides to patients and processing paperwork related to the aides.  Ms. Hendrickson also testified that Ms. Ahearn coordinated the medical doctors that came into the home to see the patients, so that a patient's nurse would not see the patient on the same day as a doctor, in conformance with the regulatory guidelines, which provide that a patient may not receive two "skilled visits" on the same day.  Ms. Hendrickson testified that her supervisor at Americare told her that Ms. Ahearn was responsible for coordinating the doctors' visits.

Another Americare nurse who worked at the Leben Home, Vearletha Davis, testified that Ms. Ahearn was responsible for assigning home health aides to Americare clients.  Anything that had

4

to be addressed to the home health aides had to go through Ms. Ahearn.  Ms. Davis also testified that Ms. Ahearn would call the patients to see doctors when they visited the home, and the doctors saw patients in Ms. Ahearn's office.  Ms. Davis understood that Ms. Ahearn had "dual bosses," because she answered to both Jacob Rubin and Americare.  Guylene Charles, also an Americare nurse at the Leben Home, testified that Ms. Ahearn was introduced to her as the "medical liason," and that Ms. Ahearn was responsible for scheduling patients for doctors' visits.  Ms. Charles also testified that doctors saw patients in Ms. Ahearn's office.

Ms. Ahearn's immediate supervisor was Josephine Stark, Americare's Leben Home Supervisor.  Ms. Stark was not at Leben Home every day.  Ms. Ahearn had no day-to-day supervisor at the Leben Home.

Mr. Kleinman was aware that the Americare nursing supervisor was not at the Leben Home on a daily basis.  Mr. Kleinman visited the Leben Home on at least two occasions.  Ms. Ahearn testified that she met him on a couple of occasions when he visited the Leben Home.  She stated, "I could remember him walking around, with Mr. Rubin and Mr. Rubin saying -- did you say hello to your boss and of course my answer always is which boss, and he says, 'this is Mr. Kleinman, remember Mr. Kleinman?'" Ms. Ahearn explained that, when she said "which boss," she meant that she worked both for the doctors and for Americare, and both were her bosses.

At the same time she was working for ACSS, Ms. Ahearn accepted payments from several doctors.  These payments were in return for her services in scheduling Leben Home residents for doctors' appointments and making ambulette arrangements for the residents to go to their appointments.  Ms. Ahearn accepted payments from Dr. Peress, and arranged for patients to receive urologic consultations from him.  Dr. Peress performed the prostate surgeries on plaintiffs at

Parkway Hospital over a four week period from December 30, 1997 to January 29, 1998.

Ms. Ahearn was involved in obtaining plaintiffs' signatures on consent forms for the prostate surgeries. Dr. Peress saw patients at the Leben Home for an initial consultation in Ms. Ahearn's office, at which time the consent forms were signed. Ms. Ahearn testified that the signatures were obtained at the Home, "where things were nice and quiet, so when they went to the hospital or if they needed to go to the hospital, the paperwork would be done." After Dr. Peress met with patients at the Leben Home, Ms. Ahearn would have them sign the consent forms. At the time the patients signed the consent forms at the Leben Home, the area indicating the procedure the signer was consenting to was left blank, to be filled in later if necessary. This procedure was utilized after instances with another doctor where patients became confused and nervous at the hospital because they did not know why they were there, a situation Ms. Ahearn described as a "disaster." According to Ms. Ahearn, two patients who could not remember why they were at the hospital got so scared that they ran away. Ms. Ahearn testified that Gary Eisendorf, of Parkway Hospital, notified her that they had decided to have the consent forms signed at the Leben Home so that things would "run smoother" for the residents. Ms. Ahearn testified that she did not discuss this with anyone at the Leben Home or Americare. Defendants maintain that Ms. Ahearn's participation in this process was not within the scope of her duties as an Americare employee.

Americare nurses were aware that Americare patients were being sent out for surgeries. Nurse Charles testified that she noticed that some patients who received surgery did not have a problem with incontinence prior to surgery. She became aware of the surgeries when patients came back from the hospital with a catheter and a bag, and the nurses received orders from the doctor to change the bag. She testified that everyone in the nurses' office was discussing the fact that a lot

6

of patients were going out for surgery "all of a sudden."  Ms. Charles did not discuss her concerns

with Americare management.

Maxine Welsh, an Adult Home Supervisor for ACSS, testified that she had discussions with

the nurses at Leben Home about the number of patients going out for prostrate surgery.  She testified

that she never discussed this with anyone other than the nurses, because ACSS was not involved in

determining patients' medical needs.  There is a dispute over whether Ms. Welsh could have had

prior knowledge of the surgeries.  The record indicates that she began her employment with ACSS

on January 12, 1998.  Ms. Welsh testified that she received training for approximately ten days to

two weeks before going into the Leben Home.  However, she also testified that she was aware that

some patients were being sent out prior to the surgeries.

Ms. Ahearn is no longer employed by ACSS.  She was not terminated as a result of her

conduct with respect to the surgeries performed on Leben Home residents; rather, Ms. Ahearn was

terminated on November 18, 2003 after she failed to return to work following a period of disability

leave.

## DISCUSSION

### Standard of Review

Summary judgment is appropriate where "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter

of law.  Fed. R. Civ. Proc. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 91 L. Ed. 2d 265,

106 S. Ct. 2548 (1986); *Lipton v. Nature Co.,* 71 F.3d 464, 469 (2d Cir. 1995).  A genuine issue of

material fact exists where "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).  "There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Id.* at 249-50 (citation omitted).

### Section 1985(3) Claim

Section 1985(3) provides an action for damages to those injured by conspiracies formed "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws."  42 U.S.C. § 1985(3); *See Bowen*, 2002 U.S. Dist. LEXIS 25283 at *5-9.  Defendants argue that plaintiffs have failed to adduce sufficient admissible evidence of their participation in the conspiracy to defeat summary judgment.

The Americare Defendants argue, and plaintiffs do not dispute, that they may not be held liable for conspiracy under Section 1985(3) solely on a theory of *respondeat superior* liability. Instead, plaintiffs, borrowing the standard applicable to municipal corporations from *Monell v. Departmen of Social Services of the City of New York*, 436 U.S. 658 (1978), seek to show that defendants are liable by virtue of an official policy or custom of the corporation.  *Monell's* bar against vicarious liability under Section 1983 has been extended to private corporations.  *See Rojas v. Alexander's Department Stores, Inc.*, 924 F.2d 406, 408-09 (2d Cir. 1990) (noting that "[a]lthough *Monell* dealt with municipal employers, its rationale has been extended to private businesses"); *Mejia v. City of New York*, 228 F.Supp.2d 234, 243 (E.D.N.Y. 2002) ("[N]either a municipality nor

a private corporation can be held vicariously liable under § 1983 for the actions of its employees.").
*Monell's* prohibition against vicarious liability in the context of Section 1983 claims also has been
extended to claims brought against municipal corporations under Section 1985.  *See Owens v. Haas*,
601 F.2d 1242, 1247 (2d Cir. 1979); *Estes-El v. New York State Dep't of Motor Vehicles Office of
Admin.*, 1997 U.S. Dist. LEXIS 8779, *15 (S.D.N.Y. 1997) ("As with section 1983, a section 1985
claim may not be based solely on the doctrine of *respondeat superior*."). Although defendants argue
that *Monell's* "official policy or custom" standard of liability has never been extended to private
businesses in a Section 1985(3) claim, they offer no persuasive reason why this standard should not
apply to private employers as well.  In *Rojas*, the court stated that private employers are not liable
under Section 1983 for the constitutional torts of their employees "*unless* the plaintiff proves that
'action pursuant to official … *policy* of some nature caused a constitutional tort.'" *Rojas*, 924 F.2d
at 408 (first emphasis added).  Thus, if plaintiffs can demonstrate that the Americare Defendants
conspired to deprive them of their rights by virtue of an official policy or custom of the corporation,
this would be sufficient to state a claim under Section 1985(3).[2]

_____

[2] Most courts which have extended *Monell's* bar against *respondeat superior* liability to
private entities have done so with little analysis.  As noted by the court in *Taylor v. Plousis*, 101
F.Supp.2d 255, 264 n.4 (D.N.J. 2000), "there remains a lingering doubt whether the public
policy considerations underlying the Supreme Court's decision in *Monell* should apply" to shield
private corporations from vicarious liability in Section 1983 cases.

Furthermore, even if applying *Monell* to private entities is warranted with respect to
Section 1983 claims, which require action under color of state law, it is unclear that the same
holds true for claims brought under Section 1985(3), which encompasses wholly *private*
conspiracies to engage in invidiously discriminatory conduct, *Griffin v. Breckenridge*, 403 U.S.
88 (1971).

However, since both plaintiffs and defendants argue within the framework of the *Monell*
"official policy or custom" standard, and since, as shown below, there are genuine issues of
material fact with respect to whether defendants had a policy or custom that subjects them to
liability under the *Monell* standard, I decline to reach this issue.

9

Using the *Monell* standard, the liability of a municipal corporation, or, in this case, a private corporation, may be established in a number of ways.  First, where the action of the employee in question is taken by, or is attributable to, one of the entity's authorized policymakers, the action will be considered the act of the entity itself.  *See Amnesty America v. Town of West Harford*, 361 F.3d 113, 126 (2d Cir. 2004).  When a subordinate employee is alleged to have committed the violation, the entity's liability will turn on plaintiffs' ability to attribute the subordinate's conduct to the actions or omissions of higher ranking officials with policymaking authority.  *Id.*

Next, a policymaking official can be implicated through subordinates' conduct by a showing of deliberate indifference to the deprivations caused by the subordinates.  Such deliberate indifference, which serves effectively to ratify the subordinates' actions, may be established by demonstrating a failure to train, where "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [entity] can reasonably be said to have been deliberately indifferent to such need," *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989), or by a failure to supervise, where the need for supervision was obvious, and "the policymaker's failure to investigate or rectify the situation evidences deliberate indifference, rather than mere negligence or bureaucratic inaction." *Amnesty America*, 361 F.3d at 128.

Finally, plaintiffs could show that the alleged discriminatory practice was so "persistent or widespread" as to constitute an official policy or custom of the corporation or that a discriminatory practice of subordinate employees was so manifest as to imply the constructive acquiescence of senior policymaking officials.  *See Patterson v. County of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004) (quoting *Sorlucco v. New York City Police Department*, 971 F.2d 864, 870-71 (2d Cir. 1992)).

10

Here, plaintiffs have made a sufficient showing that the Americare Defendants had an official policy or custom that would subject them to liability under Section 1985(3). There are factual issues as to whether Ms. Ahearn acted as policymaker for the Americare Defendants. Although the scope of Ms. Ahearn's authority within the corporation is disputed, there is evidence in the record that her duties for Americare/ACSS included coordinating patients' doctors' visits and the provision of services to Americare/ACSS patients. Ms. Ahearn was held out as the "Medical Director" of the Leben Home, and there is evidence in the record from which it can be inferred that defendant Kleinman, who visited the Home, was aware of this. Additionally, there is evidence in the record that Ahearn acted in a supervisory role at the Leben Home.

Furthermore, Ms. Ahearn engaged in her activities in the Leben Home with little training and no direct day-to-day supervision. The record, viewed in the light most favorable to the plaintiffs, indicates that the Americare Defendants had no formal system in place to supervise Ms. Ahearn's provision of services to Americare clients, a population of mentally disabled individuals who relied on the Americare Defendants for the provision of basic services. *Cf. Doe v. Estes*, 926 F.Supp. 979, 987-88 (D. Nev. 1996) (deliberate indifference to the rights of school children, who were particularly vulnerable to sexual abuse). When nurses complained about the inappropriate use of home health aides, Ms. Ahearn was reprimanded. However, Ms. Ahearn responded by stating she would have to speak with Mr. Rubin, rather than anyone at Americare or ACSS. Furthermore, no system was in place to ensure that further improprieties did not occur. Although ACSS did hire Ms. Spillane as an administrator to review the patient roles and ensure compliance with Medicare and Medicaid guidelines, Ms. Spillane was not responsible for supervising Ms. Ahearn.

Additionally, there is evidence in the record that the provision of services by the two

corporations, Americare and ACSS, was structured in such a way that the only link between them was Ms. Ahearn, who was also the only person in close contact with the doctors. As noted above, there is a factual dispute as to whether Ms. Ahearn's contact with the doctors was undertaken as part of her ACSS duties. There can be no dispute, however, that Ms. Ahearn was situated in the Leben Home and had access to plaintiffs and other Americare clients by virtue of her position at ACSS. It can be inferred from the record that Americare and ACSS management was aware of Ms. Ahearn's independence in dealing with operations at the Leben Home, as she had no day-to-day supervision. Thus, there are open issues of fact as to whether the Americare Defendant's failure to supervise Ms. Ahearn constitutes deliberate indifference that would subject the corporation to liability for conspiracy under Section 1985(3).

Finally, plaintiffs have raised an issue of fact as to what knowledge may be attributed to the Americare Defendants. Several employees testified that they noticed and discussed the large number of patients going out for prostrate surgery, some of whom had no prior problems with incontinence. Additionally, Americare employees heard Ms. Ahearn summoning patients to doctors appointments over the loud speaker at Leben Home and knew that Dr. Peress saw patients in Ms. Ahearn's office.

As to defendant Kleinman, plaintiffs argue that he directly participated in the Section 1985(3) conspiracy. Mr. Kleinman is the President, CEO and sole shareholder of the Americare Defendants. There are no boards of directors of the corporate defendants, nor have defendants identified any supervisors at the Home, other than Mr. Kleinman, who could have been responsible for the alleged lack of supervision and training of Ms. Ahearn. Thus, Mr. Kleinman possessed final policymaking authority with respect to corporate operations. He negotiated Americare's

12

management services agreement with the Leben Home and visited the Home on a number of occasions.  Americare managers testified as to Mr. Kleinman's general knowledge of the company's operations at the Leben Home, although Mr. Kleinman testified that he was not aware of the day-to-day operation of the Home.  On this record, there is a factual issue as to Mr. Kleinman's liability.

**Section 1986 Claim**

Section 1986 provides an action for damages against those who, having knowledge of the existence of a conspiracy under Section 1985 and power to prevent it, fail to do so.  Pursuant to the statute, "no action under the provisions of this section shall be sustained which is not commenced within one year after the cause of action has accrued."  42 U.S.C. § 1986.  Defendants argue that plaintiffs' claim under Section 1986 must be dismissed as time-barred.  The motion for summary judgment is denied because there are factual issues as to whether the statute of limitations should be tolled.

The last prostate surgery at issue in this litigation occurred on or about January 31, 1998.  However, plaintiffs' counsel first learned of the surgeries in approximately October 2000.  When plaintiffs' counsel interviewed plaintiffs in preparation for commencing this law suit in November and December 2000, plaintiffs were unaware that their surgeries were unnecessary.  Plaintiffs all suffer from mental disabilities.  This action was filed on January 8, 2001, approximately three months after plaintiffs' counsel learned that plaintiffs had been subjected to the unnecessary surgeries.

The statute by its terms makes no provision for tolling of its limitations period.  The Second Circuit has not addressed whether federal equitable tolling doctrine applies to claims under Section

13

1986.  *See Paige v. Police Dep't of the City of Schenectady*, 264 F.3d 197 (2d Cir. 2001).  Generally, federal equitable tolling doctrines apply so long as tolling is not inconsistent with the legislative purpose.  *See Ellis v. City of San Diego*, 176 F.3d 1183, 1189 n.3 (9th Cir. 1999).  Issues of fact as to whether there was fraudulent concealment sufficient to invoke federal equitable tolling doctrine should be determined by the jury.  *See Robertson v. Seidman & Seidman*, 609 F.2d 583, 593 (2d Cir. 1979).

## ADA & Rehabilitation Act Claims

### a. Liability

Under Title III of the ADA, "no individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."  42 U.S.C. § 12182(a).  Similarly, under Section 504 of the Rehabilitation Act, "no otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).

The standards for claims under the ADA and under Section 504 of the Rehabilitation Act are essentially the same.  *See Henrietta D. v. Bloomberg*, 331 F.3d 261, 273 (2d Cir. 2003), *cert. denied*, 541 U.S. 936 (2004).  To establish violations of the ADA and Section 504, plaintiffs must demonstrate that (1) they are qualified individuals with a disability; (2) that the defendants are

14

subject to the ADA and the Rehabilitation Act;[3] and (3) that plaintiffs were denied the opportunity to participate in or benefit from defendants' services, programs or activities, or were otherwise discriminated against by defendants, by reason of their disabilities. *See Doe v. Pfrommer*, 148 F.3d 73, 82 (2d Cir. 1998).

Plaintiffs seek to hold the Americare Defendants liable for Ahearn's actions in facilitating their surgeries under both the ADA and the Rehabilitation Act on a theory of vicarious liability. Plaintiffs also argue that the Americare Defendants are directly liable under these statutes for actions taken by defendant Kleinman.

General common law agency principles apply to the ADA. *See EEOC v. Wal-Mart Stores*, Inc., 187 F.3d 1241, 1247 (10th Cir. 1999); *Palmer v. City of Yonkers*, 22 F.Supp.2d 283, 287 (S.D.N.Y. 1998). The Second Circuit has not yet determined whether private entities may be subject to vicarious liability under the Rehabilitation Act for actions taken by their employees. *See Henrietta D.*, 331 F.3d at 284 n.14 (declining to address the issue). However, other courts have applied vicarious liability principles to claims under Section 504 of the Rehabilitation Act. *See Rosen v. Montgomery County, Md.*, 121 F.3d 154, 157 n.3 (4th Cir. 1997); *Duvall v. County of Kitsap*, 260 F.3d 1124, 1141 (9th Cir. 2001). Under a vicarious liability theory, the Americare defendants could be held liable for Ahearn's actions if such actions were within the scope of her employment and were (1) the kinds of acts she was supposed to perform; (2) occurred substantially within authorized time and space limits; and (3) were actuated, at least in part, by a purpose to serve

---

[3] In order to prevail on a claim under the Rehabilitation Act, plaintiffs must also show that the defendants received federal financial assistance. *See Doe v. Pfrommer*, 148 F.3d at 82. There is no dispute that Americare and ACSS received federal funds under Medicare and Medicaid.

the master.

Viewing the record as a whole, a reasonable fact finder could conclude that the coordination and scheduling of patient services was within the scope of Ms. Ahearn's duties as an ACSS employee, and that this included the scheduling of doctors' visits.  It is precisely this job function that plaintiffs maintain was abused by Ms. Ahearn in the scheme to subject them to unnecessary prostate surgery.  There are also issues of fact as to whether Ms. Ahearn's conduct occurred substantially within authorized time and space limits, and whether the conduct was actuated, at least in part, by a purpose to serve the master, since the result of the surgeries was that plaintiffs required additional services from the Americare Defendants. Thus, applying the principles of vicarious liability, the plaintiffs have demonstrated a genuine issue of material fact as to whether the Americare defendants may be held liable under the ADA and the Rehabilitation Act.

As to defendant Kleinman, plaintiffs argue he may be held liable as the owner and operator of the Americare Defendants.  The ADA provides for liability for any person or private entity "who owns, leases (or leases to), or operates a place of public accommodation."  42 U.S.C. § 12182(a); *see* 28 C.F.R. § 36.201(a); 28 C.F.R. § 36.104, subpart A.  In determining whether an individual is a proper defendant under the ADA, the inquiry must focus on the issue of control, *i.e.*, whether the named defendant "operates" a place of public accommodation within the meaning of the ADA.  *See Coddington v. Adelphi University*, 45 F.Supp.2d 211, 215 (E.D.N.Y. 1999).  "The term 'operate' has been interpreted as being in a position of authority and having the power and discretion to perform potentially discriminatory acts."  *Id.*

There is no dispute that Kleinman is the sole shareholder and president of the Americare Defendants.  As such, he is subject to liability as the owner of a place of accommodation.

Furthermore, his position as president of the corporations, for which there were no boards of directors, indicates that he is an individual in a position of authority and with power and discretion to operate the facility and to make decisions regarding the training and supervision of the corporations' employees.

The *Tomka* line of cases, cited by Mr. Kleinman, is not to the contrary.  In *Tomka v. Seiler Corp.*, 66 F.3d 1295 (2d Cir. 1995), the Second Circuit held that individual employees cannot be held personally liable as "employers" under Title VII of the Civil Rights Act.  This holding has been extended to claims of disability-based employment discrimination brought under Title I of the ADA. *See, e.g.*, *Meling v. St. Francis College*, 1997 U.S. Dist. LEXIS 23693 (E.D.N.Y. 1997); *Lane v. Maryhaven Center of Hope*, 944 F.Supp. 158 (E.D.N.Y. 1996); *Romand v. Zimmerman*, 881 F.Supp. 806 (N.D.N.Y. 1995).  Two additional cases cited by Kleinman, which hold that public officials may not be sued individually in their private or official capacities under Title II of the ADA, which prohibits discrimination in accommodation by public entities, rest on different grounds.  Both noted that there is no need for "official capacity" suits against individuals because the governmental entity at issue may be sued directly, since the Second Circuit had decided that Congress abrogated state immunity under the ADA and the Rehabilitation Act.  *See Candelaria v. Cunningham*, 2000 U.S. Dist. LEXIS 8669, *6-9 (S.D.N.Y June 20, 2000); *Hallett v. N.Y. State Dep't of Correctional Services*, 109 F.Supp.2d 190 (S.D.N.Y. 2000).  Although the court in *Coddington* extended the *Tomka* rationale to a discrimination case brought under Title III of the ADA against a university and its president, former president, and dean, this court in not bound by that holding, which, in any event, recognized that "an individual defendant may be characterized as the owner or operator of a public accommodation under the ADA."  *Coddington*, 45 F.Supp.2d at 216.

17

B. Relief

Injunctive relief is the only remedy available to private litigants under Title III of the ADA. *See* 42 U.S.C. § 12188(a)(1); *Disabled in Action of Metropolitan New York v. Trump Int'l Hotel and Tower*, 2003 U.S. Dist. LEXIS 5145, *17 (S.D.N.Y. 2003). In deciding whether to award injunctive relief, courts are free to assume that past misconduct is highly suggestive of the likelihood of future violations. *Henrietta D.*, 331 F.3d at 290 (quoting *United States v. Carson*, 52 F.3d 1173, 1183-84 (2d Cir. 1995)).

The Americare Defendants argue that those plaintiffs who continue to reside in the care facility formerly called the Leben Home[4] have failed to show a reasonable expectation that they will be subject to future discrimination on the basis of their mental disability. As plaintiffs note, however, the record contains no indication that the companies have taken steps to safeguard against future abuses of patients with mental disabilities. Although Ms. Ahearn is no longer employed by ACSS, the record indicates that her termination was not as a result of her conduct with respect to the surgeries, but rather, occurred only after she failed to report back to work following a period of disability leave in November 2003, approximately six years after the surgeries at issue in this case took place. Therefore, plaintiffs have shown a genuine issue of material fact with respect to injunctive relief.

**State Law Claims**

Defendants also move for summary judgment on plaintiffs' claim brought under the New

---

[4] Plaintiffs Bowen, Fazio, Ford, Grant, Johnson, Leabough, and Ziegberman are the only plaintiffs who continue to reside in the Queens Adult Care Facility, which was formerly the Leben Home.

York Human Rights Law, N.Y. Executive Law § 290 et. seq., and on plaintiffs' state common law claims for negligent supervision of Ms. Ahearn, fraud, and breach of fiduciary duty.

For the same reasons that summary judgment is denied as to plaintiffs' claim of disability discrimination under the ADA, summary judgment is also denied as to plaintiffs' claim under the New York Human Rights Law. *See Bonitch v. Original Honey Baked Ham Co.*, 34 F.Supp.2d 154, 160 (noting that the New York Human Rights Law substantially resembles the ADA and that there is no difference between the quantum or elements of proof required by the ADA and the New York Human Rights Law).

Plaintiffs have also raised genuine issues of material fact with respect their common law claims. In order to recover on a claim of negligent hiring, supervision, or retention, plaintiffs must show that the employer was on notice of the relevant tortious propensities of the wrongdoing employee. *Gomez v. City of New York*, 758 N.Y.S.2d 298, 299 (1st Dep't 2003). As noted above, the record indicates that the Americare Defendants had no formal system in place to supervise Ms. Ahearn's provision of services, and plaintiffs have raised genuine issues of material fact as to defendants' knowledge of Ms. Ahearn's activities in the Leben Home.

As to fraud, plaintiffs have raised factual issues as to whether Ms. Ahearn's conduct in obtaining their signatures on the consent forms constitutes fraud. As noted above, they have also raised an issue as to whether, when she engaged in this conduct, it was within the scope of her employment. Summary judgment on plaintiffs' fraud claim is therefore denied. *See Helbig v. City of New York*, 622 N.Y.S.2d 316, 318 (2d Dep't 1995) ("When an employee commits an intentional tort, his intentional conduct may be said to have been within the scope of his employment when his employer could have reasonably anticipated the conduct. … [T]he employer need not have foreseen

19

the precise act or the exact manner of the injury as long as the general type of conduct may have been reasonably expected.") (citation omitted).

Finally, as to plaintiffs' claim that defendants breached a fiduciary duty, there are genuine factual issues as to whether defendants, who assumed responsibility for providing care to a vulnerable population, owed plaintiffs a fiduciary duty, and whether Ms. Ahearn's conduct in obtaining signatures on the consent forms constitutes a breach of any such duty.

In sum, defendants' motion for summary judgment on plaintiffs' state law claims is denied.


**Trial Preference & Daubert Motion**

Plaintiffs have requested that the court designate this case for trial preference.  The parties are directed to file a pre-trial order by September 16, 2005 and to appear in court for a pre-trial conference on September 27, 2005 at 4:00 p.m.

Plaintiffs' motion regarding defendants' expert, Dr. Melman, was resolved on oral argument. If the parties have any remaining disputes as to expert testimony, they should set them forth in the pre-trial order.

**CONCLUSION**

For the reasons stated above, defendants' motion for summary judgment is denied in its entirety.  The parties are directed to submit a pre-trial order by September 16, 2005 and to appear in court for a pre-trial conference on September 27, 2005 at 4:00 p.m.

**SO ORDERED.**

*/s/ Nina Gershon*
**NINA GERSHON**
**United States District Judge**

**Dated: Brooklyn, New York**
        **July 29, 2005**